QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Daniel L. Brockett (Bar No. 237551)
   danbrockett@quinnemanuel.com
   Marc L. Greenwald (Bar No. 176072)
   marcgreenwald@quinnemanuel.com
   David D. Burnett (*pro hac vice*)
   daveburnett@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York   10010
Telephone:   (212) 849-7000
Facsimile:   (212) 849-7100

   Jeremy D. Andersen (Bar No. 227287)
   jeremyandersen@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

*Attorneys for Allstate Insurance Company, et al.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE LIFE INSURANCE COMPANY; ALLSTATE LIFE INSURANCE COMPANY OF NEW YORK A.K.A. ALLSTATE LIFE OF NEW YORK; AND AMERICAN HERITAGE LIFE INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> vs. <br><br> COUNTRYWIDE FINANCIAL CORP.; COUNTRYWIDE HOME LOANS, INC.; COUNTRYWIDE CAPITAL MARKETS, LLC; COUNTRYWIDE SECURITIES CORP.; CWALT, INC.; CWABS, INC.; CWHEQ, INC.; CWMBS, INC.; BANK OF AMERICA CORP.; BAC HOME LOANS SERVICING, LP; NB HOLDINGS CORP.; ANGELO MOZILO; DAVID SAMBOL; ERIC SIERACKI; RANJIT KRIPALANI; STANFORD KURLAND; DAVID A. SPECTOR; N. JOSHUA ADLER; AND JENNIFER SANDEFUR, <br><br> Defendants. | CASE NO. 2:11-CV-05236 MRP (MANx) <br><br><br> **AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

1

# **TABLE OF CONTENTS**

2

**Page**

3

NATURE OF ACTION ............................................................................... 1

4

PARTIES ................................................................................................... 5

5

JURISDICTION AND VENUE ................................................................ 12

6

SUBSTANTIVE ALLEGATIONS .......................................................... 13

7

I.     ALLSTATE'S INVESTMENTS IN COUNTRYWIDE
       CERTIFICATES ................................................................................ 13

8

9

II.    COUNTRYWIDE'S MANDATE TO MATCH ANY PRODUCT ON
     THE MARKET REQUIRED IT TO SYSTEMATICALLY IGNORE

10

     ITS STATED UNDERWRITING PROCEDURES ........................... 15

11

     A.    Countrywide Makes Origination Volume King.................... 15

12

     B.    Countrywide Cedes its Underwriting Policy to the Market's
          Lowest Common Denominator By Way of a "Matching"

13

          Mandate .................................................................................. 17

14

     C.    The "Matching" Policy Demanded the Systemic Abandonment
          of Countrywide's Own Policies ............................................ 18

15

     D.    Securitization Allowed Countrywide to Transfer the Risks
          Created by Its Underwriting Abandonment to Investors Like

16

          Allstate .................................................................................. 20

17

III.   COUNTRYWIDE'S MATERIAL MISREPRESENTATIONS ................... 23

18

     A.    General Underwriting Guidelines ......................................... 23

19

     B.    Owner-Occupancy Statistics ................................................ 24

20

     C.    Loan-to-Value Ratios and Appraisals ................................... 25

21

     D.    Debt-to-Income ...................................................................... 26

22

     E.    No Adverse Interest in Selection .......................................... 26

23

     F.    Ratings................................................................................... 27

24

     G.    Share of Mortgage Loans Granted Pursuant to Full-
          Documentation Procedures ................................................... 28

25

     H.    Servicing Quality ................................................................. 28

26

     I.     Case-by-Case Underwriting Exceptions ............................... 29

27

28

IV.  ALL OF THE REPRESENTATIONS WERE UNTRUE AND
     MISLEADING BECAUSE COUNTRYWIDE SYSTEMATICALLY
     IGNORED ITS OWN UNDERWRITING GUIDELINES ........................... 29

     A.  A Statistical Analysis of Allstate's Certificates Shows That the
         Representations Were False ................................................................ 33

         (1)  The securities' high default rates and souring credit ratings ...... 33

         (2)  There are numerous indications that borrowers did not
              actually occupy the mortgaged properties as claimed ............... 35

         (3)  Re-calculating the loan-to-value ratios .................................... 38

         (4)  Statistical studies by others have similarly revealed that
              the problems in Countrywide-originated loans were tied to
              underwriting abandonment ......................................................... 41

         (5)  Other parties' reviews of Countrywide's full loan files
              have revealed even greater deviations ...................................... 43

     B.  Countrywide's Own Internal Documents Demonstrate It
         Abandoned Its "Theoretical" Underwriting Standards ........................ 46

         (1)  Countrywide's internal post-mortem shows it
              systematically ignored the risks created by its "matching"
              strategy ...................................................................................... 46

         (2)  Mozilo's emails show he "personally observed a serious
              lack of compliance" .................................................................... 48

         (3)  Internal quality reviews highlight that loans were being
              issued outside of Countrywide's underwriting guidelines ......... 49

         (4)  Exceptions were used as a way to deploy the "matching"
              strategy, despite Countrywide's "theoretical" underwriting
              guidelines .................................................................................... 53

         (5)  Countrywide admits to "cherry picking" deals ......................... 56

         (6)  In short, Countrywide "basically continued to operate as
              though they never received" risk policies. ................................. 56

     C.  The Sworn Testimony of Countrywide's Own Former Officers
         Demonstrate That It Abandoned Its "Theoretical" Underwriting
         Standards ........................................................................................... 57

         (1)  Chief Risk Officer John McMurray:  "Matching policy"
              resulted in "routinely" using loan "exceptions" ........................ 58

         (2)  Vice President of Credit Risk Management Christian
              Ingerslev:  "Focus groups" confirmed borrowers were
              misrepresenting income ............................................................. 60

(3)   Managing Director Frank Aguilera:  "Matching" strategy
was "not a tolerable process" for subprime products ................ 61

(4)   CEO Angelo Mozilo:  Matching strategy was a
"dangerous game" ........................................................................ 62

(5)   Depositor President Nathan Adler:  "Salability" was the
sole factor for giving "exceptions" ............................................ 62

D.   Other Statements Provided By Countrywide Employees and
Customers Further Confirm Countrywide's Abandonment of its
Underwriting Standards ........................................................................ 63

(1)   Former employees:  Borrowers were coached on how to
use no-doc loans to circumvent prior loan rejections ................ 63

(2)   Former employee:  Countrywide knew appraisals were
being inflated .............................................................................. 65

(3)   Borrowers:  Countrywide falsified our records ...................... 66

(4)   Former employees:  Countrywide steered borrowers to
riskier (higher fee) products and heavily incentivized
employees to do so ...................................................................... 67

E.   Other Evidence That the Representations Were False ........................ 68

(1)   Appraisal company:  Countrywide pressured companies
to obtain inflated home values .................................................... 68

(2)   The ratings were a garbage-in, garbage out process further
hindered by conflicts of interest and outdated models .............. 72

(3)   Government investigations and other lawsuits .......................... 75

(4)   Studies of the percent of loans approved on a fully-
documented basis ........................................................................ 78

(5)   Servicing failures ...................................................................... 78

V.   COUNTRYWIDE KNEW ITS REPRESENTATIONS WERE FALSE ....... 82

VI.   ALLSTATE'S DETRIMENTAL RELIANCE AND DAMAGES ................ 90

VII.   OTHER MATTERS ........................................................................................ 92

A.   Defendants' Liability as Control Persons ............................................ 92

B.   Bank of America's Liability as a Successor-in-Interest .................... 104

(1)   The Bank of America-Countrywide Consolidation Plan ......... 107

(2)   The Integration of Countrywide's Operations into Bank of
America .................................................................................... 120

Case No. Case No. 2:11-CV-05236 MRP (MANx)
AMENDED COMPLAINT

(3)   Bank of America Assumed Countrywide's Liabilities............. 126

C.   The Bank of Amercia-Countrywide Asset and Share Transfers
were Fraudulent Conveyances ............................................................ 132

(1)   Bank of America's Fraudulent Intent ....................................... 133

(2)   Bank of America Did Not Pay Fair Consideration................... 134

(3)   Countrywide Rendered Insolvent or Unable to Pay
Contingent Creditors................................................................. 134

D.   Allstate's 1933 Act Claims Have Been Tolled By Previously-
Filed Class Action Complaints .......................................................... 135

THIRD CAUSE OF ACTION ................................................................................. 138

NINTH CAUSE OF ACTION ................................................................................ 139

TENTH CAUSE OF ACTION ................................................................................ 140

ELEVENTH CAUSE OF ACTION ....................................................................... 141

PRAYER FOR RELIEF .......................................................................................... 142

JURY TRIAL DEMANDED................................................................................... 143

Case No. Case No. 2:11-CV-05236 MRP (MANx)
AMENDED COMPLAINT

Plaintiffs Allstate Insurance Company, Allstate Life Insurance Company, Allstate Life Insurance Company of New York, and American Heritage Life Insurance Company (collectively "Allstate"), by and through their attorneys, bring this action against Countrywide Financial Corporation ("Countrywide Financial"), Countrywide Home Loans, Inc. ("Countrywide Home Loans"), Countrywide Capital Markets, LLC ("Countrywide Capital Markets") formerly known as Countrywide Capital Markets, Inc., Countrywide Securities Corporation ("Countrywide Securities"); and CWALT, Inc. ("CWALT"), CWABS, Inc. ("CWABS"), CWHEQ, Inc. ("CWHEQ"), and CWMBS, Inc. ("CWMBS") (the "Depositors") (all collectively, "Countrywide" or "the Countrywide Defendants"); Angelo Mozilo, David Sambol, Eric Sieracki, Ranjit Kripalani, Stanford Kurland, David A. Spector, N. Joshua Adler, and Jennifer Sandefur (the "Officer Defendants"); and Defendants Bank of America Corporation ("Bank of America"), BAC Home Loans Servicing, LP, and NB Holdings Corporation (together "the Bank of America Defendants"), and allege as follows:[1]

## NATURE OF ACTION

1. This action arises out of Countrywide's sale of certain residential mortgage-backed securities (the "Certificates") to Allstate. The Certificates were sold pursuant to registration statements and prospectuses that contained untrue statements and omissions of material facts, in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act"); Sections 10(b) and 20(a) of the

---

[1]   Allstate reserves its rights to appeal the Court's October 21, 2011 Order, but in light of that Order Allstate is not pursuing in this Amended Complaint claims against the Officer Defendants, Countrywide Capital Markets, Inc., or BAC Home Loans Servicing, LP.   For the sake of continuity, the only changes made to the text of this Amended Complaint are the addition of footnotes 1, 2, and 3, the removal of the dismissed counts, the addition of new successor liability allegations (in Section VII, and in the Ninth, Tenth, and Eleventh Causes of Action), and a clarified demand for relief requesting rescission even apart from the now-dismissed Section 12 claim.

1  Securities and Exchange Act of 1934 (the "1934 Act"); and common-law fraud and

2  negligent misrepresentation.

3      2.    Beginning in 2003, Countrywide began systematically to ignore the

4  underwriting standards it touted.   Countrywide was singularly focused on

5  increasing its market share, offloading the risk onto Allstate and other institutional

6  investors that purchased securities backed by pools of Countrywide's mortgages.

7  In pursuit of market share, unbeknownst to Allstate, Countrywide internally adopted

8  a "matching" strategy that would approve any mortgage product feature offered by a

9  competitor.   By mixing and matching the worst features of mortgage products from

10  different competitors, Countrywide's composite product offering became very

11  aggressive within the industry.

12      3.    This "matching" strategy could only be implemented through the

13  substantial and material abandonment of Countrywide's claimed credit-risk-

14  reducing underwriting procedures.   To get around these "theoretical" requirements,

15  Countrywide set up a system whereby any loan would be approved by way of

16  underwriting "exceptions," and coached borrowers on how to apply for loan

17  products that required little or no income or asset verification.   This systemic

18  abandonment of Countrywide's stated underwriting guidelines infected all of the

19  loans it securitized.   Whereas Allstate was made to believe it was buying highly-

20  rated, safe securities backed by pools of loans with specifically-represented risk

21  profiles, in fact the Defendants knew the loans offloaded onto Allstate were a toxic

22  mix of loans given to borrowers that could not afford the properties, and thus were

23  highly likely to default.

24      4.    Countrywide's material misrepresentations and omissions regarding the

25  riskiness and credit quality of the Certificates in which Allstate invested, made

26  through the registration statements, prospectuses and prospectus supplements, term

27  sheets, and other written materials (the "Offering Materials"),   are numerous.   For

28  example:

1              (i)      ***Underwriting guidelines***.   The Offering Materials consistently

2 represented that Countrywide followed a conservative, reliable, reasonable

3 underwriting process whose purpose was to evaluate a borrower's ability to repay

4 their loan.   Internal Countrywide materials recently made available by the SEC,

5 however, and other sources all confirm that Countrywide "ceded" its standards to

6 the lowest common denominator in the market.   Countrywide undermined whatever

7 "theoretical" remaining standards it even purported to follow internally by way of,

8 among other things, loan "exceptions," low-documentation loan procedures, and

9 simply ignoring the rejection of deals by its own credit officers.

10             (ii)     ***Owner Occupancy Statistics***.   The Offering Materials made

11 specific representations regarding the percentage of borrowers who would be

12 occupying the property being mortgaged – a key risk characteristic for Allstate

13 given that borrowers are less likely to walk away from the properties in which they

14 live, as compared to second homes or investment properties.   Analytical tools

15 recently made available confirm that in truth, a far greater percentage of the loans

16 underlying Allstate's Certificates were in fact given to borrowers who lived

17 elsewhere, such as investors or people purchasing vacation homes.

18            (iii)    ***Loan to Value Ratios and Independent Appraisals***.   The

19 Offering Materials represented that the loans had specific loan-to-value and

20 combined loan-to-value ratios.   This is another key risk metric, because these

21 statistics represent the equity "cushion" that borrowers have, and the likelihood of

22 repayment to lenders upon foreclosure.   Countrywide represented that these values

23 were calculated using independent appraisers, when in fact it knew they were

24 derived from affiliates and other appraisers who knowingly inflated property values

25 to qualify borrowers for larger loans than they could truly afford.   Analytical tools

26 recently made available confirm that the Offering Materials' statistics vastly

27 overstated the value of the collateral being included in the loan pools.

28

1    (iv)    ***Purpose and use of exceptions and low-documentation***
2    ***procedures***.   The Offering Materials represented that "exceptions" to
3    Countrywide's underwriting guidelines were given on the basis of countervailing
4    features of the borrowers' risk profiles that 'made up' for negative aspects of the
5    risk profile.   Internal documents and testimony given in the SEC action that have
6    recently been made available, however, confirm that "exceptions" were instead used
7    merely as a tool to circumvent the underwriting process and increase market share.
8    Similarly, though the Offering Materials represented that low-documentation loans
9    were sometimes used, they materially misstated the number of such loans that
10   underlie the Certificates.   Defendants also hid from Allstate that these alternative-
11   documentation procedures were being used as another way to circumvent the
12   underwriting guidelines.   Countrywide would shift borrowers that would otherwise
13   be rejected into such programs, and then help them falsify their applications in such
14   a way as to ensure the borrower received approval for a loan.

15       5.      Allstate purchased over $700 million in Countrywide mortgage-backed
16   securities (the "Certificates") between March 2005 and June 2007 in reliance on
17   these and the other misrepresentations and omissions, as set forth below.   The
18   details of the securities at issue in this action are set forth in Exhibit A.[2]   The
19   exhibits attached to this Complaint are all incorporated as if set forth fully herein.

20       6.      The systemic abandonment of Countrywide's stated underwriting
21   practices has predictably led to soaring default rates in the mortgage loans
22   underlying Allstate's Certificates (the "Mortgage Loans").   For instance, despite the
23   fact that the majority of Allstate's Certificates started out with AAA ratings – the
24   same rating given to treasury bills backed by the full faith and credit of the United
25   States government – 93% of them are now not even considered to be investment
26   grade.   These problems are so drastic and their onset was so rapid (in comparison to

27   _____
     [2]    All references to the Exhibits in this Amended Complaint refer to those
28   previously attached and filed with the initial Complaint.

1  the long-term security of the investments Allstate thought it was purchasing) that the
2  Certificates' poor performance to date is itself powerful evidence that the Mortgage
3  Loans were not underwritten according to the procedures represented to Allstate.
4  With the underlying loans performing so poorly, the market value of Allstate's
5  Certificates has plummeted, causing Allstate to incur significant losses.

6  **PARTIES**

7      7.   ***The Plaintiffs.***   Plaintiff Allstate Insurance Company is an insurance
8  company formed under the laws of, and domiciled in, the State of Illinois, with its
9  principal place of business in Northbrook, Illinois.   It is the nation's largest publicly
10 held personal lines insurer selling property and casualty insurance.   Allstate
11 Insurance Company is licensed to do business in New York and writes insurance
12 policies to New York residents.   Allstate is a wholly-owned subsidiary of Allstate
13 Insurance Holdings, LLC, which is a Delaware limited liability company.   Allstate
14 Insurance Holdings, LLC is a wholly-owned subsidiary of The Allstate Corporation,
15 which is a Delaware corporation.

16     8.     Plaintiff Allstate Life Insurance Company is an insurance company
17 formed under the laws of, and domiciled in, the State of Illinois, with its principal
18 place of business in Northbrook, Illinois.   It sells life insurance and annuity
19 products.   Allstate Life Insurance Company is a wholly-owned subsidiary of
20 Allstate Insurance Company.

21     9.     Plaintiff Allstate Life Insurance Company of New York is an insurance
22 company formed under the laws of, and domiciled in, the State of New York, with
23 its principal place of business in Hauppauge, New York.   Allstate Life Insurance
24 Company is licensed to do business in New York and writes insurance policies to
25 New York residents.   It sells life, accident and health insurance and annuity
26 products.   Allstate Life Insurance Company of New York is a wholly-owned
27 subsidiary of Allstate Life Insurance Company.

28

10.     Plaintiff American Heritage Life Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of Florida, with its principal place of business in Jacksonville, Florida.   It sells life, accident and health insurance and annuity products.   American Heritage Life Insurance Company is a wholly-owned subsidiary of American Heritage Life Investment Corporation, which is a Delaware corporation.   American Heritage Life Investment Corporation is a wholly-owned subsidiary of The Allstate Corporation.

11.     ***The Countrywide Defendants.***   Defendant Countrywide Financial is a corporation organized under the laws of the State of Delaware with its principal executive offices at 4500 Park Granada, Calabasas, California.   Pursuant to a merger completed on July 1, 2008, Countrywide Financial has been merged into and is now part of Bank of America.

12.     Defendant Countrywide Home Loans, a wholly-owned subsidiary of Countrywide Financial, is a corporation organized under the laws of the State of New York with its principal place of business at 4500 Park Granada, Calabasas, California.   Countrywide Home Loans is now part of Bank of America and operates under the trade name "Bank of America Home Loans."

13.     Defendant Countrywide Capital Markets, a wholly-owned subsidiary of Countrywide Financial, is a corporation organized under the laws of the State of California with its principal place of business at 4500 Park Granada, Calabasas, California.   Countrywide Capital Markets (now part of Bank of America) operates through its two main wholly-owned subsidiaries, Defendant Countrywide Securities Corporation and Countrywide Servicing Exchange.

14.     Defendant Countrywide Securities Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 4500 Park Granada, Calabasas, California.   Countrywide Securities is now part of Bank of America.

15.     ***The Depositors.***   Defendant CWALT is a Delaware corporation and a limited purpose subsidiary of Countrywide Financial Corporation with its principal place of business at 4500 Park Granada, Calabasas, California.   CWALT was the Depositor for certain of the Offerings in which Allstate invested, the Registrant for certain Registration Statements filed with the SEC, and an issuer of certain mortgage-backed Certificates purchased by Allstate.

16.     Defendant CWABS is a Delaware corporation and a limited purpose subsidiary of Countrywide Financial Corporation with its principal place of business at 4500 Park Granada, Calabasas, California.   CWABS was the Depositor for certain of the Offerings in which Allstate invested, the Registrant for certain Registration Statements filed with the SEC, and an issuer of certain mortgage-backed Certificates purchased by Allstate.

17.     Defendant CWHEQ is a Delaware corporation and a limited purpose subsidiary of Countrywide Financial Corporation with its principal place of business at 4500 Park Granada, Calabasas, California.   CWHEQ was the Depositor for certain of the Offerings in which Allstate invested, the Registrant for certain Registration Statements filed with the SEC, and an issuer of certain mortgage-backed Certificates purchased by Allstate.

18.     Defendant CWMBS is a Delaware corporation and a limited purpose subsidiary of Countrywide Financial Corporation with its principal place of business at 4500 Park Granada, Calabasas, California.   CWMBS was the Depositor for certain of the Offerings in which Allstate invested, the Registrant for certain Registration Statements filed with the SEC, and an issuer of certain mortgage-backed Certificates purchased by Allstate.

19.     ***The Officer Countrywide Defendants.***   Defendant Angelo Mozilo is Countrywide Financial's co-founder and served on Countrywide Financial's Board of Directors from 1969 to July 1, 2008.   Mozilo also served as Countrywide Financial's Chairman of the Board starting in March 1999 and in various other

executive positions since Countrywide Financial's inception, including President
from March 2000 through December 2003, and Chief Executive Officer from
February 1998 to July 1, 2008.   He was a member of Countrywide Financial's
Executive Strategy Committee, which, from its creation in 2005, was responsible for
establishing and evaluating Countrywide's overall strategic direction and governing
its annual planning process.   Mozilo also served on Countrywide Financial's Credit
Committee and Finance Committee and, as CEO and Chairman of the Board,
directly oversaw the Ethics and Asset/Liability Committees.   Mozilo resigned from
all of the above positions on July 1, 2008.   Mozilo resides in Thousand Oaks,
California.

20.     Defendant David Sambol joined Countrywide Financial in 1985.
Sambol held numerous key executive positions at Countrywide.   From 1994 to
2003, Sambol was a Managing Director and served as Countrywide Financial's
Senior Managing Director and Chief of Production for its loan sector.   From 2004
to 2006, Sambol was President and COO of Countrywide Home Loans, where he
led all operations and had oversight responsibility for the company.

21.     From 2004 to 2006, Sambol served as Countrywide Financial's
Executive Managing Director for Business Segment Operations, heading up all
revenue-generating operations at Countrywide Financial, as well as the corporate
operational and support units comprised of Administration, Marketing and
Corporate Communications, and Enterprise Operations and Technology.   From
September 2006 through mid-2008, when he retired, Sambol was Countrywide
Financial's President and Chief Operating Officer.   Beginning in 2007, Sambol was
CEO of Countrywide Home Loans and a member of Countrywide Financial's Board
of Directors.   Beginning in 2007, Sambol also was CEO and President of CWHEQ
and a member of its Board of Directors.   Sambol resides in Hidden Hills,
California.

22.     During his tenure at Countrywide, Sambol was also a member of several Countrywide Financial committees, including the (1) Executive Strategy Committee; (2) Asset/Liability Committee; (3) Finance Committee; (4) Audit and Ethics Committee; and (5) Committee to Set Loan Loss Allowance.

23.     Defendant Eric Sieracki served as Countrywide Financial's Executive Managing Director and Chief Financial Officer from April 2005 through Countrywide's merger with Bank of America in 2008.   Prior to his appointment as CFO, Sieracki occupied other high-level positions within Countrywide, including with CWALT, CWABS, CWHEQ, and CWMBS.   Sieracki signed the Registration Statements for the following securitizations:   CWALT 2006-30T1, CWALT 2006-45T1, CWALT 2006-9T1, CWALT 2006-J1, CWALT 2007-18CB, CWALT 2007-20, CWHEL 2005-B, CWHL 2005-HYB-7, CWHL 2006-9, CWL 2005-11, CWL 2005-13, CWL 2005-16, CWL 2005-17, CWL 2006-1, CWL 2006-9, CWL 2006-S1, CWL 2006-S2, CWL 2006-S5, CWL 2006-S8, CWL 2007-4, CWL 2007-S1, and CWL 2007-S2.   Sieracki resides in Lake Sherwood, California.

24.     Defendant Ranjit Kripalani joined Countrywide Financial and its subsidiary Countrywide Securities in 1998, as Countrywide Financial's Executive Vice President, and Countrywide Securities' National Sales Manager.   He served in numerous high-level positions across Countrywide since, including with CWALT, CWABS, CWHEQ and CWMBS.   Kripalani signed the Registration Statements for the following securitizations:   CWALT 2007-18CB and CWALT 2007-20. Kripalani resides in Manhattan Beach, California.

25.     Defendant Stanford Kurland was President and COO of Countrywide Financial from 1988 until he ceased working for Countrywide Financial on September 7, 2006.   He served in numerous high-level positions across Countrywide.   At all relevant times up to his 2006 departure from Countrywide, Kurland was also the CEO, President and Chairman of the Board of CWABS.   He was also Chairman of the Board, President, and CEO of CWALT, CWABS,

CWHEQ, and CWMBS.   Kurland signed the registration statements for the
following securitizations:   CWALT 2005-25T1, CWALT 2006-30T1, CWALT
2006-45T1, CWALT 2006-9T1, CWALT 2006-J1, CWHEL 2005-B, CWHL 2005-
HYB7, CWHL 2006-9, CWL 2005-1, CWL 2005-11, CWL 2005-13, CWL 2005-
16, CWL 2005-17, CWL 2005-3 CWL 2006-1, CWL 2006-9, CWL 2006-S1, CWL
2006-S2, CWL 2006-S5, CWL 2006-S8, CWL 2007-4, CWL 2007-S1, and CWL
2007-S2.   Kurland resides in Hidden Hills, California and is employed by
PennyMac, a mortgage company in Calabasas, California, that invests in distressed
mortgages of the type that Kurland helped originate as a Countrywide executive.

26.     Defendant David A. Spector joined Countrywide in 1990 and served as
its Executive Vice President of Secondary Markets.   He was subsequently
promoted to Managing Director in 2001 and served as Senior Managing Director of
Secondary Marketing at Countrywide Financial from 2004 to 2006.   He was also a
member of the Board of Directors for CWALT, CWABS, CWHEQ, and CWMBS.
Spector signed the Registration Statements for the following securitizations:
CWALT 2005-25T1, CWALT 2006-30T1, CWALT 2006-45T1, CWALT 2006-
9T1, CWALT 2006-J1, CWHEL 2005-B, CWHL 2005-HYB7, CWHL 2006-9,
CWL 2005-1, CWL 2005-11, CWL 2005-13, CWL 2005-16, CWL 2005-17, CWL
2005-3, CWL 2006-1, CWL 2006-9, CWL 2006-S1, CWL 2006-S2, CWL 2006-S5,
CWL 2006-S8, CWL 2007-4, CWL 2007-S1, and CWL 2007-S2.   Spector resides
in Martinez, California.   Like Kurland, Spector is also employed by PennyMac.

27.     Defendant N. Joshua Adler served as President, CEO, and was a
member of the Board of Directors for CWALT, CWABS, CWMBS, and CWHEQ.
Adler signed the Registration Statements for the following securitizations:
CWALT 2007-18CB and CWALT 2007-20.   Adler resides in Calabasas,
California.

28.     Defendant Jennifer Sandefur joined Countrywide Financial in 1994 as
Vice President and Assistant Treasurer and was shortly thereafter promoted to

Treasurer of Countrywide Home Loans.   She served as Senior Managing Director and Treasurer of Countrywide Financial at the time of her departure in 2008.   She also held high-level positions with CWALT, CWABS, CWHEQ, and CWMBS. Sandefur signed the Registration Statement for the CWALT 2007-18CB securitization.   Sandefur resides in Somis, California.

29.   ***The Bank of America Defendants.***   Defendant Bank of America Corporation is a Delaware corporation with its principal executive offices at 100 North Tryon Street, Charlotte, North Carolina.   Defendants Countrywide Financial, Countrywide Home Loans, Countrywide Capital Markets, and Countrywide Securities all became part of Bank of America following the merger of Countrywide Financial into Bank of America on July 1, 2008.

30.   Defendant BAC Home Loans Servicing, LP is a limited partnership and subsidiary of Bank of America with its principal executive offices at 4500 Park Granada, Calabasas, CA.   BAC Home Loans Servicing, LP is identified in mortgage contracts and other legal documents as "BAC Home Loans Servicing, LP FKA Countrywide Home Loans Servicing, LP," meaning it was formerly known as Countrywide Home Loans Servicing, LP, the Countrywide subsidiary responsible for servicing Countrywide's mortgage loans after they are originated.

31.   Defendant NB Holdings Corporation is a Delaware corporation.   NB Holdings Corporation is one of the shell entities used to effectuate the Bank of America-Countrywide merger, and is a successor to Defendant Countrywide Home Loans.   On July 3, 2008, Defendant CHL completed the sale of substantially all of its assets to NB Holdings Corporation, a wholly-owned subsidiary of Bank of America.

32.   ***Relevant Non-Parties.***   The Certificates for each securitization relevant to this action were issued by a trust.   The issuing trusts (collectively, the "Trusts") are identified in Exhibit A along with other details regarding Allstate's

purchases. The Trusts are common-law trusts formed under the laws of the State of New York.

33.    The Trusts are managed by a trustee.   The trustee for Allstate's Countrywide Offerings was The Bank of New York, a New York banking corporation, for all Offerings except for CWHEL 2005-B.   The trustee for that Offering was Wilmington Trust Company, a Delaware banking corporation.

34.    At all relevant times, the Defendants committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint.   Any allegations about acts of corporate Defendants means that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

## JURISDICTION AND VENUE

35.    This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331.   The federal claims asserted herein arise under Section 10(b) of the Securities and Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b); Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a); 28 U.S.C. § 1337; and Section 27 of the 1934 Act, 15 U.S.C. § 78aa.   The federal claims asserted herein also arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o; Section 22 of the 1933 Act, 15 U.S.C. § 77v; and 28 U.S.C. § 1337.

36.    This Court has supplemental jurisdiction over Allstate's state-law claims pursuant to 28 U.S.C. § 1367.

37.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of the 1934 Act, 15 U.S.C. § 78aa.   Defendants can be found and transact business in this District and many of the acts and practices giving rise to Allstate's claims occurred in substantial part in this District.   Defendants are also subject to personal jurisdiction in this District.

# SUBSTANTIVE ALLEGATIONS

## I.    ALLSTATE'S INVESTMENTS IN COUNTRYWIDE CERTIFICATES

38.    Allstate made its Countrywide investments as part of a broader plan to invest in a diverse array of mortgage-backed securities.   Allstate typically purchased senior classes of mortgage-backed securities (e.g. those rated AAA/Aaa or AA/Aa by the rating agencies Standard & Poor's and Moody's Investors Service).   Allstate purchased the Certificates from Countrywide to generate income and total return through safe investments.   But Allstate also purchased these securities with the expectation that the investments could be—and indeed some would be—sold on the secondary market.

39.    Allstate made the following purchases of Countrywide Certificates, representing a total investment of over $700 million.   Exhibits A and B to this Complaint set forth information about the Certificates and the Offerings in greater detail.[3]

| Asset | Full Name of Offering | Purchase Price |
|---|---|---|
| CWALT 2005-25T1 A6 | Mortgage Pass-Through Certificates, Series 2005-25T1 | 5,148,437 |
| CWALT 2005-25T1 A6 | Mortgage Pass-Through Certificates, Series 2005-25T1 | 5,148,437 |
| CWALT 2006-30T1 1A3 | Mortgage Pass-Through Certificates, Series 2006-30T1 | 38,492,814 |
| CWALT 2006-45T1 2A6 | Mortgage Pass-Through Certificates, Series 2006-45T1 | 5,709,930 |
| CWALT 2006-9T1 A4 | Mortgage Pass-Through Certificates, Series 2006-9T1 | 13,057,391 |
| CWALT 2006-J1 1A6 | Mortgage Pass-Through Certificates, Series 2006-J1 | 24,545,197 |
| CWALT 2007-18CB 1A2 | Mortgage Pass-Through Certificates, Series 2007-18CB | 24,982,422 |
| CWALT 2007-20 A1 | Mortgage Pass-Through Certificates, Series 2007-20 | 22,000,000 |
| CWALT 2007-20 A1 | Mortgage Pass-Through Certificates, Series 2007-20 | 13,000,000 |
| CWHEL 2005-B, 2A | Revolving Home Equity Loan Asset Backed Notes, Series 2005-B | 25,000,000 |

---

[3]    The Court's October 21, 2011 Order dismissed the common-law counts arising out of transactions whose date of sale was before December 27, 2005. Allstate reserves its rights to appeal that decision, but in accordance with the Court's Order it is not pursuing such claims in this Amended Complaint.

| CWHL 2005-HYB7 3A2 | Mortgage Pass-Through Certificates, Series 2005-HYB7 | 22,525,023 |
|---|---|---|
| CWHL 2006-9 A10 | Mortgage Pass-Through Certificates, Series 2006-9 | 34,765,770 |
| CWHL 2006-9 A10 | Mortgage Pass-Through Certificates, Series 2006-9 | 20,887,501 |
| CWL 2005-1, MF2 | Asset-Backed Certificates, Series 2005-1 | 2,699,893 |
| CWL 2005-1, MF3 | Asset-Backed Certificates, Series 2005-1 | 1,499,962 |
| CWL 2005-1, MF4 | Asset-Backed Certificates, Series 2005-1 | 1,999,916 |
| CWL 2005-1, MF5 | Asset-Backed Certificates, Series 2005-1 | 1,249,986 |
| CWL 2005-11, AF5A | Asset-Backed Certificates, Series 2005-11 | 11,999,332 |
| CWL 2005-11, AF6 | Asset-Backed Certificates, Series 2005-11 | 24,999,925 |
| CWL 2005-13, AF5 | Asset-Backed Certificates, Series 2005-13 | 9,999,433 |
| CWL 2005-13, AF6 | Asset-Backed Certificates, Series 2005-13 | 8,841,703 |
| CWL 2005-13, AF6 | Asset-Backed Certificates, Series 2005-13 | 4,999,770 |
| CWL 2005-16 2AF2 | Asset-Backed Certificates, Series 2005-16 | 9,999,947 |
| CWL 2005-16 2AF5 | Asset-Backed Certificates, Series 2005-16 | 19,998,986 |
| CWL 2005-17, 1AF2 | Asset-Backed Certificates, Series 2005-17 | 12,999,766 |
| CWL 2005-17, 1AF5 | Asset-Backed Certificates, Series 2005-17 | 4,999,896 |
| CWL 2005-17, 1AF5 | Asset-Backed Certificates, Series 2005-17 | 12,060,058 |
| CWL 2005-17, 1AF5 | Asset-Backed Certificates, Series 2005-17 | 12,060,058 |
| CWL 2005-3, MF2 | Asset-Backed Certificates, Series 2005-3 | 8,499,866 |
| CWL 2005-3, MF3 | Asset-Backed Certificates, Series 2005-3 | 10,539,509 |
| CWL 2005-3, MF4 | Asset-Backed Certificates, Series 2005-3 | 4,589,945 |
| CWL 2005-3, MF5 | Asset-Backed Certificates, Series 2005-3 | 3,249,865 |
| CWL 2006-1, AF5 | Asset-Backed Certificates, Series 2006-1 | 9,999,873 |
| CWL 2006-1, AF6 | Asset-Backed Certificates, Series 2006-1 | 9,999,802 |
| CWL 2006-9 1AF6 | Asset-Backed Certificates, Series 2006-1 | 3,203,649 |
| CWL 2006-9 1AF6 | Asset-Backed Certificates, Series 2006-1 | 3,203,649 |
| CWL 2006-9 1AF6 | Asset-Backed Certificates, Series 2006-1 | 4,036,093 |
| CWL 2006-S1, A2 | Home Equity Loan Asset Backed Certificates, Series 2006-S1 | 11,199,824 |
| CWL 2006-S1, A2 | Home Equity Loan Asset Backed Certificates, Series 2006-S1 | 38,799,390 |
| CWL 2006-S2, A2 | Home Equity Loan Asset Backed Certificates, Series 2006-S2 | 19,999,824 |
| CWL 2006-S5, A3 | Home Equity Loan Asset Backed Certificates, Series 2006-S5 | 24,999,422 |
| CWL 2006-S5, A4 | Home Equity Loan Asset Backed Certificates, Series 2006-S5 | 9,999,795 |
| CWL 2006-S8, A3 | Home Equity Loan Asset Backed Certificates, Series 2006-S8 | 14,999,731 |
| CWL 2006-S8, A6 | Home Equity Loan Asset Backed Certificates, Series 2006-S8 | 7,499,840 |
| CWL 2006-S8, A6 | Home Equity Loan Asset Backed Certificates, Series 2006-S8 | 5,999,872 |
| CWL 2007-4 M1 | Asset-Backed Certificates, Series 2007-4 | 15,249,301 |
| CWL 2007-4 M1 | Asset-Backed Certificates, Series 2007-4 | 15,249,301 |
| CWL 2007-4 M2 | Asset-Backed Certificates, Series 2007-4 | 13,999,714 |
| CWL 2007-4 M2 | Asset-Backed Certificates, Series 2007-4 | 13,999,714 |
| CWL 2007-S1 A3 | Home Equity Loan Asset Backed Certificates, Series 2007-S1 | 8,999,559 |
| CWL 2007-S1 A3 | Home Equity Loan Asset Backed Certificates, Series 2007-S1 | 8,999,559 |

| CWL 2007-S1 A3 | Home Equity Loan Asset Backed Certificates, Series 2007-S1 | 6,999,657 |
| CWL 2007-S1 A4 | Home Equity Loan Asset Backed Certificates, Series 2007-S1 | 6,999,510 |
| CWL 2007-S1 A4 | Home Equity Loan Asset Backed Certificates, Series 2007-S1 | 6,999,510 |
| CWL 2007-S1 A4 | Home Equity Loan Asset Backed Certificates, Series 2007-S1 | 5,999,580 |
| CWL 2007-S1 A6 | Home Equity Loan Asset Backed Certificates, Series 2007-S1 | 8,999,896 |
| CWL 2007-S1 A6 | Home Equity Loan Asset Backed Certificates, Series 2007-S1 | 8,999,896 |
| CWL 2007-S1 A6 | Home Equity Loan Asset Backed Certificates, Series 2007-S1 | 6,999,919 |
| CWL 2007-S2 A6 | Home Equity Loan Asset Backed Certificates, Series 2007-S2 | 9,999,371 |
| CWL 2007-S2 A6 | Home Equity Loan Asset Backed Certificates, Series 2007-S2 | 8,499,465 |
| CWL 2007-S2 A6 | Home Equity Loan Asset Backed Certificates, Series 2007-S2 | 8,499,465 |

## II.   COUNTRYWIDE'S MANDATE TO MATCH ANY PRODUCT ON THE MARKET REQUIRED IT TO SYSTEMATICALLY IGNORE ITS STATED UNDERWRITING PROCEDURES

### A.   Countrywide Makes Origination Volume King

40.    Countrywide's remarkable growth from 2003 to 2007 was fueled by its success in the process of pooling residential mortgages, "securitizing" the pool by issuing securities backed by it, then selling the securities to investors.   The value and marketability of the securities was dependent on the represented quality of the mortgages selected for the underlying pools.

41.    During a conference call with analysts in 2003, Mozilo stated that his goal for Countrywide Financial was to "dominate" the mortgage market and "to get our market share to the ultimate 30% by 2006, 2007."   Accomplishing Mozilo's goal of a 30% market share required Countrywide to systematically departing from its credit risk and underwriting standards.

42.    This abandonment of Countrywide's underwriting guidelines came under the direction of Mozilo and Sambol, and was first put into action in a company-wide mandate by Sambol.   Around May 2003, Sambol became

particularly close to Mozilo and emerged as a major force within Countrywide Financial and Countrywide Home Loans, taking complete charge of loan production in 2004.   Countrywide's senior management, particularly Sambol, who ran Countrywide's loan production machine as President and Chief Operating Officer of Countrywide Home Loans, sent a clear message to loan origination and underwriting employees that overall volume was far more important than creditworthiness.

43.     Rather than relying on its underwriting standards to maintain Countrywide's profitability, Sambol argued that by originating and procuring a large volume of loans, regardless of their relative risk, Countrywide would be able to cover any losses incurred by the riskier loans by the profits it generated on other loans.

44.     Mozilo's 30% market share dictate resulted in a "culture change" starting in 2003.   A former senior regional vice president of Countrywide was quoted in *Business Week* as saying that Countrywide "approached making loans like making widgets, focusing on cost to produce and not risk or compliance.   Programs like 'Fast and Easy' where the income and assets were stated, not verified, were open to abuse and misuse.   The fiduciary duty of making sure whether the loan should truly be [extended] was not as important as getting the deal done."

45.     Countrywide's senior management imposed intense pressure on underwriters to approve mortgage loans, in some instances requiring underwriters to process 60 to 70 mortgage loan applications in a single day and to justify any rejections they made.   This created an incentive not to review loans thoroughly but instead simply to rubber-stamp them "approved."   That pressure even came from the most senior levels of management—a former executive reported that Sambol was "livid" at a 2005 meeting because call-center employees were not selling enough adjustable-rate mortgages, which begin with "teaser" rates but quickly reset to higher rates and thus are highly profitable for Countrywide.

**B.** **Countrywide Cedes its Underwriting Policy to the Market's Lowest Common Denominator By Way of a "Matching" Mandate**

46.     In order to meet its volume and market share goals, Countrywide abandoned any semblance of underwriting standards.   Unknown to Allstate, the only underwriting principles at work within Countrywide were:   (1) is another company doing it, and/or (2) can we sell it.

47.     Countrywide had a policy of matching any product that a competitor was willing to offer.   A former finance executive at Countrywide explained that: "To the extent more than 5 percent of the [mortgage] market was originating a particular product, any new alternative mortgage product, then Countrywide would originate it . . . .   [I]t's the proverbial race to the bottom."

48.     Reuters reported that Mozilo saw the mortgage industry's lending standards "come unglued."   Yet Countrywide stuck to its "matching" strategy. Matching the most aggressive mortgage products in an "unglued" industry would obviously make Countrywide among the most aggressive.   But this understates the severity of the impact Countrywide's "matching" strategy had.   Countrywide would mix and match the terms offered by multiple lenders.   The resulting composite offering would be *even more* aggressive than any one competitor who had a particular feature matched.   Countrywide's aggressive mortgage products presented "layered" risks created by its undisclosed "matching" philosophy.

49.     To conceal its greatly increased production of subprime loans, Countrywide employed an internal, undisclosed definition of prime versus subprime, and thus, in its public reports, Countrywide Financial classified loans as "prime" that clearly were subprime under well-established industry standards.   A former senior underwriter at Countrywide reported that Countrywide regularly classified loans as "prime" even if they were issued to non-prime borrowers, including people who recently went through bankruptcy.   According to the SEC, Countrywide included in the prime category loans with FICO scores below 620, and

further included loan products with increasing amounts of credit risk such as reduced or no-documentation loans and pay-option adjustable-rate mortgages ("ARMs").

### C.   The "Matching" Policy Demanded the Systemic Abandonment of Countrywide's Own Policies

50.   Countrywide's "matching" strategy in an "unglued" market required it to systematically abandon its underwriting guidelines.   It was impossible for its protocols to even nominally keep up with the pace of change dictated by Countrywide's "matching" strategy.

51.   According to the SEC, Countrywide created an underwriting process that incorporated at least four attempts to approve loans.   First, loans were processed by an automated system that would either approve the loan or refer it to manual underwriting.   The manual underwriter would then seek to determine if the loan could be approved under his or her exception authority.   If the loan exceeded the underwriter's exception authority, it was then referred to the Structured Lending Desk, where underwriters with broader exception authority attempted to get the loan approved.   Finally, if all prior attempts to find an "exception" failed, it would be referred to the Secondary Markets Structured Lending Desk, where the sole criterion for approving was whether it could be sold.

52.   One major way Countrywide deployed its "matching" strategy, despite its "theoretical" underwriting policies, was to expand the number of employees who could grant exceptions throughout this process.   A wide range of employees received authority to grant exceptions and to change the terms of a loan, including underwriters, their superiors, branch managers, and regional vice presidents.   Even if Countrywide's computer system recommended denying a loan, an underwriter could override that denial by obtaining permission from his or her supervisor.

53.   Countrywide routinely approved "exception" loans that did not satisfy even Countrywide's weakened "theoretical" underwriting criteria through a high-

volume computer system called the Exception Processing System (but only after Countrywide charged these high risk borrowers extra points and fees).   The Exception Processing System was known to approve virtually every borrower and loan profile with a pricing add-on when necessary, and was previously known within Countrywide as the "Price Any Loan" system.   Indeed, Mozilo and Sambol authorized the establishment of the exception-based Structured Loan Desk in Plano, Texas, specifically to grant exceptions from the underwriting guidelines to which Countrywide told the public it was adhering.

54.   According to the SEC, Countrywide's culture of "exceptions" started at the top, with Mozilo personally approving loans by way of guideline exceptions pursuant to a "Friends of Angelo" program.

55.   Unknown to Allstate and contrary to Defendants' representations, these exceptions were not based on any countervailing compensating factors.   Rather, they were given merely to allow Countrywide to "match" what competitors were offering, and because Countrywide believed the loans could be sold in the secondary market to investors like Allstate.

56.   According to the SEC, at one point, ***23% of Countrywide's subprime first-lien loans were generated as "exceptions."***   Similarly, according to the California Attorney General's complaint against Countrywide and Mozilo, a former supervising underwriter at Countrywide stated that up to 15% or 20% of the loans that Countrywide generated were processed via the Exception Processing System, of which very few were ever rejected.   One former Countrywide employee remarked that he could "count on one finger" the number of loans that his supervisors permitted him to reject as an underwriter with Countrywide's Structured Loan Desks.   All of these studies of Countrywide's use of "exceptions" implicated Countrywide's practices at the same time that Allstate was originating the Mortgage Loans underlying Allstate's Certificates.

57.     Another way Countrywide found to get around its "theoretical" underwriting policies was the systematic abuse of no- and low-documentation loan processes.   With these products, the borrower is not required to provide the normal confirmations and details for credit criteria such as annual income or current assets. Low-documentation mortgages were originally designed for professionals and business owners with high credit scores, who preferred not to disclose their confidential financial information.   Traditionally, these loans generally also required low loan-to-value ratios.   Countrywide repeatedly represented that risky products such as low-doc loans were adhering to these traditional applications by providing low-documentation products only to the most sophisticated and creditworthy borrowers.

58.     To the contrary, low-doc loans were instead used as a tool to get around Countrywide's "theoretical" underwriting standards.   When a loan officer knew an application would not be approved on the basis of the applicant's actual financial condition, the officer often steered applicants into low-documentation products. Once in those programs, Countrywide coached borrowers on how to falsify the application to ensure it would be approved, and in some instances would even fill out the required misrepresentations without the borrower's knowledge. Countrywide's abuse of these alternative-documentation procedures is directly relevant to Allstate's Certificates, which often included loans approved through these procedures—indeed, as described further below, on information and belief the loan pools underlying Allstate's Certificates included even more alternative-documentation loans than Countrywide disclosed at the time of purchase.

**D.     Securitization Allowed Countrywide to Transfer the Risks Created by Its Underwriting Abandonment to Investors Like Allstate**

59.     Countrywide was willing to let its "matching" policy trump sound underwriting practices because it was routinely placing the resulting risk from its risky loans on investors like Allstate.   Countrywide aggressively securitized the

risky mortgages it was issuing by aggregating or pooling them, and then issuing and selling securities to the public that were backed by the mortgage pools.

60.    Specifically, as it relates to the Certificates purchased by Allstate, many of the loans that Countrywide Home Loans originated in the relevant period were pooled together by the Depositors, and deposited into special purpose entities or trusts created by Countrywide through the Depositors.   The Trusts in turn issued Certificates backed by the loans, which were then sold by the Countrywide Securities and other underwriters to Allstate.

61.    The cash flows from the pooled loans, in the form of payments of interest and principal, were used to make payments on the Certificates.   The purchase of each Certificate was thus the purchase of a right to participate in the cash flows generated by the underlying pool.

62.    In other words, the individual Countrywide Defendants' roles were:

(a)    Countrywide Home Loans acted as the sponsor of the Securitizations and as one of the Sellers.   It originated the Mortgage Loans that were pooled together in the securitizations and then sold, transferred, or otherwise conveyed title to those loans to the Depositor pursuant to Pooling and Servicing Agreements, which are governed by New York law.

(b)    Countrywide Securities was the Lead Manager of the underwriters for the Offerings.   In that role, it was responsible for underwriting and managing the Securitizations' sale of certificates to Allstate and other investors, including screening the Mortgage Loans for compliance with Countrywide's underwriting guidelines.

(c)    CWABS, CWALT, CWMBS, and CWHEQ were the Depositors for the Offerings.   The Depositors are the issuers of the securities for purposes of the 1933 Act.   The Depositors purchased the Mortgage Loans from Countrywide Home Loans and one or more other Sellers pursuant to the Pooling and Servicing Agreements, which are governed by New York law.   The Depositors then sold,

transferred, or otherwise conveyed the Mortgage Loans to the Trustee, Wilmington Trust Company (for the CWHEL 2005-B Offering) and The Bank of New York (for all other Offerings), which held the Loans in the Trusts for the benefit of Allstate and other Certificate holders.   The Depositors then issued the Certificates, which represent interests in the Mortgage Loans held by the Trusts, to Plaintiffs and other investors.   The Depositors and the Sellers and Underwriters marketed and sold the Certificates to investors such as Allstate.   The Certificates were sold in classes according to their expected credit ratings, and were expected to provide interest on the income stream generated by the Mortgage Loans in the collateral pools.   The Depositors were established as limited-purpose finance subsidiaries of Countrywide Financial.

(d)     Defendant Countrywide Financial is the corporate parent of Countrywide Home Loans, Countrywide Securities, and the Depositors.   In that capacity, it directed and controlled those Defendants' activities related to the Securitizations.   Countrywide Financial and/or Countrywide Home Loans also guaranteed Countrywide Home Loans Servicing's loan-servicing activities when required by the owner of the Mortgage Loans.

63.     The following chart summarizes the roles above using one of the Offerings in which Allstate invested as an example:



Summary of Transaction Parties

III.   **COUNTRYWIDE'S MATERIAL MISREPRESENTATIONS**

64.     As it is the stream of payments from borrowers that funds payments to investors, if enough loans in the pool default, investors will not be paid the interest returns promised and may even lose their principal.   The market value for the Certificates also decreases as the perceived risk of the underlying pool increases. As such, any representation bearing on the riskiness of the underlying Mortgage Loans was material to investors, including Allstate.

A.     **General Underwriting Guidelines**

65.     The underwriting process used to form the pools of Mortgage Loans underlying Allstate's Certificates was material to Allstate because, as discussed above, the quality of loans in the pool determines the risk of the Certificates backed by those loans.   If a reasonable underwriting process was not actually followed, the chances that the loans had riskier features than what Countrywide claimed (whether

due to error, borrower misrepresentation, or otherwise) greatly increases.   This makes the resulting loan pool much more risky.   A systemic underwriting failure decreases the reliability of *all* of the information investors have about the loans, and thus greatly increases their perceived and actual risk, and greatly decreases their market value.

66.   Countrywide represented it consistently followed a conservative, reliable, reasonable underwriting program.   For example, in the Offering Materials for CWALT 2006-9T1, Countrywide represented that "All of the mortgage loans will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards" and that "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."

67.   The Offering Materials for each of the securitizations at issue here had similar representations.   The specific representations at issue in the Offering Materials on which Allstate relied are found in Exhibits F through DD.

### B.   Owner-Occupancy Statistics

68.   Owner-occupancy statistics were material to Allstate and other investors because high owner-occupancy rates should have made the Certificates safer investments than Certificates backed by second homes or investment properties.   Homeowners who reside in mortgaged properties are less likely to default than owners who purchase homes as investments or second homes and live elsewhere.

69.   Each of the Offering Materials contained detailed statistics regarding the Mortgage Loans in the collateral pool, including the reported owner-occupancy characteristics of the Mortgage Loans.   The statistics reported whether the borrowers intended to occupy the properties as owners, or use the properties as

investment properties or second homes.   For example, in the Offering Materials for CWALT 2006-9T1, Countrywide represented that among the 779 initial Mortgage Loans in the offering, 679 of the Mortgage Loans (86% of the total) were for primary residences, i.e. owner-occupied properties.

70.     The Offering Materials for each of the securitizations at issue here had similar representations and statistics.   Examples of each can be found in Exhibits F through DD.

### C.   Loan-to-Value Ratios and Appraisals

71.     The loan-to-value ("LTV") ratio is the ratio of a Mortgage Loan's original principal balance to the appraised value of the mortgaged property.   The related Combined LTV ("CLTV") takes into account other liens on the property. These ratios were material to Allstate and other investors because higher ratios are correlated with a higher risk of default.   A borrower with a small equity position in a property has less to lose if he or she defaults on the loan.   There is also a greater likelihood that a foreclosure will result in a loss for the lender if the borrower fully leveraged the property.   These are common metrics for analysts and investors to evaluate the price and risk of mortgage-backed securities.

72.     For example, in the CWABS 2007-04 transaction, Countrywide represented that the weighted average LTV ratio was 77.0%.   Allstate's subsequent loan-level analysis, described further below, has subsequently determined that the weighted average LTV for this portfolio was actually 87.0%.

73.     The Offering Materials provided in connection with the Offerings also represented that one or more *independent* appraisals were obtained for nearly every Mortgage Loan.   For example, in the Offering Documents for CWALT 2006-9T1, Countrywide represented as follows:

> Except with respect to mortgage loans originated pursuant to its Streamlined Documentation Program, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans.   Appraisers inspect and appraise the proposed mortgaged property and verify that the property

is in acceptable condition.   Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home.   All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

74.   These representations regarding independence were material to Allstate and other investors because they signaled the reliability of the LTV ratios discussed above.

75.   The Offering Materials for each of the securitizations at issue here had similar representations.   Examples of each can be found in Exhibits F through DD.

**D.   Debt-to-Income**

76.   The ratio of a borrower's debt to his or her income was material to Allstate and other investors because it represents a borrower's ability to afford the mortgage payments at issue, and thus implicates the likelihood of default.

77.   In the Offering Documents for the CWABS 2007-04 Offering, for example, Countrywide represented that "After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations."   Countrywide stated that "The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level . . . but does not generally exceed 55%."

78.   The Offering Materials for each of the securitizations at issue here often had similar representations.   Examples of each can be found in Exhibits F through DD.

**E.   No Adverse Interest in Selection**

79.   Whether or not Countrywide was "cherry picking" the higher-quality loans for itself and leaving behind a poorer-quality pool for offloading onto

investors was material to Allstate and other investors because such a process would flag to investors the poor quality of the loans actually being securitized, regardless of the general underwriting processes that Countrywide supposedly followed.

80.     For example, in the CWALT 2007-20 Offering Documents, Countrywide represented that "the mortgage loans were selected from among the outstanding one- to four-family mortgage loans in Countrywide Home Loans' portfolio as to which the representations and warranties set forth in the pooling and servicing agreement can be made and that the selection was not made in a manner intended to affect the interests of the certificateholders adversely."

81.     The Offering Materials for each of the securitizations at issue here had similar representations.   Examples of each can be found in Exhibits F through DD.

**F.     <u>Ratings</u>**

82.     Each of the Certificates purchased by Allstate received a rating purportedly indicating the rating agencies' view of the risk profile of the securities. The initial and current ratings given to the Certificate are contained in Exhibit C. The ratings were material to reasonable investors, including Allstate, because the ratings were important to investors in making their investment decisions.   The securities would have been unmarketable and would not have been issued but for the provision of these ratings.

83.     The Offering Materials represented that the rating agencies conducted an analysis that was designed to assess the likelihood of delinquencies and defaults in the underlying mortgage pools.   For example, the Offering Materials for CWL 2005-1 stated that "It is a condition to the issuance of the securities of each series offered hereby and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies (each, a "Rating Agency'') specified in the related prospectus supplement.   Any such rating would be based on, among other things,

the adequacy of the value of the Trust Fund Assets and any credit enhancement with respect to such class and will reflect such Rating Agency's assessment solely of the likelihood that holders of a class of securities of such class will receive payments to which such securityholders are entitled under the related Agreement."

84.     The Offering Materials for each of the securitizations at issue here had similar representations.   Examples of each can be found in Exhibits F through DD.

### G.     <u>Share of Mortgage Loans Granted Pursuant to Full-Documentation Procedures</u>

85.     Whether the information in a loan file was fully documented, or whether it was instead approved pursuant to a reduced or no-documentation procedure, was material to Allstate.   Reduced-documentation loans are riskier because the borrower provides less substantiating information for items such as his or her income and assets.   With less confirmation, it is more likely that there are errors or misrepresentations in the loan file.

86.     For example, in the CWL 2007-4 Offering, the prospectus supplement represented that 71.8% of the Mortgage Loans were issued according to Full Documentation procedures, but 28.2% were issued according to Stated Income procedures.

87.     The Offering Materials for each of the securitizations at issue here had similar representations.   Examples of each can be found in Exhibits F through DD.

### H.     <u>Servicing Quality</u>

88.     How the loans were to be serviced after origination was material to Allstate and other investors because a failure to properly service loans can significantly increase the number of troubled loans that default rather than being brought back into compliance.

89.     For example, in the CWALT 2007-20 Offering Documents, Countrywide represented that "The master servicer [Countrywide Home Loans Servicing LP] will master service all of the mortgage loans in accordance with the

terms set forth in the pooling and servicing agreement.   The master servicer has agreed to service and administer the mortgage loans in accordance with customary and usual standards of practice of prudent mortgage loan lenders."

90.     The Offering Materials for each of the securitizations at issue here had similar representations about Countrywide Home Loans Servicing.   Examples of each can be found in Exhibits F through DD.

**I.     Case-by-Case Underwriting Exceptions**

91.     Whether Countrywide was making case-by-case exceptions was material to Allstate and other investors because Countrywide's claimed underwriting standards would be made irrelevant if large portions of the loans were systemically excused from those standards.

92.     Countrywide represented that it made case-by-case exceptions to its underwriting standards, based on compensating factors that increased the quality of a loan application.   For example, in the Offering Materials for CWALT 2006-9T1, Countrywide represented that "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."

93.     The Offering Materials for each of the securitizations at issue here had similar representations.   Examples of each can be found in Exhibits F through DD.

**IV.   ALL OF THE REPRESENTATIONS WERE UNTRUE AND MISLEADING BECAUSE COUNTRYWIDE SYSTEMATICALLY IGNORED ITS OWN UNDERWRITING GUIDELINES**

94.     Instead of focusing on assessing an applicant's credit standing and repayment ability, Countrywide subordinated its underwriting standards to the goal of originating and securitizing as many loans as it could to expand its market share and generate fees in the secondary mortgage market.   The systematic abandonment of any underwriting standards rendered all of the above representations false or misleading at the time they were made.

95.     The representations regarding Countrywide's underwriting processes, underwriting quality, loan selection, and use of exceptions were untrue. Countrywide systematically abandoned its underwriting standards to increase loan volumes without regard to loan quality, "cherry picked" loans for itself, and offloaded the risky remaining pool of loans onto Allstate and other institutional investors.   Countrywide systematically ignored borrowers' actual repayment ability and the value and adequacy of mortgaged property used as collateral in issuing loans.   Exceptions were granted abundantly and without consideration of any compensating factors in order to grow market share pursuant to its "matching" corporate strategy.   The Defendants also misleadingly omitted that Countrywide was systematically abusing "exceptions" and low-documentation loans in order to further circumvent its purported underwriting standards, that it had adopted a "matching" strategy that ensured that its loan offerings (a composite of the most aggressive features from every other lender) were at the "frontier" of the industry, that "salability" was in essence the only underwriting principle, and that Countrywide was further concealing the true quality of its practices by using a misleading and self-serving definition of "prime."

96.     The representations regarding owner-occupancy and debt-to-income were untrue.   Countrywide's abandonment of its underwriting practices and coaching of borrowers regarding how to game the system facilitated the widespread falsification of these statistics.   In reality, a far greater percentage of properties were not owner-occupied, and borrowers' claimed income was regularly inflated. Countrywide also failed to disclose that the disclosed statistics were baseless.

97.     The representations regarding loan-to-value, combined loan-to-value, and appraisal independence were untrue.   Countrywide did not genuinely believe the appraisal values given to the properties because it knew that the property values were being artificially and baselessly inflated in order to increase the amount of money that it could loan to a borrower, rendering the LTV and CLTV statistics false

and misleading.   The statistics also omitted the effect of additional liens on the property, making the CLTVs even further from the truth.   In addition, contrary to its representations, Countrywide used affiliated rather than independent appraisers. The Defendants also misleadingly omitted that the disclosed statistics were baseless and that Countrywide was pressuring appraisers to inflate their appraisals.

98.   The representations regarding the credit ratings were also untrue. Countrywide fed baseless loan statistics to the credit rating agencies, essentially pre-determining the ratings that would be given.   The use of baseless statistics also made representations about the ratings process being designed to assess credit risk false, as the entire ratings process was rigged from the start through the use of incorrect data.   Countrywide thus did not genuinely believe that the Certificates' ratings reflected their actual risk.   Countrywide also failed to disclose that the ratings were baseless, and were issued by rating agencies that were virulently conflicted and were using outdated models.

99.   The representations regarding servicing quality were untrue.   As the Master Servicer on the Offerings, the servicing performed by Countrywide Home Loans Servicing (or in the case of CWHEL 2005-B, Countrywide Home Loans) lagged behind the standards of the industry.   Countrywide failed to allocate sufficient resources to service and administer the loans, such as personnel to address customer inquiries and to conduct follow-up efforts with delinquent borrowers. Countrywide also provided inadequate resources for work-out plans.   These failures were exacerbated by Countrywide's break-neck origination of loans in disregard of its own underwriting guidelines, which led to an extraordinary increase in delinquencies, defaults, foreclosures, bankruptcies, litigation, and other proceedings. The Offering Materials misrepresented these practices or failed to disclose them in the Certificates' Offering Documents.

100.   As described below, the evidence that these representations were untrue is overwhelming.   As the evidence shows, Countrywide's abandonment was

systemic.   The evidence is directly relevant here, even if a particular e-mail does not refer on its face specifically to Allstate's Certificates.   The subprime mortgage loans discussed in the materials discussed below are the very same types of loans that backed some of Allstate's Certificates, and thus the materials are even more directly relevant to the collateral pools in this case.

101.   In June 2009, the SEC initiated a civil action against Mozilo, Sambol, and Sieracki.   On September 16, 2010, the District Court denied the defendants' motions for summary judgment.   Relying on just a small part of the evidence referred to below, the District Court found that the SEC raised genuine issues of fact as to, among other things, whether the defendants had misrepresented the quality of its underwriting processes:

> **The SEC has presented evidence that these statements regarding the quality of Countrywide's underwriting guidelines and loan production were misleading** in light of Defendants' failure to disclose, *inter alia*, that:   (1) As a consequence of Countrywide's "matching strategy," Countrywide's underwriting "guidelines" would end up as a composite of the most aggressive guidelines in the market . . . and (2) Countrywide routinely ignored its official underwriting guidelines, and in practice, Countrywide's only criterion for approving a loan was whether the loan could be sold into the secondary market.

> For example, Countrywide's Chief Risk Officer, John McMurray, explained in his deposition that Countrywide mixed and matched guidelines from various lenders in the industry, which resulted in Countrywide's guidelines being a composite of the most aggressive guidelines in the industry . . . .

> SEC has also presented evidence that Countrywide routinely ignored its official underwriting to such an extent that Countrywide would underwrite *any* loan it could sell into the secondary mortgage market. According to the evidence presented by the SEC, Countrywide typically made four attempts to approve a loan . . . .   According to the testimony of the Managing Director of Countrywide Home Loans' Secondary Marketing Division, once the loan was referred to Countrywide's Secondary Markets Structured Lending Desk, the sole criterion used for approving the loan was whether or not the loan could be sold in the secondary market.   As a result of this process, a significant portion (typically in excess of 20%) of Countrywide's loans were issued as exceptions to its official underwriting guidelines . . . .

> **In light of this evidence, a reasonable jury could conclude that Countrywide all but abandoned managing credit risk through its underwriting guidelines** . . . .

1  *S.E.C. v. Mozilo*, No. CV 09-3994, 2010 WL 3656068, at *10 (C.D. Cal. Sept. 16,

2  2010) (emphasis added).   The Court also found that the SEC presented evidence

3  from which a jury could find Countrywide's statistics regarding "prime" mortgages

4  to be misleading, based on Countrywide's internal definition of that term.   *Id.* at

5  *14-15.   Mozilo, Sambol, and the third defendant, Eric Sieracki, subsequently

6  settled with SEC on the eve of trial, agreeing to pay substantial fines.

> ### A.  A Statistical Analysis of Allstate's Certificates Shows That the Representations Were False

> #### (1)  The securities' high default rates and souring credit ratings

102.   Even though the Certificates were supposed to be long-term, stable

investments, just years after their issuance the underlying Mortgage Loans have

already shown serious deterioration in performance.   For instance, fourteen of

Allstate's Offerings have had more than 30% of their Mortgage Loans either default

already, or are currently in delinquency.   Many are even higher – for instance ***over

62% of the Mortgage Loans in the current pool are delinquent*** for CWABS 2005-

01 and CWABS 2005-13.   Likewise, ***60% or nearly 60% of the Mortgage Loans

in the current pool are delinquent*** for CWABS 2005-03, CWABS 2005-11,

CWABS 2005-16, CWABS 2005-17, and CWABS 2006-01, CWABS 2006-09, and

CWABS 2007-04.   These statistics are more fully set forth in Exhibit D, attached.

103.   Many of Allstate's Certificates have experienced high level of defaults.

104.   The latest available information shows that in total, 49% of the original

loans underlying CWABS 2005-13 are delinquent or written off; 49% of the original

loans underlying CWABS 2006-9 are either delinquent or written off; and 40% of

the original loans underlying CWABS 2005-13 are either delinquent or written off.

105.   An analysis of the percent of loans currently in the loan pool at any

given time (i.e., that had not been removed already by way of default, foreclosure,

prepayments, or otherwise), and that were at least 30 days delinquent in their

payments at as of certain periods in the Offerings' history, are set forth in Exhibit D.

106.   Relatedly, the ratings given to the Certificates have significantly deteriorated.   Most of Allstate's investments initially received the highest possible ratings – S&P's AAA rating or their equivalent from the other rating agencies. According to S&P's website, "An obligation rated 'AAA' has the highest rating assigned by Standard & Poor's.   The obligor's capacity to meet its financial commitment on the obligation is extremely strong."   Moody's similarly describes its highest rating, Aaa, as meaning that the investment is "judged to be of the highest quality, with minimal credit risk."   This is the same rating typically given to bonds backed by the full faith and credit of the United States government, such as treasury bills.   Historically, a AAA rated security had an expected loss rate of less than .05%.

107.   Because of the high delinquency and default rates and other factors, most of Allstate's Certificates have been downgraded from the highest possible ratings to junk-bond ratings.   ***Despite nearly all beginning with the same rating given to treasury bills (i.e., AAA), currently 93% of the Certificates are currently rated as non-investment grade***.   Indeed, ***over 70% have fallen to "junk-bond" ratings—S&P's rating of CCC   (or the other rating agencies' equivalent) or below***.   These statistics are reflected in Exhibit E.   According to S&P's website, far from having the "extremely strong capacity" to meet commitments that AAA ratings do, instead these ratings now indicate that the Certificates are "currently vulnerable and dependent on favorable business, financial and economic conditions to meet financial commitments."

108.   The Certificates were supposed to be long-term, stable investments, yet they have already experienced payment problems significantly beyond what was expected for loan pools that were properly underwritten and which contained loans that actually had the characteristics the Offering Materials claimed.   Countrywide's risk officers have acknowledged that it is usually a large and unexpected disruption to a borrower's income that causes an actual payment default.   In a properly

underwritten pool of loans, one would thus not expect to see a large spike of defaults occurring shortly after origination, since it is unlikely that many borrowers would all incur a sudden and unexpected change to their payment ability so soon after purchasing a home.

109.   Indeed, as discussed further below in section IV(A), economic studies have confirmed that high default rates early in a loan's life are highly correlated with misrepresentations in the loan files.   This makes sense—as borrowers are put in loan products they cannot actually afford, they quickly and predictably fall behind on their payments.   Thus, the dismal performance of the Mortgage Loans is itself strong evidence that they were improperly written, and that they did not have the credit risk characteristics the Offering Materials claimed.

110.   The drastic rise in default rates on the Mortgage Loans underlying Allstate's Certificates, as reflected in Exhibit D, reflects Countrywide's faulty underwriting rather than the downturn in the housing market.   Among all of the deals that Allstate invested in, the rate of delinquency on the Mortgage Loans is far out of proportion to rates of delinquency in the market as a whole, and the higher rate is directly attributable to Countrywide's wrongdoing.

**(2)   There are numerous indications that borrowers did not actually occupy the mortgaged properties as claimed**

111.   As above, Countrywide repeatedly represented that the loan pools underlying the Certificates had high percentages of loans issued to borrowers that were living in the mortgaged properties.

112.   Allstate selected a random sample of loans from each offering in which it invested to test Countrywide's representations on a loan-level basis.   Allstate conducted loan-level analyses on nearly 19,000 Mortgage Loans underlying its Certificates, across a total of 14 Offerings.

113.   Allstate analyzed data from one Offering corresponding to each of the Registration Statements for its Offerings, to obtain a representative sampling of the

Mortgage Loans across all of Allstate's investments.   For each of these Offerings, Allstate analyzed 800 defaulted loans and 800 randomly-sampled loans from within the collateral pool.   In some cases, less than 1600 loans were available to be analyzed.   For example, in the case of CWALT 2007-20, Allstate analyzed data for each of the 933 Mortgage Loans in the original collateral pool.

114.   For certain Offerings, the 1600 loans addressed essentially the entire loan pool.   For instance, Allstate analyzed 1,600 loans in CWL 2006-9 1AF6; there were 1,833 loans in the original collateral pool.   With CWHL 2005-HYB7 3A2, Allstate analyzed 1,600 of 1,951 loans.

115.   Allstate's sample sizes of Mortgage Loans are more than sufficient to provide statistically-significant data to demonstrate the degree of misrepresentation of the Mortgage Loans' characteristics.   Analyzing data for each Mortgage Loan in each Offering would have been cost-prohibitive and unnecessary.   Statistical sampling is an accepted method of establishing reliable conclusions about broader data sets, and is routinely used by courts, government agencies, and private businesses.   As the size of a sample increases, the reliability of its estimations of the total population increase as well.   Experts in RMBS cases have found that a sample size of just 400 loans can provide statistically significant data, regardless of the size of the actual loan pool, because it is unlikely that so large a sample would yield results vastly different from results for the entire population.

116.   To determine whether a given borrower actually occupied the property as claimed, Allstate investigated tax information for the sampled loans.   One would expect that a borrower residing at a property would have the tax bills sent to that address, and would take all applicable tax exemptions available to residents of that property.   If a borrower had his or her tax records sent to another address, that is good evidence that that borrower was not actually residing at the mortgaged property.   If a borrower declined to make certain tax exemption elections that

1  depend on the borrower living at the property, that also is strong evidence the

2  borrower was living elsewhere.

3      117.   A review of credit records was also conducted.   One would expect that

4  people have bills sent to their primary address.   If a borrower was telling creditors

5  to send bills to another address, even six months after buying the property, it is good

6  evidence the borrower was living elsewhere.

7      118.   A review of property records was also conducted.   It is less likely that

8  a borrower lives in any one property if in fact that borrower owns multiple

9  properties.   It is even less likely the borrower resides at the mortgaged property if a

10  concurrently-owned separate property did not have its own tax bills sent to the

11  property included in the mortgage pool.

12      119.   A review of other lien records was also conducted.   If the property was

13  subject to additional liens but those materials were sent elsewhere, that is good

14  evidence the borrower was not living at the mortgaged property.   If the other lien

15  involved a conflicting declaration of residency, that too would be good evidence that

16  the borrower did not live in the subject property.

17      120.   The results of Allstate's loan-level analysis of true owner-occupancy

18  rates on the Mortgage Loans underlying its Certificates are set forth below.   Failing

19  multiple of the above tests is strong evidence the borrower did not in fact reside at

20  the mortgaged properties.   These statistics thus show that, despite Countrywide's

21  representations, a much higher percentage of borrowers did not occupy the

22  mortgaged properties:

| Asset | Percentage of Owner-Occupied Properties Represented in Prospectus | Actual Percentage of Owner-Occupied Properties | Prospectus Overstatement |
|---|---|---|---|
| CWL 2005-1, MF2 | 97.9% | 87.8% | 10.1% |
| CWALT 2005-25T1, A6 | 86.8% | 73.6% | 13.2% |
| CWL 2005-13, AF5 | 96.4% | 85.8% | 10.6% |
| CWALT 2006-J1 1A6 | 78.5% | 72.6% | 5.9% |
| CWL 2006-S1, A2 | 91.0% | 82.4% | 8.6% |
| CWL (CWABS) 2006-9, 1AF6 | 95.1% | 89.6% | 5.5% |

| Asset | Percentage of Owner-Occupied Properties Represented in Prospectus | Actual Percentage of Owner-Occupied Properties | Prospectus Overstatement |
|---|---|---|---|
| CWALT 2006-30T1 1A3 | 88.6% | 74.1% | 14.5% |
| CWHL (CWMBS) 2006-9, A10 | 91.7% | 81.7% | 10.0% |
| CWL 2006-S5, A3 | 94.2% | 85.8% | 8.4% |
| CWL 2007-S1, A3 | 93.7% | 82.6% | 11.1% |
| CWL 2007-4, M1 | 96.9% | 87.6% | 9.3% |
| CWALT 2007-20, A1 | 95.9% | 84.7% | 11.2% |
| CWALT 2007-18C 3FL3 | 82.4% | 71.4% | 11.0% |
| CWHL 2005-HYB7, 3A2 | 79.0% | 70.3% | 8.8% |

121.   The other Offerings in which Allstate invested made similar
representations regarding the percentage of owner-occupied properties among the
Mortgage Loans.   The percentages above for actual owner-occupied properties,
which are drawn from the nearly 19,000 sample loans that Allstate analyzed, and the
degree of overstatement in Countrywide's prospectuses, holds true for the other 15
Offerings in which Allstate invested that were not subjected to loan-level analysis.
The other Offerings emanate from common registration statements, share similar
Mortgage Loans as collateral, and were purchased by Allstate at the same time as
Allstate was purchasing the securities that were analyzed.

### (3)      Re-calculating the loan-to-value ratios

122.   For each of the sampled loans, the underlying property was valued by
an industry-standard automated valuation model ("AVM").   AVMs are routinely
used in the industry as a way of valuing properties during prequalification,
origination, portfolio review and servicing.   AVMs have become ubiquitous enough
that their testing and use is specifically outlined in regulatory guidance and
discussed in the Dodd-Frank Act.   AVMs rely upon similar data as appraisers—
primarily county assessor records, tax rolls, and data on comparable properties.
AVMs produce independent, statistically-derived valuation estimates by applying
modeling techniques to this data.   The AVM that Allstate used incorporates a
database of 500 million mortgage transactions covering ZIP codes that represent

1  more than 97% of the homes, occupied by more than 99% of the population, in the

2  United States.   Independent testing services have determined that this AVM is the

3  most accurate of all such models.

4     123.   Applying the AVM to the available data for the loans underlying the

5  Certificates shows that the appraised value given to the properties was significantly

6  higher than what that property was actually worth.   This affected the LTV ratios by

7  decreasing the actual value of the properties relative to the loan amount, which

8  increased the overall ratio.   Overall, 18.3% of the loans sampled had recalculated

9  LTV ratios of more than 10% higher than what was claimed in the Offering

10  Materials, and 6.0% of the loans sampled had recalculated LTV ratios of more than

11  *25% higher* than what was claimed in the Offering Materials.   This overvaluation

12  affected numerous statistics in the Offering Materials.

13     124.   For instance, the Offerings each made representations about the percent

14  of loans that had LTVs higher than 90%.   LTVs in excess of 90% provide the

15  lender little value cushion to protect against borrower default and loss upon

16  foreclosure.   However, the AVM indicates that a much higher percentage of the

17  loans had LTVs higher than 90%.   The LTV ratios were understated by

18  Countrywide, as shown in the chart below:

| Asset | Percentage of Loans With an LTV of 90% or Greater, as Represented by Prospectus | Actual Percentage of Loans With an LTV of 90% or Greater | Prospectus Overstatement |
|---|---|---|---|
| CWL 2005-1, MF2 | 6.4% | 20.7% | 14.3% |
| CWALT 2005-25T1, A6 | 0.9% | 15.9% | 15.0% |
| CWL 2005-13, AF5 | 8.1% | 24.5% | 16.4% |
| CWALT 2006-J1 1A6 | 0.9% | 8.8% | 7.9% |
| CWL (CWABS) 2006-9, 1AF6 | 10.3% | 22.1% | 11.9% |
| CWALT 2006-30T1 1A3 | 0.3% | 20.0% | 19.7% |
| CWHL (CWMBS) 2006-9, A10 | 0.9% | 12.7% | 11.7% |
| CWL 2007-4, M1 | 11.2% | 27.9% | 16.7% |
| CWALT 2007-18C, 3FL3 | 4.3% | 33.9% | 29.6% |
| CWHL 2005-HYB7, 3A2 | 7.3% | 19.3% | 11.9% |

125.   The Offerings uniformly represented that none of the Mortgage Loans that collateralized the Certificates had LTV ratios greater than 100 percent, meaning the size of the loan is greater than the value of the property.   (This is known as being "underwater," where a borrower owes more on the property than it is worth.) Loans with over 100% LTV afford the lender no equity cushion and leave the lender with inadequate collateral from the outset of the loan.   Allstate's analysis has found that, despite Countrywide's representations, a substantial number of the Mortgage Loans had LTVs greater than 100%, as follows:

| Asset | Percentage of Loans With an LTV of 100% or Greater, as Represented by Prospectus | Actual Percentage of Loans With an LTV of 100% or Greater | Prospectus Overstatement |
|---|---|---|---|
| CWL 2005-1, MF2 | 0.0% | 7.9% | 7.9% |
| CWALT 2005-25T1, A6 | 0.0% | 7.5% | 7.5% |
| CWL 2005-13, AF5 | 0.0% | 10.0% | 10.0% |
| CWALT 2006-J1 1A6 | 0.0% | 3.3% | 3.3% |
| CWL (CWABS) 2006-9, 1AF6 | 0.0% | 7.8% | 7.8% |
| CWALT 2006-30T1 1A3 | 0.0% | 10.4% | 10.4% |
| CWHL (CWMBS) 2006-9, A10 | 0.0% | 6.0% | 6.0% |
| CWL 2007-4, M1 | 0.0% | 12.3% | 12.3% |
| CWALT 2007-20, A1 | 0.0% | 5.1% | 5.1% |
| CWALT 2007-18C, 3FL3 | 0.0% | 14.5% | 14.5% |
| CWHL 2005-HYB7, 3A2 | 0.0% | 8.4% | 8.4% |

126.   Allstate has also analyzed the weighted average LTV of the Mortgage Loans in each pool and has found that the weighted average LTV was also overstated, because of the overstatement of individual Mortgage Loans within the pools.   The AVM again indicates that these representations were untrue:

| Asset | Weighted Average LTV, as Represented by Countrywide | Actual Weighted Average LTV | Countrywide's Overstatement |
|---|---|---|---|
| CWL 2005-1, MF2 | 80.4% | 85.3% | 4.9% |
| CWALT 2005-25T1, A6 | 73.1% | 81.9% | 8.8% |
| CWL 2005-13, AF5 | 79.0% | 85.3% | 6.3% |
| CWALT 2006-J1 1A6 | 70.6% | 78.0% | 7.4% |
| CWL (CWABS) 2006-9, 1AF6 | 78.8% | 87.2% | 8.4% |
| CWALT 2006-30T1 1A3 | 74.9% | 88.1% | 13.2% |
| CWHL (CWMBS) 2006-9, A10 | 73.3% | 83.9% | 10.6% |
| CWL 2007-4, M1 | 77.0% | 87.0% | 10.0% |

| Asset | Weighted Average LTV, as Represented by Countrywide | Actual Weighted Average LTV | Countrywide's Overstatement |
|---|---|---|---|
| CWALT 2007-20, A1 | 67.0% | 77.2% | 10.2% |
| CWALT 2007-18C, 3FL3 | 71.7% | 79.9% | 8.2% |
| CWHL 2005-HYB7, 3A2 | 76.9% | 84.2% | 7.3% |

127.   The Offering Documents for certain of the Offerings also provided statistical data about the range of CLTVs for the Mortgage Loans underlying Allstate's Certificates.   Countrywide likewise misrepresented the Offering's CLTV statistics.   The Offering Documents for CWL 2006-S1, CWL 2006-S5, and CWL 2007-S1, for example, each alleged that none of the Mortgage Loans had a CLTV ratio greater than 100%.   Despite Countrywide's representations, however, Allstate's analysis has found that 9.8%, 12.6%, and 18.4% of the Mortgage Loans in the three Offerings, respectively, had a CLTV ratio greater than 100%.

128.   Countrywide did not genuinely believe the appraised values were reasonable estimations of the properties' values at the time they were given.   As discussed below, Countrywide knew that the appraisals were being inflated to allow borrowers to be approved for loans that they could not afford.   As such, it knew the LTV and CLTV statistics were baseless.   It also failed to disclose the fact that many of the properties that collateralized the Certificates were burdened by additional liens, a clear fact that should have been disclosed and is not based on any "opinion."

**(4)     Statistical studies by others have similarly revealed that the problems in Countrywide-originated loans were tied to underwriting abandonment**

129.   The F.B.I. Mortgage Fraud Reports of 2006 and 2007 reported on the results of a study of three million residential mortgages that found that between *30% and 70% of early payment defaults were linked to significant misrepresentations in the original loan applications*.   Loans containing egregious misrepresentations were *five times* as likely to default in the first six months than loans that did not.

130.   Researchers at the University of Michigan have conducted studies that found that the number of loans originated by Countrywide that suffered from a particular performance problem – sixty or more days delinquent as of six months of origination – skyrocketed beginning in 2006:



131.   The same studies showed that this drastic change did not occur because of a change in the claimed FICO or LTV scores:



132.   The fact that studies conducted by others show a spike in early payment problems, despite the fact that key characteristics of the loan pools were supposedly not changing, is powerful evidence that Countrywide was systematically abandoning its underwriting standards in creating and characterizing those loans.   As set forth above, Allstate's investigation has confirmed this to be the case with respect to Allstate's Certificates as well.   Exhibit D describes the rates of delinquency of the Mortgage Loans in the Offerings in which Allstate invested.

### (5)   Other parties' reviews of Countrywide's full loan files have revealed even greater deviations

133.   Third parties with access to the complete loan files for certain Countrywide securitizations have performed additional analysis of the mortgage loans underlying Countrywide's offerings.   These include, among others, MBIA Insurance Corporation ("MBIA") and Syncora Insurance Company ("Syncora"). Their analyses provide additional strong evidence that essential characteristics of the Mortgage Loans underlying the Certificates were misrepresented and omitted

1  material information, and that the problems in Countrywide's underwriting practices
2  were systemic.

3      134.  MBIA's analysis included at least three of the same deals in which
4  Allstate invested:   CWHEQ 2006-S8, CWHEQ 2007-S1, and CWHEQ 2007-S2.
5  The other Countrywide securitizations that were analyzed by MBIA include
6  CWABS 2004-I, CWABS 2004-P, CWHEQ 2005-A, CWHEQ 2005-E, CWHEQ
7  2005-I, CWHEQ 2005-M, CWHEQ 2006-E, CWHEQ 2006-G, CWHEQ 2006-S9,
8  CWHEQ 2006-S10, CWHEQ 2007-E, and CWHEQ 2007-S3.

9      135.  The other deals that MBIA analyzed are also probative of problems
10  underlying Allstate's Certificates because the collateral pools for the securitizations
11  that MBIA investigated were composed of second-lien home-equity line of credit
12  loans ("HELOCs") and closed-end second ("CES") loans—the same type of
13  collateral underlying some of Allstate's Certificates.   For example, the CWHEL
14  2005-B Offering that Allstate invested in was collateralized by HELOCs, while the
15  CWL 2006-S1, CWL 2006-S2, CWL 2006-S5, CWL 2007-S1, and CWL 2007-S2
16  Offerings were all collateralized by closed-end fixed-rate loans secured by second
17  liens (i.e. CES loans).   MBIA also found that the defective loans span
18  Countrywide's securitizations from 2004 to 2007, demonstrating the consistency of
19  Countrywide's disregard for its own underwriting guidelines over this period, the
20  same period at issue in this case.   Because Countrywide's violation of its
21  underwriting guidelines was a systemic problem, MBIA's findings are equally
22  applicable to *all* of Allstate's Certificates.

23      136.  MBIA is a New York-based monoline insurer that wrote insurance on
24  certain Countrywide mortgage-backed securities offerings.   MBIA conducted an
25  investigation into Countrywide's loan files after it was asked to make payments to
26  certain other investors.

27      137.  In carrying out its review of the approximately 19,000 Countrywide
28  loan files—including loans that were securitized and sold to Allstate—MBIA found

that *91% of the defaulted or delinquent loans in those securitizations contained material deviations from Countrywide's underwriting guidelines*.   MBIA's report showed that the loan applications frequently "(i) lack key documentation, such as verification of borrower assets or income; (ii) include an invalid or incomplete appraisal; (iii) demonstrate fraud by the borrower on the face of the application; or (iv) reflect that any of borrower income, FICO score, debt, DTI [debt-to-income,] or CLTV [combined loan-to-value] ratios, fails to meet stated Countrywide guidelines (without any permissible exception)."

138.   Syncora, another insurance company that insured Countrywide's securitizations, has conducted a similar re-review analysis of defaulted loans in the securitizations that it insured to determine whether the loans had been originated in accordance with Countrywide's representations.   Syncora found that *75% of the loans it reviewed "were underwritten in violation of Countrywide's own lending guidelines*, lack any compensating factors that could justify their increased risk, and should never have been made."   Syncora's review is probative of the problems underlying Allstate's Certificates because it again shows Countrywide's failures during this key period of 2004 to 2007 were systemic.

139.   Syncora gave examples of individual loans that diverged from Countrywide's guidelines.   The individual defective loans analyzed by Syncora reflected a long list of misstatements by Countrywide.   Many loans violated the DTI ratios and LTV ratios set forth in Countrywide's underwriting guidelines, without adequate compensating factors to justify the increased risk of default, due in part to borrowers' exaggerated incomes and exaggerated property values.   Loan amounts routinely exceeded the maximum amounts permitted under the Company's guidelines for each given borrower, based on a borrower's credit score, documentation, and property values.   Countrywide also improperly issued loans to borrowers when their loan files lacked adequate documentation of borrowers' income, assets, credit, employment, cash reserves, or property values.

140.   In addition, the Illinois Attorney General reviewed the sales of Countrywide loans by an Illinois mortgage broker and found that ***the vast majority of the loans had inflated incomes stated in the documentation, almost all without the borrowers' knowledge***.   This study covered the time period of 2004 to 2007, again the same time period during which Countrywide was generating the loans at issue here.   Likewise, a review of 100 stated-income loans by the Mortgage Asset Research Institute revealed that ***60% of the income amounts were inflated by more than 50%*** and that 90% of the loans had inflated income figures of at least 5%. Again, this is highly probative of the problems underlying Countrywide's Certificates as it covers the time period of 2004 to 2007.

## B.   Countrywide's Own Internal Documents Demonstrate It Abandoned Its "Theoretical" Underwriting Standards

141.   The SEC recently made public many of Countrywide's internal documents and communications.   As reflected below, these documents show that the representations at issue here were untrue.   The documents not only demonstrate that Countrywide's underwriting failures were systemic, implicating all of their loans generated at this time, but often directly deal with the same exact type of loans, products, and processes underlying Allstate's Certificates.   However, Allstate had no way of knowing these misrepresentations because these internal Countrywide documents were not available to Allstate and were only made public recently.

### (1)   Countrywide's internal post-mortem shows it systematically ignored the risks created by its "matching" strategy

142.   In November 2007, Countrywide prepared a "lessons learned" analysis. This included key observations from interviews of Countrywide's employees and culminated in an internal presentation.   In this analysis, Countrywide repeatedly admits that it was singularly focused on market share and its "matching" strategy:

- "***We were driven by market share, and wouldn't say 'no' (to guideline expansion).***"

- "Competitiveness and aggressiveness are great, and part of our DNA.   However, it can lead to arrogance and lack of friends. There are times when our strengths can turn into our weaknesses."

- "The strategies that could have avoided the situation were not very appealing at the time.   Do not produce risky loans in the first place:   This strategy would have hurt our production franchise and reduced earnings."

- "***Market share, size and dominance were driving*** themes . . . . Created huge upside in good times, but challenges in today's environment.   ***Net/net it was probably worth it.***"

(Emphasis added).

143.   Countrywide also repeatedly admits that the "matching" strategy led to product development far outpacing its risk-assessment procedures and misaligned the incentives of its employees:

- "***With riskier products, you need to be exquisite in off-loading the risk***.   This puts significant pressure on risk management. ***Our systems never caught up with the risks***, or with the pace of change."

- "Risk indicators and internal control systems may not have gotten enough attention in the institutional risk and Board committees."

- "***Not enough people had an incentive to manage risk***."

- "Decentralized and local decision making were another characteristic of our model . . . .   ***The downside was fewer risk controls and less focus on risk***, as the local decision makers were not directly measured on risk."

- "***Our wide guidelines were not supported by the proper infrastructure (credit, risk management)***."

- "[W]e did not put meaningful boundaries around the [broad product] strategy, even when our instincts might have suggested that we do so, and ***we allowed the model to outrun its critical support infrastructure in investment and credit risk management*** . . . .   Our risk management systems were not able to provide enough counterbalance . . . ."

- "***The focus of production was volume and margin, not credit risk.   There was also massive emphasis on share.***"

- "***Structure and capabilities of Secondary not in-sync with production***."

(Emphasis added).

144.   Countrywide's internal analysis of failures in its own underwriting guidelines is directly relevant to Allstate's Certificates because it is a home-grown analysis of Countrywide's systemic problems and occurred during the very time period when the loans underlying Allstate's Certificates were being generated, and when the Certificates were being issued.

### (2)   Mozilo's emails show he "personally observed a serious lack of compliance"

145.   In early 2006, HSBC had begun to contractually force Countrywide to buy back certain defective loans.   In a March 28, 2006 e-mail to Sambol and others, Mozilo admitted the problems with the loans were caused by "***errors of both judgment and protocol***."   (Emphasis added).   The "errors" referred to in this email occurred at the same time as the Mortgage Loans and Certificates at issue here.

146.   In an April 13, 2006 e-mail, Mozilo wrote to Sieracki and others that he was concerned that certain subprime loans had been originated "***with serious disregard for process [and] compliance with guidelines***," resulting in the delivery of loans "***with deficient documentation***":

> I want Sambol to take all steps necessary to assure that our origination operation "follows guidelines" for every product that we originate.   ***I have personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s].***   In my conversations with Sambol he calls the 100% sub prime seconds as the "milk" of the business.   Frankly I consider that product line to be the poison of ours.   ***Obviously as CEO I cannot continue the sanctioning of the origination of this product until such time I can get concrete assurances that we are not facing a continuous catastrophe.***   Therefore I want a plan of action not only from Sambol but equally from McMurray as to how we can manage this risk going forward.

(Emphasis added).

147.   In a June 1, 2006 e-mail regarding Pay-Option ARMs, Mozilo warned Sambol and other executives that borrowers "are going to experience a payment shock which is going to be difficult if not impossible for them to manage."   (In a Pay-Option ARM, the borrower can make a payment even less than that required to

Case No. Case No. 2:11-CV-05236 MRP (MANx)
AMENDED COMPLAINT

pay off accruing interest.   If the borrower does this too many times, the amount of principal owed is recalculated, resulting in a sudden increase in the minimum payments.)   Mozilo warned that "[w]e know or can reliably predict what's going to happen in the next couple of years."   Mozilo reiterated his concern that the majority of pay-option ARMs were originated using stated income, and that evidence suggested that borrowers were misstating their incomes.   He asked the executives to "assume the worst" and take corrective measures to try and avoid the disastrous consequences of Countrywide's lending policies, including reducing its exposure to loans with low FICO scores.

148.   In a September 26, 2006 email Mozilo admitted that with respect to pay-option ARMs "*we are flying blind* on how these loans will perform" in a stressed environment.   Mozilo's emails regarding pay-option ARMs are directly relevant here, because many of Allstate's Certificates included such loan products, such as the Certificates Allstate purchased in CWL 2005-1.   But this admission reaches further, as Countrywide's Chief Risk Officer McMurray later would testify that "I do think you could generalize [this] observation to a much broader set of loans than just pay option."

149.   According to the SEC, on May 29, 2007 Sambol and Sieracki attended a Credit Risk Committee Meeting, in which they were informed that "*loans continue[d] to be originated outside guidelines*," primarily via the Secondary Structured Lending Desk *without "formal guidance or governance surrounding" the approvals*.   This admission is probative of how the Mortgage Loans at issue here were generated, given that the admission covered the heart of the period when the loans underlying Allstate's Certificates were being generated.

### (3)   Internal quality reviews highlight that loans were being issued outside of Countrywide's underwriting guidelines

150.   On May 22, 2005, John McMurray, Countrywide's then-Chief Risk Officer, warned Sambol that loans which were originated as exceptions to

Countrywide's stated origination guidelines would likely experience higher default rates.   He wrote that "*exceptions are generally done at terms more aggressive than our guidelines*" and recommended that "[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions."   (Emphasis added).

151.   In June 2005, McMurray warned Sambol in an e-mail exchange that "as a consequence of [Countrywide's] strategy to have the widest product line in the industry, we are clearly out on the 'frontier' in many areas," adding that that "frontier" had "high expected default rates and losses."   He also told Sambol that because of the "matching" strategy, Countrywide's guidelines "will be a composite of the outer boundaries across multiple lenders," and that the resulting "composite guides [sic] are likely among the most aggressive in the industry.

152.   McMurray's 2005 emails describe how Countrywide's "matching" strategy was resulting in a "composite" process more aggressive than any other in the industry.   These emails are relevant not only because many of the Mortgage Loans at issue here were being issued at that time, but also because Countrywide's "matching" strategy only accelerated as more of the loans at issue here were generated.

153.   In a June 2006 email chain that included both McMurray and Sambol, Countrywide circulated the results of an audit it had conducted.   Among the findings were that "approximately *40% of the Bank's reduced documentation loans . . . could potentially have income overstated by more than 10% and a significant percent of those loans would have income overstated by 50% or more.*" McMurray admitted that it's "obviously the case" that "perhaps many" of these overstatements were the result of misrepresentations.   Another Countrywide Risk Officer, Clifford Rossi, agreed, testifying that "the vast majority" of the overstated income amounts was "likely" due to misrepresentations.   This analysis of misstatements in the applications for reduced-documentation loans is highly relevant

to Allstate's Certificates, because the analysis was conducted at the same time many of the Mortgage Loans at issue here were generated, and because many of the Mortgage Loans were issued on a reduced-documentation basis—indeed, as Allstate's analysis has shown, even more than Allstate was told at the time.

154.   Around the same time, according to the SEC, there was a credit meeting where attendees were informed that *one-third of the loans referred out of Countrywide's automated underwriting system violated "major" underwriting guidelines*, *23% of the subprime first-lien loans were generated as "exceptions," and that "exception" loans were performing 2.8 times worse than loans written within guidelines*.   That the loans approved by exceptions were performing so much worse than other similar loans is itself strong evidence that the "exceptions" were not being granted based on any purported countervailing circumstances in the borrowers' credit profile.

155.   At that same meeting, the Committee discussed evidence of borrower misrepresentation of incomes and occupations on reduced-documentation loan applications.   And according to the SEC, at an earlier meeting it was revealed that "exceptions" were being granted to accommodate ineligible borrowers, and in November 2006 Sieracki was informed that there was an increased volume of Suspicious Activity Reports being filed related to mortgage fraud.

156.   These studies are highly probative of the hidden problems in the Mortgage Loans at issue here, as Countrywide's self-analysis was conducted in mid-2006, just as many of the Mortgage Loans it would have been studying were being included in the pools underlying Allstate's Certificates.

157.   On November 2, 2006, McMurray asked Countrywide's Chief Investment Officer, in an e-mail forwarded to Sambol, whether Countrywide "want[s] to effectively cede" its underwriting policies to the market.

158.   In a February 11, 2007 e-mail to Sambol, McMurray reiterated his concerns about Countrywide's strategy of matching any type of loan product offered

Case No. Case No. 2:11-CV-05236 MRP (MANx)
AMENDED COMPLAINT

by its competitors, which he said could expose the Company to the riskiest offerings in the market:   "*I doubt this approach would play well with regulators, investors, rating agencies[,] etc.   To some, this approach might seem like we've simply ceded our risk standards . . . to whoever has the most liberal guidelines*" (emphasis added).

159.   During a March 12, 2007 meeting of Countrywide's credit risk committee, the Risk Management department reported that *12% of Countrywide loans that were reviewed internally were rated "severely unsatisfactory" or "high risk" because the loans had loan-to-value ratios, debt-to-income ratios, or FICO scores outside of Countrywide's already-wide underwriting guidelines*.   Again, this self-scrutiny covered loans being generated during the same period as those underlying Countrywide's Certificates.

160.   In a May 7, 2007 letter to the Office of Thrift Supervision, Countrywide admitted:   "Specifically looking at originations in the fourth quarter of 2006, we know that almost 60% of the borrowers who obtained subprime hybrid ARMs [from Countrywide] would not have qualified at the fully indexed rate." Countrywide also admitted that "almost 25% of the borrowers would not have qualified for any other [Countrywide] product."   In other words, Countrywide was shuffling borrowers to exotic products because the borrowers could not afford anything else, making those loans all the riskier.   Many of these exotic products made their way into Allstate's Certificates, even though Allstate was never told that Countrywide knew such an incredibly high number of borrowers could not afford the payments on any other type of products.

161.   In a December 13, 2007 internal memo from Countrywide's enterprise risk assessment officer to Mozilo, the officer reported that Countrywide had re-reviewed mortgages originated by Countrywide in 2006 and 2007 "to get a sense of the quality of file documentation and underwriting practices, and to assess compliance with internal policies and procedures."   Countrywide found that

"*borrower repayment capacity was not adequately assessed* by the bank during the underwriting process for home equity loans."   (Emphasis added).   That the study covered two complete years when loans were being generated for inclusion in Allstate's Certificates makes it highly relevant to this action.

**(4)   Exceptions were used as a way to deploy the "matching" strategy, despite Countrywide's "theoretical" underwriting guidelines**

162.   Frank Aguilera, a Managing Director responsible for risk management, reported the "particularly alarming" results of an internal review on June 12, 2006. He reported to others in Countrywide that *23% of the subprime loans at the time were generated as exceptions*, even taking into account "all guidelines, published and not published, approved and not yet approved."   Again, this study occurred during the same period in which loans were being generated and included in Allstate's Certificates.   The exception rate for "80/20" products (which are particularly risky because they provide 100% financing) was even higher— Allstate's Certificates included many such loans.   The CWHL 2005-HYB7 Offering that Allstate invested in, for example, included such 80/20 loans.   Aguilera wrote at the time that "*The results speak towards our inability to adequately impose and monitor controls on production operations.*"   (Emphasis added).

163.   In February 21, 2007 Aguilera disputed a belief stated by someone else in a prior meeting that there was adequate controls with regards to exceptions in certain areas, and stressed how the guidelines were meaningless when so many exceptions were being granted:   "Our review of January data suggests that these controls need to be reviewed.   *Any guidance tightening should be considered purely optics with little change in overall execution unless these exceptions can be contained*."   (Emphasis added).

164.   As an example, he provided data on loans that were approved as "exceptions" despite having high loan-to-value ratios.   He found "*significant levels of exceptions*" under "all high risk programs.   Full Spectrum Lending,

Countrywide's subprime-mortgage affiliate was called out for "***in particular exceed[ing] any imaginable comfort level***."   (Emphasis added).   His email highlighted that ***52%*** of 100% LTV loans by Full Spectrum Lending were issued by way of "exceptions."   Overall, ***37% of such loans studied required "exceptions."***

165.   In June 2007, Executive Vice President of Credit Risk Management Christian Ingerslev provided a "granular performance assessment of 2006 Vintage Non-Conforming 1st lien loans that have been (or should be) going to the Secondary [Structured Loan Desk] for exception approval . . . plus loans that [Correspondent Lending Division] is buying in bulk outside the guidelines."   In other words, he was reviewing the type of loans that were all being done outside of Countrywide's already-wide "normal" underwriting standards.   Many of Allstate's Mortgage Loans were being generated at the time Ingerslev was analyzing.   His analysis concluded that "nearly every" low documentation sector reviewed exhibited "subprime-like" performance.   Allstate's Mortgage Loans included low-documentation loans such as those studied by Ingerslev here, including those generated at around the same time.   "***There is currently no formal policy or agreed upon process which identifies what Secondary can or should price, other than what they have identified as 'unsalable' (same goes for CLD bulk bids).***   While I've asked, I have not seen a comprehensive list of what they are saying no to." (Emphasis added).

166.   Ingerslev wrote this to Chief Investment Officer Kevin Bartlett because he "understand[s] you are directing a project to make Production's ***theoretical requirement to underwrite a reality.   Under that scenario, should the line in the sand still be 'unsalable'?   After looking at the performance, it's hard to recommend anything other than no.***   Heretofore that has been a challenging edit for Credit to implement (for obvious reasons) and the outcry is to just price the risk – regardless of performance."   (Emphasis added).   Here, Countrywide admits that its underwriting policies were viewed as being merely "theoretical," with the only

1    real standard was "unsalable."   This admission came at a time when many of the

2    Mortgage Loans underlying Allstate's Certificates would have been or were about to

3    be generated.

4         167.   The above statistics regarding the massive abuse of "exceptions,"

5    though justly described as "alarming" by Aguilera, should not have been surprising

6    given the purpose of the Countrywide's exception policy was to ensure that *all* loans

7    were approved.   For example, in an April 14, 2005 email chain, various managing

8    directors were discussing what FICO scores Countrywide would accept.   One

9    Managing Director wrote that the "spirit" of the exception policy was to "provide

10    flexibility and authority to attempt to approve ***all loans submitted under an***

11    ***approved program/guideline which are later determined to be outside***."

12    (Emphasis added).   He went on:   "I would argue that the [exception] policy would

13    also contemplate more general exceptions such as . . . ***to keep pace with fast***

14    ***changing markets prior to submitting a formal change***."   (Emphasis added).   In

15    other words, he admitted that the exception process was a way for Countrywide to

16    cover its mistakes by retroactively re-approving loans that should have not been

17    approved in the first place, and a way to ensure Countrywide could lead the race to

18    the bottom.   This is probative of Allstate's Certificates not only because the

19    admission occurred around the same time as when many of the Mortgage Loans

20    underlying Allstate's Certificates were being originated and securitized, but also

21    because Countrywide's corporate "matching" policy driving the need to "keep pace"

22    with the industry continued throughout the period relevant to this case.

23         168.   Another internal Countrywide document described the objectives of

24    Countrywide's Exception Processing System to include "***[a]pprov[ing] virtually***

25    ***every borrower*** and loan profile," with "pricing add on" (i.e., additional fees) if

26    necessary to offset the risk.   (Emphasis added).   The objectives also included

27    providing "[p]rocess and price exceptions on standard products for high risk

28    borrowers."   Sambol identified during his testimony a February 13, 2005 email he

wrote that similarly said that the "purpose of the [Structured Loan Desk] and our pricing philosophy" should be expanded to include that "we should be willing to price *virtually any loan that we reasonably believe we can sell/securitize* without losing money, even if other tenders can't or won't do the deal."   (Emphasis added).

### (5)   Countrywide admits to "cherry picking" deals

169.   On August 2, 2005, Sambol actually questioned the company's policy of "cherry picking" the best loans for itself while leaving the higher-risk leftovers for securitization:

> While it makes sense for us to be selective as to the loans which the Bank retains, *we need to analyze the securitization implications on what remains if the bank is only cherry-picking and what remains to be securitized/sold is overly concentrated with higher risk loans.* This concern and issue gets magnified as we put a bigger percentage of our pay option production into the Bank because *the remaining production then increasingly looks like an adversely selected pool*.

(Emphasis added).

170.   Mozilo responded the same day:

> I absolutely understand your position however there is a price we will pay no matter what we do.   *The difference being that by placing less attractive loans in the secondary market we know exactly the economic price we will pay when the sales settle.*   By placing, even at 50%, *into the Bank we have no idea what economic and reputational losses we will suffer not to say anything about restrictions placed upon us by regulators*.

(Emphasis added).

### (6)   In short, Countrywide "basically continued to operate as though they never received" risk policies.

171.   In a March 23, 2006 email, Chief Risk Officer McMurray circulated a "Policy on High Risk Products."   He wrote that there were also "many meetings and other conversations" where the policy issues were discussed.   Nonetheless, over a year later, on September 7, 2007 he admitted:   "I was never supported on this and Secondary, Production, and CCM *basically continued to operate as though they never received this policy*."   (Emphasis added).   Similarly, on February 9, 2006, McMurray had circulated additional policy guidance, including asking

"should we really even be offering this product?"   He complained at the time that he's "*continuing to encounter resistance to my efforts and instructions to rein in this program*."   (Emphasis added).   In 2007 he summarized:   "I wasn't supported on this."

172.   In a March 7, 2005 email, the Vice President of Product Management (Christian Ingerslev) similarly complained:

> [S]ounds like they got on the line with the traders, and long story short, they now think they can sell them . . . .   *[I]t's frustrating to try and hold the line just to be overridden with whining and escalation. [J]ust reinforces that sales can have anything they want if they yell loud enough* to Drew [Gissinger, President of Countrywide Home Loans].

(Emphasis added).

173.   In November 2006, McMurray reiterated to Sambol his view on "*fundamental deficiencies*" within Countrywide with regard to risk:

> First, we need to agree on a risk vision and guiding principles that the entire enterprise will follow.   *I previously created a set of guiding principles, but there hasn't been acceptance from some of the key business units.   The most widely held belief is that our guiding principle is simply doing what anyone else in the market is doing; if it's in the market, we have to do it.*

> Second, we should require everyone to follow established risk guidance and policies[;] a product cannot be rolled out or transactions closed without required approvals.   *There are several recent examples where products or transactions proceeded without the required risk approvals or in contradiction of established policy*.

(Emphasis added).

**C.   The Sworn Testimony of Countrywide's Own Former Officers Demonstrate That It Abandoned Its "Theoretical" Underwriting Standards**

174.   The SEC has recently made available the testimony given by Countrywide's former executives in its action against Mozilo and others.   As described below, this testimony again confirms that the Offering Materials were false and misleading.

### (1)   Chief Risk Officer John McMurray:   "Matching policy" resulted in "routinely" using loan "exceptions"

175.   ***"Matching strategy" routinely deployed by way of exceptions – even after his department had rejected a proposed transaction.***   McMurray admitted that the "matching strategy" was a "a corporate principle and practice that had a profound effect on credit policy."   In fact, he thought it was not possible to understand Countrywide's underwriting policies without knowing of and understanding the matching strategy, ***and that the strategy was rolled out by use of "the exception desks," which happened "routinely."***

176.   He testified that he was aware that there were instances where his credit risk department "***would reject proposals for new products but the people in sales nevertheless used the exceptions procedure to achieve the same result***."   He was "surprised, angry, and disappointed," for instance, when he found out that despite being previously rejected Countrywide had advertising fliers promoting loans that had low FICO requirement, only required a stated (non-documented) income, and provided 100% financing.   The CWALT 2007-18CB, CWALT 2007-20, and CWALT 2006-J1 Offerings, for example, contained Mortgage Loans that were originated according to a Stated Income/Stated Asset Documentation Loan Program, where income and asset information was not verified and borrowers were not required to give proof of income or assets, and a No Income/No Asset Documentation Program, where no documentation relating to a prospective borrower's income, employment or assets was required.

177.   McMurray believed those loans were being issued through exceptions despite such a program being previously rejected by his team.   More generally, he also testified that he was "fairly certain" he had conversations with others in Countrywide, including Sambol, about the fact that exceptions were being made without sufficient compensating factors.

178.   McMurray also agreed that the use of exceptions, even as a general matter, made the process more risky:   "Almost by definition, you are dealing with a riskier transaction" when the loan is approved by an exception, and in fact there were areas where his group found a "big disparity" in performance between "exception" loans and others.   That the "exception" loans were performing so much worse is strong evidence that the exceptions were not being used based on countervailing positive features of the borrower's credit profile.

179.   ***Expanding guidelines because of the "matching strategy" increased the default risk.***   McMurray admitted that underwriting "guidelines were expanding" at Countrywide from September 2003 and the middle of 2007—i.e., throughout the period when Countrywide was originating and securitizing Allstate's Mortgage Loans.   This guideline "drift" was a concern of his because "even if you undertake measures to transmit that risk outside the company, you're still starting with more risk that needs to be distributed."   He admitted that "the idea of risk being sold off, [] that was a key part of Countrywide's strategy."

180.   He also admitted in his testimony that "there's [a] relationship between expanding underwriting guidelines and a probability of a loan going to default or serious delinquency."   McMurray testified that he shared his concerns about this correlation with others at Countrywide, including Mozilo, Sambol, and Sieracki.

181.   McMurray also testified that he raised concerns about the "composite" effects of Countrywide's "matching strategy."   He explained:

> [I]f you match one lender on – on one – on certain guidelines for certain products and then you match a separate lender on on a different product or a different set of guidelines, then in my view the composite of that – of that two-step match would be more – would be more aggressive than either one of those competitor reference points viewed in isolation.

He further testified that he was concerned about "companion mitigants" that would allow competitors to use the products Countrywide was matching only because they had additional terms not in Countrywide's system, such as additional credit history

Case No. Case No. 2:11-CV-05236 MRP (MANx)
AMENDED COMPLAINT

requirements.   In short, "the chief concern on [the matching strategy] is that some of your risk standards get ceded to other institutions by following that strategy. That is my chief concern."   McMurray testified that whether Countrywide was "ceding our credit policy to the most aggressive players in the market" was a "pretty serious concern" he had, which he raised with others in Countrywide including his supervisor Bartlett.

182.   ***Countrywide securitized the worst loans, keeping the better ones for itself.***   McMurray testified that he specifically raised concerns about the risks presented by Countrywide's securities.   Part of this concern was not only Countrywide's aggressive standards, but also that:

> There's another element that we need to bring in here that's important with respect to securities performance.  ***Countrywide's bank tended to – on – on some of the key products, tended to select the best loans out of the ones that were originated.***   By best – I'm talking about from a credit risk standpoint, so let me clarify that.  ***So as – as those loans are drawn out of the population, what's left to put into the securities were not – are not as good as what you started out with***, and then that can have an adverse effect on securities performance.

183.   That Countrywide was "cherry-picking" the loans it would keep for itself was also confirmed by the testimony of Clifford Rossi, a Countrywide Risk Officer, who testified that the "bank was to originate and to cherry pick the better quality assets."

**(2)   Vice President of Credit Risk Management Christian Ingerslev:   "Focus groups" confirmed borrowers were misrepresenting income**

184.   Christian Ingerslev, Countrywide's Executive Vice President of Credit Risk Management, testified that Countrywide used ***"focus groups," which made it "seem[] like it was the case"*** that ***"income was being overstated to reality in some cases."***   He testified that Sambol, among others, was aware of these results because he spoke to Sambol about them.   Upon information and belief, these focus groups occurred during the same period when Countrywide was generating the Mortgage Loans relevant here.

185.   Ingerslev agreed that "loan quality relate[s] to or bear[s] upon the issue of likelihood of default or serious delinquency.   He thought it to be an "intuitive" conclusion that loans with higher loan-to-value ratios have a higher risk of default. He testified:

> [People default] when an income disruption event happens in their lives . . . and when that unexpected event happens in people's lives, if they have an equity cushion in their home, they have something to sort of stem off the short-term problem . . . .   If people were buying homes, you know, beginning without any cushion, they were going to be more susceptible to this income disruption event.   And, again, this is intuitive sense based on my experience in the business and not necessarily analytical, but then when we attempted to model it, our modeling group attempted to model it, you know, we showed some more results where the expected default rates were going to be pretty high.

This is highly probative of the issues in this case because, as discussed above, Countrywide was materially misrepresenting the actual LTV ratios of Allstate's Mortgage Loans.

186.   Ingerslev confirmed that internal documentation showed that products and transactions *were even going forward "without the required risk approvals or in contradiction of established policies."   He testified that there was no "systemic way" to stop this from happening because "you're talking about human beings, not systems."*   He also testified there was no "consequence or penalty" for originating loans that had not been signed off by McMurray.

### (3)   Managing Director Frank Aguilera:   "Matching" strategy was "not a tolerable process" for subprime products

187.   The testimony of Frank Aguilera, a Managing Director responsible for risk management, confirms that the company followed a "matching strategy."   To support this strategy, the company even created a large database of products offered by competitors so that if somebody tried to convince Countrywide to approve a new product all it had to do was to check the database to see if someone else had already approved it.   He also testified that he did not think investors were aware of Countrywide's internal "matching" strategy.

Case No. Case No. 2:11-CV-05236 MRP (MANx)
AMENDED COMPLAINT

188.   Aguilera was "surprised" this strategy was deployed not just to the more well-developed prime loans, but also the riskier subprime loan area.   He testified that "***from a credit perspective, my view, it's not a tolerable process***."   He raised his concerns formally with at least two other managers at Countrywide.

189.   ***Aguilera confirmed that the way this "matching" strategy was implemented was through Countrywide's "exception" processes.***   This confirms Countrywide was using its "exception" processes in order to gain market share and increase loan volume by working around its stated underwriting guidelines.   He also testified that "90 percent" of his time as the person responsible for Countrywide's "technical manuals" was spent on "expansions" of the guidelines.

### (4)   CEO Angelo Mozilo:   Matching strategy was a "dangerous game"

190.   In his testimony, Mozilo admitted that "if the only reason why you offered a product, without any other thought, any other study, any other actuarial work being done is because someone else was doing it, that's a dangerous game to play."

### (5)   Depositor President Nathan Adler:   "Salability" was the sole factor for giving "exceptions"

191.   Defendant Nathan Adler, the President of many of the Depositor Defendants here, testified about the "evolution" of the Structured Loan Desk.   He testified that Countrywide's exception policy had "core guidelines."   If those were not met, the company also had "shadow" guidelines.   If even those were met, the loans were given to "Secondary Marketing to determine if the loan could be sold given the exception that was being asked for."   Thus "salability" was a "factor in the determination of whether to make a loan on an exception basis."   ***Indeed, by the time the loan reached Adler whether the loan could be sold in the secondary market was "the only criteria that we followed***."   Upon information and belief, "salability" was the sole factor governing final approval or denial of the Mortgage Loans throughout the relevant period.

## D.   Other Statements Provided By Countrywide Employees and Customers Further Confirm Countrywide's Abandonment of its Underwriting Standards

### (1)   Former employees:   Borrowers were coached on how to use no-doc loans to circumvent prior loan rejections

192.   Mark Zachary is a former Regional Vice President of Countrywide who claims he was fired for airing his concerns about Countrywide's underwriting practices.   He told Larry King of CNN that if a borrower did not qualify for a conventional loan, Countrywide's loan officers would often steer the borrower into riskier loans that did not require documentation, so-called "liar loans."   Allstate's Mortgage Loans included low-documentation loans such as those described by Zachary here.   Indeed, as alleged herein, Allstate's Certificates included many more loans approved on less than a fully documented application than the Offering Materials let on.

193.   In a February 13, 2007 e-mail to one of his supervisors, the Senior Vice President Divisional Manager of Countrywide KB Home Loans, a joint venture between Countrywide and KB Homes, a homebuilder, Zachary said that "it seems to be an accepted practice for [Countrywide] to have a full doc loan and then if it can't be approved . . . we flip to a stated[-income loan] and send to FSL [Full Spectrum Lending, Countrywide's subprime-mortgage affiliate] under non-prime (sub-prime business unit)."

194.   Once in the low-documentation process, "the income stated on those loans generally was not a true representation of what the person normally makes." Zachary confirmed that Countrywide employees were coaching applicants to lie, including overstating their income by as much as 100% to qualify for a loan. According to Zachary, loan officers would coach potential homeowners on the income levels needed to qualify for a given mortgage loan and would then accept revised loan applications from those borrowers which contained an inflated reported income.

195.   Other former employees have similarly confirmed that Countrywide coached borrowers how to falsify their low- or no-documentation loan applications in order to circumvent the normal underwriting process.   For instance, a former Countrywide loan officer described in the California Attorney General's complaint against Countrywide reiterated the fact that borrowers were coached on how to lie. He explained that a loan officer might say, "with your credit score of X, for this payment, and to make X payment, X is the income you need to make."   And NBC News reported that it spoke to six other former Countrywide employees, who worked in different parts of the country, who described the same "anything goes" corrupt culture and practices.   Some of those employees even said that borrowers' W-2 forms and other documents were falsified to allow for loan approval.   One employee stated that "***I've seen supervisors stand over employees' shoulders and watch them . . . change incomes and things like that to make the loan work***."

196.   Given that Countrywide was often coaching borrowers on how to falsify their applications, or even making changes without the borrower's knowledge, it is not surprising that Countrywide did not seek to confirm that the information being provided to it was accurate.   A former supervising underwriter at Countrywide explained that the company declined to check bank balances for applicants applying for stated-income, stated-asset loans that provided account information.   Countrywide also had the right to verify the income stated on a loan application by use of Internal Revenue Service data, but only 3% to 5% of the loans that Countrywide issued by 2006 were checked.   This period covers many of the Mortgage Loans that would have collateralized Allstate's Certificates.

197.   For stated-income loans, where Countrywide promised that it would exercise discretion, during the 2005-2006 period the company directed loan officers to support their assessments by referring to the website www.salary.com.   Again, this period covers many of the loans that would have collateralized Allstate's Certificates.   This practice was reported by former employees cited in the Illinois

Attorney General's complaint against Countrywide.   The website did not provide specific salary information for any particular borrower, but provided a range of salaries for particular job titles based upon the borrower's zip code.   And even when the salaries were outside the ranges, Countrywide did not require its employees to follow-up with the borrower.

198.   ***One Countrywide employee estimated that approximately 90% of all reduced-documentation loans sold out of the employee's Chicago office had inflated incomes***.   One of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications.   Similarly, according to a confidential witness relied on by plaintiffs in other actions, as much as 80% of the loans originated by Countrywide out of its Jacksonville processing center between June 2006 and April 2007—i.e., when many of the loans at issue here were being generated—had significant variations from Countrywide's theoretical underwriting standards.

**(2)   Former employee:   Countrywide knew appraisals were being inflated**

199.   In September 2006, Zachary informed Countrywide executives that there was a problem with appraisals performed on KB Home properties being purchased with mortgage loans originated by Countrywide.   According to Zachary, Countrywide executives knew that appraisers were strongly encouraged to inflate appraisal values by as much as 6% to allow homeowners to "roll up" all closing costs.   According to Zachary, this practice resulted in borrowers being "duped" as to the true values of their homes.   This also made loans more risky because when values were falsely increased, loan-to-value ratios calculated with these phony numbers were necessarily incorrect.

200.   Zachary brought his concerns to executives of the Countrywide/KB Homes joint venture, as well as Countrywide executives in Houston, Countrywide's Employee Relations Department and Countrywide's Senior Risk Management

1  Executives.   According to Zachary, Countrywide performed an audit investigating

2  these matters in January 2007, and the findings of the audit corroborated his story.

3  According to Zachary, the findings of this audit were brought to the attention of

4  Countrywide executives.

5  **(3)     Borrowers:   Countrywide falsified our records**

6       201.   Julie Santoboni, who took out a Countrywide mortgage on her family's

7  home in Washington, D.C., was interviewed on National Public Radio.   She

8  explained that she has owned several homes and that she and her husband are

9  professionals.   Nonetheless, when the family reached out to Countrywide to

10  refinance their home's adjustable-rate loan, *a Countrywide loan officer pressured*

11  *her to lie about her income to obtain a more attractive loan, since she had taken*

12  *off two years of work for her children.*   The employee said that he could increase

13  her husband's listed income, that the underwriters would not question the income

14  because her husband's job title included the word "manager," and that the

15  employee's boss would also not verify the stated income.

16       202.   Santoboni also said that the Countrywide loan officer wanted her to

17  write a letter stating she made $60,000 during each of the past two years and get her

18  accountant to sign it, even though that would have been fraudulent, since she had no

19  income.   The loan officer continued to give her a "hard sell," pressuring her to lie

20  about her income in order to obtain a more favorable interest rate on the loan.

21  Santoboni followed up with Countrywide to complain about the incident but

22  received no response as of the time of the interview.   She made a complaint with

23  the Federal Office of Thrift Supervision about the wrongdoing.

24       203.   Another Countrywide borrower, Bruce Rose, described obtaining a

25  mortgage loan from Countrywide that stated his monthly income as $12,166, as he

26  realized only later, when his income at the time was only around $16,000 *a year*.

27

28

204.   One borrower told NBC News that her Countrywide loan officer told her to claim she made more than twice her actual income in order to gain approval for her loan.

205.   A potential Countrywide customer known to Zachary complained to Countrywide in a September 19, 2006 e-mail that "I was told that my loan had been turned over to Countrywide's internal fraud department for review because *a loan officer increased my income figures without authorization in order to get me approved for the stated-income loan*.   I was told by several people at Countrywide that this was done just to get me qualified and that nobody would check on it."

**(4)   Former employees:   Countrywide steered borrowers to riskier (higher fee) products and heavily incentivized employees to do so**

206.   Riskier loans were more profitable for Countrywide, which provided an incentive to systematically encourage the use of riskier products.   A former employee provided documents to the *New York Times* indicating that Countrywide's profit margins ranged from three to five percent on regular subprime loans, but that loans which included heavy burdens on borrowers, such as high prepayment penalties that persisted for three years, Countrywide's profit margins could reach as high as fifteen percent of the loan.

207.   Because Countrywide had a higher incentive to originate higher-risk loans, it similarly incentivized its employees to do so.   For instance, it paid employees who originated loans in part based on the volume and dollar value of the loans they approved.   A substantial portion of the salary of Countrywide's sales employees was based on commissions, which gave the employees a strong incentive to maximize sales volume and close the maximum number of mortgage loans regardless of quality.   For example, Countrywide's wholesale account executives, the employees who dealt with brokers, were paid only on commission – they had no base salary.

208.   Because of the higher origination fees charged with respect to nontraditional loans, employees and independent mortgage brokers were paid more when originating nontraditional loan products than when they originated standard loans.   Former Countrywide mortgage brokers reported that brokers received commissions of 0.50% of the loan's value for originating subprime loans, while their commission was only 0.20% for less-risky loans.   Moreover, adding a three-year prepayment penalty to a mortgage loan would generate an extra commission for the Countrywide employee of 1% of the loan's value.   Persuading someone to add a home equity line of credit to a loan carried an extra commission of 0.25%.

209.   That Countrywide was incentivized to push high-risk products—including on borrowers who did not understand and could not afford them—directly impacts the Mortgage Loans at issue here.   Many of Allstate's Certificates were backed with such "exotic" products generated at the time when these incentives were in place, such as the Certificates Allstate purchased in the CWL 2005-1 Offering.

### E.   <u>Other Evidence That the Representations Were False</u>

#### (1)   **Appraisal company:   Countrywide pressured companies to obtain inflated home values**

210.   As described above, Countywide touted the Mortgage Loans' LTV ratios, including emphasizing that they were based on the use of independent appraisers.   In fact, Countrywide Home Loans regularly engaged appraisers that were affiliated with Countrywide, including appraisers that were owned or controlled by Countrywide, either directly or indirectly through intermediate subsidiaries or otherwise subject to Countrywide's influence.   This created a conflict of interest.   As originator and securitizer of the loans, Countrywide had an incentive to inflate the value of properties because doing so would result in lower LTV ratios.   A lower LTV ratio would allow a loan to be approved when it otherwise would not be, and would appear less risky to Allstate and other investors.

But loans based on inflated appraisals are more likely to default and less likely to produce sufficient assets to repay the second lien holder in foreclosure.

211.   The appraisals in practice were not intended to determine the adequacy of the collateral in the event of a default, but rather to ensure that a large volume of mortgages were rapidly originated, underwritten and securitized with no regard to the value of the collateral.

212.   According to Capitol West Appraisals, LLC, a company that has provided real estate appraisals to mortgage brokers and lenders since 2005, and is a "review appraiser" for Wells Fargo, Washington Mutual and other lenders, Countrywide Financial and Countrywide Home Loans engaged in a pattern and practice of pressuring even non-affiliated real estate appraisers to increase appraisal values artificially for properties underlying mortgages Countrywide Home Loans originated.   Capitol West stated that Countrywide Home Loans officers sought to pressure Capitol West to increase appraisal values for three separate loan transactions.   When Capitol West refused to vary the appraisal values from what it independently determined was appropriate, Countrywide Home Loans retaliated.

213.   In particular, according to Capitol West, from at least 2004, and likely before, and continuing through at least 2007—i.e., for the relevant period when the Mortgage Loans at issue here were being originated and securitized into the Certificates—Countrywide Home Loans maintained a database titled the "Field Review List" containing the names of appraisers whose reports Countrywide Home Loans would not accept unless the mortgage broker also submitted a report from a second appraiser.   Capitol West was placed on the Field Review List after refusing to buckle under the pressure to inflate the value of the properties.   No mortgage broker would hire an appraiser appearing on the Field Review List to appraise real estate for which Countrywide Home Loans would be the lender because neither the broker nor the borrower wanted to pay to have two appraisals done.   Instead, the broker would simply retain another appraiser who was not on the Field Review List.

214.   According to Capitol West, Countrywide Home Loans created certain procedures to further enforce its blacklisting of uncooperative appraisers like Capitol West.   Specifically, if a mortgage broker were to hire an appraiser that happened to be on the Field Review List, Countrywide's computer systems automatically flagged the underlying property for a "field review" of the appraisal by LandSafe, Inc., a wholly owned subsidiary of Countrywide Financial.   LandSafe would then issue another appraisal for the subject property that, without exception, would be designed to "shoot holes" in the appraisal performed by the blacklisted appraiser such that the mortgage transaction could not close based on that appraisal. Indeed, according to Capital West, in every instance, LandSafe would find defects in the appraisal from the blacklisted appraiser, even if another, non-blacklisted appraiser had arrived at the same value for the underlying property and the non-blacklisted appraiser's appraisal was accepted.   According to Capitol West, this exact set of facts happened with respect to an appraisal it submitted after it was placed on the Field Review List.

215.   Because Countrywide was one of the nation's largest mortgage lenders, a substantial portion of any mortgage broker's loans was submitted to Countrywide. Because a broker could not rule out that Countrywide would be the ultimate lender, and because mortgage brokers knew from the blacklist that a field review would be required if a blacklisted appraiser were chosen, with the likely result that a mortgage would not be issued with that appraisal, and that its mortgage applicant would have to incur the cost of retaining another appraiser, such a broker had a strong incentive to refrain from using a blacklisted appraiser.   By these means, Countrywide systematically and deliberately enlisted appraisers in its scheme to inflate appraisals and issue low-quality, extremely risky loans.

216.   Several claims have been filed against Countrywide and related entities which describe individual homeowners' experiences with inflated property appraisals in obtaining mortgages from Countrywide.   Such lawsuits include three

class actions brought by homebuyers against KB Home, a building company that used Countrywide as its exclusive lender:   *Zaldana v. KB Home*, No. 3:08-cv-03399 (MMC), currently pending in the United States District Court for the Northern District of California; *Johnson v. KB Home*, 2:09-CV-00972 (MHB), currently pending in the United States District Court for the District of Arizona; and *Bolden v. KB Home*, No. BC385040, currently pending in Los Angeles County Superior Court.

217.   The Arizona complaint cites two KB Home developments in which sample appraisals were inflated by $82,169 per property on average.   The plaintiffs' lawyer explained that "Even if we used a more conservative $20,000 per property" in inflated value, "this alleged scheme would add ($280 million) in ill-gotten profits in KB's pockets.   Those profits come at the expense of the homeowner, who moves into a house [on which the mortgage exceeds the property's value], and the secondary market, buying tainted investments."   The complaint cites instances of appraisals that used pending sales within the same development as comparable properties substantiating appraisal values.

218.   *Bolden v. KB Home* describes the experiences of Deborah and Lonnie Bolden, who purchased a KB Home residence in a new development in California's Central Valley.   She obtained an appraisal on the property from LandSafe, Countrywide's in-house appraisal company.   She also used Countrywide's in-house real-estate agents and mortgage brokerage.   The property was appraised at $475,000.   But a neighbor with an identical home was given an appraisal from an outside company, not affiliated with Countrywide, of $73,000 less.

219.   Bolden found that the outside company had based the appraisals on sales of comparable homes in the same subdivision, whereas an investigation at the country assessors' office showed that LandSafe had made its appraisal based on erroneous comparable-sales data, using properties outside of the immediate area and properties in the development with misstated purchase prices, which artificially

1    inflated her property's value.   For example, the listed purchase price for one

2    property in the development was $461,000 but its actual sale price was $408,500;

3    another property's listed price was $480,500, instead of $410,000.

4         220.   Bolden says that KB Home, the Countrywide affiliate, never gave her a

5    satisfactory answer.   Another couple, David and Dolores Contreras, purchased a

6    home in the same Countrywide-affiliated subdivision and made similar allegations

7    that LandSafe overstated their property value based on comparisons to properties

8    that were out-of-town, and thus not comparable, or inaccurately inflated.   The

9    appraisers' blatant misstatements make the inflated appraisals easy to identify.

10        221.   Countrywide and its appraisal subsidiary, LandSafe, have also been

11   sued by Fannie Mae and Freddie Mac investors for damages arising from inflated

12   appraisals for property underlying mortgage packages sold to both Fannie Mae and

13   Freddie Mac.

14        222.   Falsely overstated appraisals were a systemic problem within

15   Countrywide's loan origination process.   The overstated appraisals meant that the

16   stated LTV ratios for the Mortgage Loans underlying Allstate's Certificates were

17   false and misleading and contained omissions of material fact, since they were based

18   on inaccurate values which skewed the loan-to-value ratios.   The properties' actual

19   LTV ratios would have been much higher, since the mortgaged properties' value

20   was so frequently overstated.

**(2)    The ratings were a garbage-in, garbage out process further hindered by conflicts of interest and outdated models**

21

22        223.   The supposedly-independent ratings given by the major credit rating

23   agencies (such as Moody's and S&P) were based on the loan profiles fed to the

24   agencies by Countrywide.   As previously explained, the evidence that that data was

25   false is overwhelming.   As such, the Defendants essentially pre-determined the

26   ratings by feeding garbage into the ratings system.

27

28

224.   The rating agencies accepted the garbage data because the process suffered from a serious conflict of issue problem, which was not disclosed to Allstate even as Countrywide represented that the ratings would be independent. Typically, the rating agencies were only paid if the rating is used, with preliminary work done in order to generate goodwill with issuers.   This means arrangers could obtain work from multiple agencies and choose the agency that was willing to give the highest rating for worst deal structure.   This is known as "ratings shopping." The agencies were thus conflicted, as the party paying their bills (like Defendants) leveraged their ability to go elsewhere to secure a higher credit rating.   The Defendants did not disclose that the agencies were driven by a virulent conflict of interest to issue those ratings using insufficient data and baseless assumptions.   For example, an April 2010 memorandum issued as part of the Senate's Permanent Subcommittee on Investigation's analysis concluded that S&P allowed "competitive pressures" to affect ratings quality.

225.   The agencies also used models that were outdated and thus, contrary to Defendants' representations, were not actually designed to assess the true risk presented by the Certificates.   Despite the rapidly-changing mortgage market (such as the rise of subprime loans, exotic loan structures, no- and low-documentation origination programs, etc.) the rating agencies did not materially update their models until late 2007, when both S&P and Moody's belatedly announced they were revising their methodologies to deal with "loosened" and "aggressive" underwriting practices.

226.   The President's Working Group's policy statement concluded that "faulty assumptions" caused the need to eventually downgrade significant RMBS, and specifically highlighted reliance "on assumptions about correlations between ABS that underestimated the degree of linkages between underlying securities."

227.   The Congressional Research Service concluded that "the models failed to understand the likelihood of falling house prices, attached the wrong weights to

the effect of falling house prices on loan default rates; and miscalculated the

interdependence among loan defaults."   It blamed the fact that "the models did not

contain adequate performance data from subprime, interest only, option ARM, and

other high risk mortgages that had come to dominate the housing market."

228.   The government's April 2010 ratings report also found that S&P "used

credit rating models with data that was inadequate," and that "[b]y 2006, knew their

ratings of [RMBS and CDOs] were inaccurate," and "despite record profits from

2004 to 2007 . . . failed to assign sufficient resources to adequately rate new

products and test the accuracy of existing ratings."

229.   For instance, S&P developed better models but chose not to use them

because it would harm its bottom line.   According to Congressional testimony of

former S&P Managing Director Frank Raiter, S&P's 1999 model used data from

900,000 loans, but S&P later developed an alternative using 2,500,000 loans, and

another using 10,000,000.   He testified these more broadly-based models would

have alerted investors about problems much sooner than the collapse suddenly did.

He also claimed that S&P chose not to use them because they cost more, yet S&P

did not think they would increase its market share.

230.   S&P's own documents support Mr. Raiter's testimony that market

share concerns, rather than a concern for ratings accuracy, drove S&P's modeling

decisions.   In a May 25, 2004 S&P email entitled "competition with Moody's," one

employee lamented that a "huge" deal was lost because of "criteria issues" that

threatened to "have an impact in the future deals" if not addressed.   The S&P

employee found that S&P's requirements were "at least 10% higher" than Moody's,

and thus the only way to compete was to have a "paradigm shift in thinking."

231.   In a March 2005 S&P email exchange, one S&P employee wrote:

"I'm puzzled.   When we first reviewed 6.0 results **a year ago** we saw the sub-

prime and Alt-A numbers going up and that was a major point of contention . . . .

Version 6.0 could've been released months ago and resources assigned elsewhere if

we didn't have to massage the sub-prime and Alt-A numbers to preserve market share."   In May 2007, an S&P employee discussing a modeling change stated that he "would recommend we do something," before adding the qualifier "unless we have too many deals in US where this could hurt."

232.   There is similar evidence that Moody's was driven by conflicts of interest to rubber-stamp ratings despite the garbage data being fed to them by Defendants and despite the outdated models being used.   Moody's CEO, during a September 10, 2007 town-hall meeting, admitted that "It was a slippery slope. What happened in '04 and '05 with respect to subordinated tranches is that our competition, Fitch and S&P, went nuts.   Everything was investment grade."

233.   In an October 21, 2007 Moody's document forwarded by its CEO, Moody's admitted internally that:   "[T]he market share pressure persists . . . . Moody's has erected safeguards . . . . This does NOT solve the problem though . . . . Analysts and [managing directors] are continually 'pitched' by bankers, issuers, investors – all with reasonable arguments – whose views can color credit judgment, sometimes improving it, other times degrading it (we 'drink the koolaid')."

234.   During his Congressional testimony, former Moody's Managing Director Jerome Fans admitted that "the deterioration in standards was palpable – as I said, evidenced – first arose at least in 2006 as things were slipping, and the analysts or the managers for whatever reason turned a blind eye to this, did not update their models or their thinking, and you know allowed this to go."

### (3)   Government investigations and other lawsuits

235.   As a result of the facts about Countrywide's practices coming to light, Countrywide Financial's market capitalization declined by more than 90% in just one year, deteriorating by $25 billion in 2008.   Bank of America subsequently acquired Countrywide Financial and its subsidiaries for just 27% of Countrywide's stated $15.3 billion book value.

236.   The scope and breadth of Countrywide's unlawful conduct have prompted a substantial number of public and private inquiries, investigations and actions.   The actions are based, in part, upon misconduct by Countrywide and its personnel that was inconsistent with Countrywide's representations to investors. Federal and state governments have alleged that Countrywide's Offering Documents contained materially untrue and misleading statements and omissions of material facts.   For example, FBI investigators have found that Countrywide's loan documents often contained dubious or erroneous information about its borrowers.

237.   The Department of Justice and the SEC investigated potential securities fraud by Countrywide and its personnel in the securitizations of mortgage loans and offerings of mortgage-backed securities in the secondary market, allegations that false and misleading disclosures were made to influence the stock trading price, and allegations of insider trading by Mozilo and Sambol.   On June 4, 2009, the SEC filed a complaint in the U.S. District Court for the Central District of California, levying civil fraud charges against Mozilo for insider trading, and against Sambol and Sieracki for failing to tell the truth about Countrywide's relaxed lending standards in its 2006 Annual Report.   *See SEC v. Mozilo*, CV 09-03994 (VBF).   As discussed above, on September 16, 2010, the District Court rejected the defendants' motions for summary judgment.   According to news reports, a month later all three defendants settled with the SEC, for a combined total of over $28 million in penalties.   Allstate did not become aware (nor in the exercise of reasonable diligence could have discovered) most of the e-mails and other documents alleged in this Complaint until the SEC published these documents in its civil enforcement proceeding brought against Mozilo and Sambol.

238.   A number of states and municipalities have also investigated Countrywide's lending practices, and several have commenced actions against Countrywide.   Bank of America paid to restructure certain of Countrywide's home loans, approving and facilitating the settlement of a predatory-lending lawsuit

1   brought by state attorneys general by agreeing to modify up to 390,000 Countrywide

2   loans, an agreement valued at up to $8.4 billion.

3       239.   Countrywide has been the target of multiple state and federal

4   investigations and proceedings regarding its lending, underwriting, and appraisal

5   practices for mortgage loans.

6       240.   In addition, the *Wall Street Journal* reported on December 5, 2009 that

7   Fannie Mae and Freddie Mac are requiring Bank of America – Countrywide's

8   successor – and other mortgage lenders to buy back nearly $3 billion in souring

9   loans that Fannie Mae and Freddie Mac purchased from those lenders.   The

10   investors are invoking putback clauses in their contracts which require the

11   repurchase of defectively underwritten loans, including loans that exaggerate

12   borrowers' incomes or misstate their intentions to live in the mortgaged properties.

13   Fannie Mae explained that putting back improper loans asserts "accountability."

14       241.   Countrywide has also been sued dozens of times by private individuals

15   for the Company's lending practices.   Plaintiffs allege that Countrywide has broken

16   laws ranging from federal securities laws to state consumer-protection laws.   In

17   addition, a number of private actions have been commenced against Countrywide,

18   including shareholder actions challenging the accuracy and completeness of

19   Countrywide's statements in and around the period between 2004 and 2007.   These

20   actions allege that Countrywide failed to disclose the expansion of its origination of

21   subprime and other higher-risk mortgage loans.   In addition, consumer actions have

22   been filed challenging Countrywide's lending practices.   One shareholder action, *In

23   re Countrywide Financial Corp. Securities Litigation*, CV 07-05295 (C.D. Cal),

24   recently settled, with Countrywide Financial agreeing to pay $600 million to the

25   plaintiffs.

26

27

28

### (4) Studies of the percent of loans approved on a fully-documented basis

242.   The Federal Home Loan Bank of Indianapolis studied the information it was able to obtain from loan servicing companies regarding the loans underlying many of its investments.   It found that Countrywide had overstated by 18% the number of underlying loans that were underwritten pursuant to the much lower risk, full-documentation procedures.

243.   This study included a Countrywide transaction that occurred at the same time as Allstate's Certificates were issued, included loans being originated at the same time as the Mortgage Loans underlying Allstate's Certificates, and was done pursuant to the same purported underwriting standards.   Given this overlap and the other evidence discussed herein that Countrywide was systematically abandoning all underwriting standards and controls, this is strong evidence the same type of overstatements occurred in Allstate's Offerings as well.   On information and belief, the Offering Materials at issue here similarly materially overstated the percent of underlying loans that were based on a fully-documented basis, and thus materially understated the risk associated with Allstate's Certificates.

### (5) Servicing failures

244.   On information and belief, Countrywide Home Loans Servicing and Countrywide Home Loans have also failed to service the Mortgage Loans consistent with industry standards, including, for example, by refusing to accept partial payments from borrowers.   Countrywide also prematurely charged off loans to the direct detriment of Allstate by charging off loans where the borrower was able to, and in fact did, make payments after the date of the charge-off.

245.   Countrywide's servicing of its mortgage loans lagged behind the standards of the industry, contrary to its representations.   Countrywide failed to allocate sufficient resources to service and administer the loans, such as personnel to address customer inquiries and to conduct follow-up efforts with delinquent

borrowers.   Countrywide has also provided inadequate resources for work-out plans.

246.   These failures were exacerbated by the Company's break-neck origination of loans in disregard of its own underwriting guidelines, which led to an enormous increase in delinquencies, defaults, foreclosures, bankruptcies, litigation, and other proceedings, which place greater demands on Countrywide Home Loans Servicing and Countrywide Home Loans (in the case of CWHEL 2005-B) in their capacity as Master Servicer.

247.   Countrywide also provided poor customer service to its borrowers, often proving unhelpful in resolving customers' problems and frequently acting against its customers' interests by steering borrowers into repayment plans that worsened their financial problems and increased their indebtedness to the Company. When borrowers contacted Countrywide seeking help to avoid foreclosure proceedings, Countrywide frequently offered repayment plans that actually *increased* the borrowers' monthly mortgage payments, which thereby further increased the risk of default and foreclosure.

248.   Customer-service representatives at Countrywide's Call Center were required to complete service calls in three minutes or less, and to complete as many as 65 to 85 calls in a day, which did not give the Company's employees adequate time to fully explain the details of borrowers' loans to those borrowers.   Inadequate information provided to borrowers increased the likelihood of delinquency, default, and other problems with the Mortgage Loans because borrowers were not fully apprised of the payment terms and other material aspects of their loans.

249.   Customer-service representatives received financial incentives, in the form of bonuses, for exceeding volume quotas and for successfully recommending that existing Countrywide customers refinance their loans by taking out new Countrywide mortgages, even when doing so was not in borrowers' best interests. For example, the Illinois Attorney General's complaint describes a widower whom

1  Countrywide refinanced into an adjustable-rate loan; when the interest rate reset, her

2  interest rate ballooned and rendered her mortgage unaffordable on her fixed income.

3     250.   The Illinois Attorney General describes a borrower whose monthly

4  mortgage payment was $1600.   She fell behind on payments and called

5  Countrywide to ask for help.   Countrywide Home Loans Servicing ended up

6  placing her in a repayment plan that *increased* her monthly mortgage bill to $2500,

7  which included her original payment plus money toward past-due payments and

8  fees.   She continued to be unable to pay her mortgage.   After six months of

9  working with Countrywide, the company demanded a payment of over $5000 by the

10  borrower before it would consider her request for loan modification.

11     251.   Even when Countrywide Home Loans Servicing comes up with loan-

12  modification plans, it often fails to discuss the plan with the borrower to confirm if it

13  affordable or fails to send timely documentation to the borrower regarding details of

14  the plan.   A borrower who called Countrywide Home Loans Servicing on five

15  separate occasions was only told on the fifth call that Countrywide was modifying

16  her loan, but it failed to discuss whether that would be affordable for her.

17  Countrywide Home Loans Servicing should have known that the loan was *not*

18  affordable, based on information send by the borrower.

19     252.   Borrowers report having difficulty reaching Countrywide Home Loans

20  Servicing to discuss their mortgages.   For example, a woman told the Illinois

21  Attorney General that when she called Countrywide to discuss 10 months of

22  payments that she had made and which did not appear on her financial statements,

23  she was put on hold and transferred from person to person, never obtaining a

24  satisfactory answer regarding her account.

25     253.   As foreclosures have increased across the country, complaints have

26  mounted that Countrywide and other mortgage servicers were abusing their

27  authority by improperly claiming title to properties and overcharging borrowers.   In

28  a number of lawsuits, judges have halted Countrywide foreclosures because they

1  were based on errors or wrongdoing by Countrywide in servicing the borrowers'

2  loans.

3          254.   For example, in the case of Connie and David Prince, a couple from

4  Iron City, Tennessee with a Countrywide mortgage, the Company failed to credit

5  their account with mortgage payments and foreclosed on the property based on

6  alleged failures to pay.   In court, Countrywide claimed that the failure to credit the

7  Princes' account was "inadvertent."   Countrywide has since agreed to reverse the

8  foreclosure and reinstate the couple's mortgage.   The couple tried to explain the

9  accounting problems to Countrywide prior to the foreclosure but was unsuccessful.

10  Mr. Prince remarked that "Our lives have been destroyed by this and it wasn't our

11  mistake."

12          255.   Judges have criticized Countrywide for its flawed servicing practices.

13  In one case, a federal judge in Houston told Countrywide to "mend" its "broken

14  practices" with regard to servicing.   The United States Trustee, which oversees the

15  integrity of bankruptcy courts, has sued Countrywide, contending that its tactics

16  represent an abuse of the bankruptcy system.

17          256.   Hundreds of Countrywide customers have posted stories on Internet

18  websites such as the consumer-protection website ConsumerAffairs.com, at

19  http://www.consumeraffairs.com/ finance/countrywide_mortgage.html (last

20  accessed December 3, 2010), describing their personal experiences with

21  Countrywide's neglectful servicing practices.   The website alone lists hundreds of

22  testimonials by borrowers who complain of their dealings with the Company's

23  unhelpful, unprofessional, and harassing bureaucracy.   The stories describe false

24  allegations of overdue payments and resulting foreclosure notices by the Company,

25  dozens of phone calls to resolve simple problems, uninformed employees, and

26  mishandled records.

27

28

Case No. Case No. 2:11-CV-05236 MRP (MANx)

AMENDED COMPLAINT

# V.   <u>COUNTRYWIDE KNEW ITS REPRESENTATIONS WERE FALSE</u>

257.   The allegations below are made in support of Plaintiffs' 1934 Act and common-law fraud claims, not in support of Plaintiffs' 1933 Act claims, which are based solely on strict liability and negligence.

258.   The same evidence discussed above not only shows that the representations were untrue, but that the Countrywide Defendants *knew* it was falsely representing the underlying process and the risk profiles behind the Mortgage Loans.   For instance:

- The large discrepancies in basic information such as owner occupancy, LTV, and CLTV statistics, detailed above and in the Exhibits, evidences a systemic underwriting failure that Countrywide could not possibly have been ignorant of given that it controlled the entire underwriting and securitization process.

- Countrywide's post-mortem admits that it did not "heed the warnings," and that "lots of experienced people were uncomfortable."

- Countrywide's CEO's emails show that he saw "errors of both judgment and protocol," "massive disregard for the guidelines," and "serious lack of compliance within our origination system."

- Countrywide's internal audits discovered that a staggering percentage of loans were being approved as "exceptions."   For instance, one "particularly alarming" audit found that 23% of subprime loans were at the time being processed as exceptions, and another found that 52% of the subprime division's 100% financings were done with exceptions.

- The amount of loans having to be approved as "exceptions" was seen within Countrywide as "speak[ing] towards our inability to adequately impose and monitor controls."

- Other correspondence and testimony confirms the "exceptions" were just a tool being used to "keep pace" as to implement the "matching" strategy.

- Countrywide's credit officers viewed the "matching" strategy as "ceding" Countrywide's policies to the market.   Another saw Countrywide's underwriting policies as "theoretical," and saw it as indefensible that Countrywide continued to use "salability" as the sole criterion for approval.

- Countrywide's risk officers wrote that the company "basically continued to act as though they never received" policies the credit officers circulated, and that the risk officers were

"frustrat[ed]" to have their judgment "overridden with whining and escalation."

- Countrywide's documents refer to "several recent examples" where products were approved despite explicit rejections by the company's credit risk department.

- According to former employees, borrowers who could not quality for a loan were steered into low-documentation products, then coached on how to falsify the application to ensure it would be approved.

- According to former borrowers, in some instances Countrywide's loan officers would even fill out the required misrepresentations without the borrowers' knowledge.

- Countrywide's internal reviews found at one point that 40% of the reduced-documentation loans had income overstatements.

- Countrywide's "focus group" studies found that borrower income was being overstated.

259.    That the Countrywide Defendants knew their representations were fraudulent is further supported by additional evidence from Countrywide's own documents and employees.   For instance, Countrywide's post-mortem analysis, discussed above in Section IV, also shows an admission that the company knew at the time what it was doing was wrong, but it proceeded anyway:

- "*We did not fully heed the warnings of our credit models. Delinquencies were increasing, and models predicted worse to come.*"

- "Early indicators of credit risk exposure existed.   *Internal control systems highlighted many of the risks that eventually transpired.*"

- "*Lots of experienced people were uncomfortable with underwriting guidelines.*   Going forward, we need to rely on our experience and instinct when business practices don't make sense.   In particular, stated income and high LTV was highly counter-intuitive."

- "This crisis will stay in our minds for a generation.   We will probably not see a return to this type of *irrational behavior* for a long time to come."

(Emphasis added).

260.    The fact that the above concerns mirror concerns the Credit Risk Committee raised long before Countrywide's problems became public further shows

Case No. Case No. 2:11-CV-05236 MRP (MANx)
AMENDED COMPLAINT

1  that Countrywide's admissions were not mere hindsight.   In an internal document

2  highlighting "areas of concern," alternatively known as a "wall of worries," one of

3  the Credit Risk Committee's "areas of concern" was Countrywide's "loan quality,"

4  including "increased fraud," "exception underwriting," "guideline drift," "attribute

5  deterioration," and "appraisal quality."   This document was generated within

6  Countrywide at the time many of the Mortgage Loans at issue here were being

7  generated and securitized in Allstate's Offerings.

8      261.   As noted above, John McMurray, Countrywide's then-Chief Risk

9  Officer, gave repeated, explicit, and alarming warnings to Sambol, Mozilo, and

10  others about the financial risks of Countrywide's origination practices, and

11  advocated for stricter origination guidelines.   McMurray's testimony also identified

12  his own notes from November 3, 2006, wherein McMurray indicated that he had

13  discussed with Sambol that McMurray was concerned that he would be personally

14  blamed for products that he "***never advocated and often recommended against***."

15  (Emphasis added).   His testimony also indicates he raised "***concerns about***

16  ***inadequate controls, infrastructure, etc.***"   (Emphasis added).   His notes also

17  indicated that he discussed with Sambol concerns about "the company's risk

18  philosophy.   Discussed 'can't say no' culture, pressure from matching and no

19  brokering policies."

20      262.   The testimony of another risk manager, Ingerslev, also confirms that

21  Countrywide was made aware internally of the risks its shoddy procedures were

22  creating:

> In an organization like Countrywide, sales, the strategy of the company was predominantly, you know, a sales-oriented one because of our history as a mortgage banker and, you know, being able to sell off a lot of credit risk, that was one instant, one probability factor that contributes to the culture that we have.   ***So that – and ultimately, you know, disagreements or ties were broken, you know, to the – you know, the side of erring on, well, we don't want to lose volume, we want to keep up the volume and keep up our market share.   That was a strategy at the company level.***

Case No. Case No. 2:11-CV-05236 MRP (MANx)
AMENDED COMPLAINT

*But, you know, John [McMurray] and I and those of us in credit still felt like it was our obligation to make sure that there was perspective, and we were doing it with eyes wide open.* In other words, in that environment, there was conflict. Some of it you'd expect, and some of it went beyond what you would expect and was tough.

263. He said it was "part of the culture" to have "pressure to [] move things along and say yes to things, and you felt that pressure." *He also testified that he thought the company's guidelines had gone "too far" given the "additional layers of risk"* in the product mix and because of changing interest rates. He testified that he was involved in a "constant dialogue" regarding requests to expand even further, but that "*I'm sure I said on more than one occasion, you've got to stop here*."

264. In a May 26, 2006 email, Sieracki wrote: "They're finally forced to pay me good money and I will try to ride that train as long as I can. The big issue is risk. Sarbanes-Oxley can *result in me going to jail or losing my net worth for things I don't even know. Guilty verdicts were handed down in Enron today*." (Emphasis added).

265. According to a former employee, Mark Zachary, whose other statements are discussed above, Countrywide's loan origination was plagued by "outright misrepresent[ation of] loans to the secondary markets, to end investors, and to buyers." The Company's mentality, he said, was "what do we do to get one more deal done. It doesn't matter how you get there . . . ." Zachary confirmed that he was driven to issue mortgages even though he knew he was setting up the borrower to eventually lose their home.

266. Zachary also recounts an October 25, 2006 e-mail in which a Senior Vice President and Divisional Operations Manager for Countrywide KB Home Loans sanctioned the falsification of information. In the e-mail, Zachary posed to the manager a situation in which a loan officer confessed that a potential borrower did not have a job in the local area, when that is a requirement of the mortgage for which the borrower was applying. Even more drastically, Zachary wondered what would happen if the loan officer mentioned that the borrower was applying for a

stated-income loan because he was unemployed.   Zachary asked for confirmation that in those circumstances, when there was evidence that the borrower and/or loan officer were falsifying the borrower's information, the Company would reject the loan.   Shockingly, the senior executive wrote back that "***I wouldn't deny the [loan] because I didn't hear anything.   I would definitely tell the [loan officer] to shut up or shoot him!***"

267.   Zachary brought his concerns regarding no-doc loans (discussed further above) to the attention of Countrywide Employee Relations and Risk Management officials in 2006 and early 2007, but he was ignored.   He also refused to unconditionally approve borrowers that did not meet Countrywide's stated guidelines, at which point he was taken out of the approval process and the loans were approved anyway, by his supervisor.

268.   That Countrywide knew the loans it was placing into Allstate's pools were failing basic underwriting standards is further evidenced by the fact that the investment bank's due diligence reports, which it should have received, showed that large number of loans it was originating was failing basic tests but were being included in securitizations anyway.

269.   Investment banks performed due diligence on mortgages before purchasing them from originators.   Prior to a loan auction, originators provided investment banks with bid sheets, which, among other things, dictated: (1) the percentage of the pool on which the investment banks would be permitted to conduct due diligence (e.g., 25%); and (2) the number of loans the investment banks could "kick out" due to borrower deficiencies, payment delinquencies, early payment defaults, lack of documentation and other problems.   Prior to bid submission, originators also sent the investment banks spreadsheets known as loan tapes, which contained various loan data.   The investment banks were supposed to "crack" the loan tapes, analyze them, and determine what prices to bid for the loan

1   pools.   Once this "bid package" analysis was complete, the investment banks
2   submitted their bids.

3       270.   If the originator accepted a bid, the investment bank typically had a
4   short period of time prior to the settlement date to conduct due diligence on the
5   loans.   The investment banks sometimes hired third-party due diligence firms such
6   as Clayton Holdings, Inc. ("Clayton") or the Bohan Group ("Bohan") to conduct this
7   review under their supervision.

8       271.   Due to strong demand, originators such as Countrywide gained
9   bargaining power over investment banks seeking to purchase mortgages and sponsor
10  securitizations.   One way originators exercised this bargaining power was to insist
11  that investment banks limit their due diligence to smaller percentages of loans prior
12  to purchase.   If an investment bank chose to kick out a large number of loans from
13  a pool (e.g., because the loans failed to conform to the mortgage originator's
14  guidelines or did not contain adequate documentation) it risked being excluded from
15  future loan purchases.   As a result, investment banks performed increasingly
16  cursory due diligence on the loans they securitized.

17      272.   On information and belief, Countrywide knew of the red flags raised by
18  the due diligence conducted by Clayton and Bohan.   As an originator, Countrywide
19  was aware of the pressure on investment banks to scale back their due diligence and
20  limit the number of loans kicked out of a securitization.   In addition, Countrywide
21  itself retained third-party due diligence firms such as Clayton to perform due
22  diligence with respect to the securitizations it sponsored.   According to a
23  confidential witness referenced by the plaintiff in *Federal Home Loan Bank of*
24  *Chicago v. Banc of America Funding Corporation et al.*, No. 10CH450B3 (Oct. 15,
25  2010 complaint), sponsors of deals that Clayton was reviewing would even have
26  their own employees on site to review the loans that were being considered for
27  inclusion in a mortgage pool.

28

273.   Congressional testimony by Clayton's Vice President Vicki Beal indicates that the investment banks determined the type and scope of review performed on the loan pools.   Yet, rather than directing the firms to conduct thorough reviews that were most likely to identify defective loans, the investment banks pressured the loan reviewers to disregard problematic loans through exceptions and offsets that did not satisfy the applicable underwriting guidelines.

274.   Further compounding the problems, Clayton employees were instructed to review fewer loans in the loan pools as the securitization market grew. According to Beal's 2010 testimony, as the securitization markets grew even more frenzied Clayton's clients were only asking for samples of 5% of the loan pools. Showing how careless underwriters were when other people's money was at stake, according to the Los Angeles Times, Bohan President Mark Hughes contrasted these low figures with the 50% to 100% sample sizes consistently seen where loan buyers were keeping the loans for themselves.

275.   As reported by the Los Angeles Times, Clayton and Bohan employees (including eight former loan reviewers who were cited in the article) "raised plenty of red flags about flaws so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored, or stricken from reports."   Ironically, while the investment banks pressured third-party reviewers to make exceptions for defective loans, they often utilized information about bad loans to negotiate a lower price for the pool of loans from the seller (i.e. originator).   Indeed, according to September 2010 testimony before the FCIC by Clayton's former president, D. Keith Johnson, this was one of the primary purposes of the due diligence review.

276.   Clayton provided the FCIC with documents showing the defect and waiver rates for some of the investment banks which had retained Clayton to conduct loan pool due diligence.   These documents reveal that from the fourth quarter of 2006 to the first quarter of 2007, 23% of the mortgages Countrywide

1   submitted were rejected.   Of the mortgages that Clayton rejected, 12% were

2   subsequently waived by Countrywide and included in securitizations like the ones in

3   which Allstate invested.

4   　　　　277.   Clayton also produced a report containing the rejection and waiver

5   rates for loans originated by Countrywide.   Those rates are as follows:

6   
|  | 1Q 2006 | 2Q 2006 | 3Q 2006 | 4Q 2006 | 1Q 2007 |
| --- | --- | --- | --- | --- | --- |
| Rejection rate | 24% | 23% | 13% | 14% | 16% |
| Waiver rate | 8% | 14% | 16% | 11% | 14% |

8

9   　　　　278.   Nevertheless, Countrywide never disclosed to Allstate that the due

10  diligence conducted by Clayton and Bohan had informed their clients that a

11  substantial number of the loans in the pools backing Countrywide's securities were

12  defective, that Countrywide had waived the defects as to a substantial number of the

13  loans, or that the underwriters were using this information to negotiate a lower price

14  for the loan pools.

15  　　　　279.   Relying on only a part of the evidence referred to in this Complaint, the

16  District Court that rejected Mozilo, Sambol, and Sieracki's motions for summary

17  judgment in the SEC action found a triable issue of fact as to the question of

18  scienter:

19  　　　　Here, the SEC has presented evidence from which a reasonable jury
       could conclude that Defendants possessed the requisite scienter.   For
20     example, the SEC has demonstrated that Defendants were aware that
       Countrywide routinely ignored its underwriting guidelines and that
21     Defendants understood the accompanying risks . . . .   The SEC has
       also presented evidence that Sambol was aware that Countrywide's
22     matching strategy resulted in Countrywide's composite guidelines
       being the most aggressive guidelines in the industry . . . .

23     Moreover, in addition to demonstrating that Defendants were aware of
24     the facts which made their statements misleading, the SEC has
       presented evidence that Sambol and Sieracki knew that Countrywide's
25     Chief Risk Officer John McMurray firmly believed that Countrywide
       should include greater risk disclosure in its SEC filings . . . .

26     ***Accordingly, the SEC's evidence is sufficient to raise a genuine issue***
27     ***of material fact with respect to Defendants' scienter, and summary***
       ***judgment is inappropriate.***

28

1    *S.E.C. v. Mozilo*, 2010 WL 3656068, at \*16-20 (emphasis added).

2        280.   Other courts have similarly found that allegations similar to those made

3    here relating to the activities of Countrywide and its executives present a "cogent

4    and compelling inference of scienter."   *See In re Countrywide*, 588 F. Supp. 2d

5    1132, 1192-94 (C.D. Cal. 2008).

6    ## VI.   **ALLSTATE'S DETRIMENTAL RELIANCE AND DAMAGES**

7        281.   In making the investments, Allstate relied upon Countrywide's

8    representations and assurances regarding the quality of the mortgage collateral

9    underlying the Certificates, including the quality of Countrywide's underwriting

10   process whereby it generated the underlying loans.   Allstate received, reviewed,

11   and relied upon the Offering Materials, which described in detail the Mortgage

12   Loans underlying each offering.

13       282.   In purchasing the Certificates, Allstate justifiably relied on Defendants'

14   false representations and omissions of material fact detailed above, including the

15   misstatements and omissions in the Offering Materials.

16       283.   But for the misrepresentations and omissions in the Offering Materials,

17   Allstate would not have purchased or acquired the Certificates, because those

18   representations and omissions were material to its decision to acquire the

19   Certificates, as described in Section III above.

20       284.   The false and misleading statements of material facts and omissions of

21   material facts in the Offering Materials directly caused Allstate damage, because the

22   Certificates were in fact far riskier than Countrywide had described them to be.

23   The loans underlying the Certificates experienced default and delinquency at very

24   high rates due to Countrywide's abandonment of its underwriting guidelines.

25       285.   Allstate has incurred substantial losses in market value and lost

26   principal and interest payments, due to the poor quality of the collateral underlying

27   the Certificates.   The income and principal payments to which Allstate is entitled

28

1 have been lower than Allstate expected and lower than the payments to which

2 Allstate is entitled under the "waterfall" provisions of the securitizations.

3     286.   The disclosure of irregularities in Countrywide's underwriting practices

4 and increased risk regarding future cash flow has also led to a substantial decline in

5 market value of the Certificates.   Allstate purchased the Certificates not only for

6 their income stream, but also with an expectation of possible reselling the

7 Certificates on the secondary market.   Allstate thus viewed market value as a

8 critical aspect of the Certificates it purchased.   Allstate incurred substantial losses

9 on the Certificates due to a drastic decline in market value attributable to

10 Countrywide's misrepresentations which, when disclosed, revealed that the

11 Mortgage Loans likely had a substantially higher risk profile than investors

12 (including Allstate) were led to believe.

13     287.   Allstate's losses on the Certificates have been much greater than they

14 would have been if the loans were as Countrywide described them to be.   For

15 example, the fact that the loans were not applied to owner-occupied properties at

16 their claimed rate made them more prone to default.   Owners who do not occupy

17 their properties are more likely to default on their loans, which made the Certificates

18 poorer investments, accelerated the Certificates decline in value, and greatly

19 worsened Allstate's losses.

20     288.   The drastic and rapid loss in value of Allstate's Certificates was

21 primarily and proximately caused by Countrywide's issuance of loans to borrowers

22 who could not afford them, in contravention of the prudent underwriting guidelines

23 described in the Offering Materials.   These rates of delinquency and default were

24 much higher than expected for securitizations supported by collateral fitting

25 Countrywide's representations, and much higher than they would have been if the

26 Mortgage Loans had been properly underwritten.   The drastic increases in

27 delinquency and default on the Mortgage Loans were not attributable to the recent

28

decline in the American housing market, but rather due to Countrywide's wrongdoing.

## VII. <u>OTHER MATTERS</u>

### A. <u>Defendants' Liability as Control Persons</u>

289. ***<u>Primary Violators.</u>***   The primary violators in this action are the Depositors, Countrywide Home Loans, and Countrywide Securities.

290.   The Depositors issued the Certificates.   The Depositors purchased the Mortgage Loans that comprised the trust assets, typically from Countrywide Home Loans and other Countrywide subsidiaries.   As stated in the CWHEQ 2005-E Offering Materials, "Countrywide Home Loans, Inc. will be the seller of a portion of the Mortgage Loans.   The remainder of the mortgage loans will be sold directly to the depositor by one or more special purpose entities that were established by Countrywide Financial Corporation which, in turn acquired those mortgage loans directly from Countrywide Home Loans, Inc."   After the Depositors acquired the Mortgage Loans and created the collateral pools, the Depositors transferred the pools to the Trusts to issue the Certificates.

291.   The Trusts had no discretion or control over the mortgages in the pool. The Trusts had no autonomy or assets of their own, but were mere agents of the Depositors created by Countrywide Financial for the sole purposes of holding the pools of Mortgage Loans assembled by the Depositors and issuing the Certificates to Countrywide Securities for sale to the investors.

292.   Countrywide Securities and Countrywide Home Loans, Inc. sold the Certificates to Allstate, and also qualify as sellers.

293.   ***<u>Control Person:   Countrywide Financial.</u>***   Countrywide Financial operated its consolidated subsidiaries as a collective enterprise, making significant strategic decisions for its subsidiaries, monitoring enterprise-wide risk, and maximizing profit for Countrywide Financial's executives and shareholders.   As

1  reported in Countrywide Financial's 2003 Form 10-K, although mortgage banking

2  remained Countrywide Financial's "core business," it had expanded operations in

3  recent years "to capitalize on meaningful opportunities to leverage our core

4  Mortgage Banking business and to provide sources of earnings that are less cyclical

5  than the mortgage banking business."[4]   In other words, in conjunction with its goal

6  of prioritizing the origination of loans regardless of the risk of default, Countrywide

7  developed its own "in-house" subsidiaries to facilitate its ability to package and sell

8  these risky products.

9      294.   Countrywide Financial managed Countrywide's enterprise-wide risks,

10  strategic direction, and business operations through executive committees.   These

11  committees included the Executive Strategy Committee, the Corporate Credit Risk

12  Committee, the Corporate Enterprise Risk Committee, and the Asset/Liability

13  Committee.

14      295.   *The Executive Strategy Committee.*   Its members included four Officer

15  Defendants:   Mozilo, Sambol, Sieracki, and Kurland.   They were responsible for

16  defining and assessing Countrywide's enterprise-wide strategic direction and risk.

17  The Committee's activities included developing Countrywide Financial's Corporate

18  Strategic Plan and reviewing the strategic plans of each of Countrywide Financial's

19  divisions, to ensure consistency and proper strategic alignment.

20      296.   *The Corporate Credit Risk Committee and The Corporate Enterprise*

21  *Risk Committee.*   These committees interfaced directly with the Credit Committee

22  within Countrywide Financial's Board of Directors, assessed the risks to which the

23  Countrywide enterprise was exposed, and they decided which risks Countrywide

24  Financial should sell or otherwise mitigate.   The Credit Risk group was also

25

26      [4]   Throughout the relevant time period, Countrywide Financial filed

27  consolidated Form 10-Ks, providing a cumulative assessment of the operations of
    Countrywide Financial and all of its subsidiaries, including the other Countrywide

28  entity Defendants.

1    responsible for managing fraud prevention and investigation.   Sieracki and Kurland
2    were both members of the Corporate Credit Risk Committee.

3        297.   *The Asset/Liability Committee.*   This committee was responsible for
4    addressing market risk for the Countrywide enterprise, across all Countrywide
5    Financial subsidiaries.   The Asset/Liability Committee engaged in extensive
6    modeling for the performance of Countrywide Financial's various financial
7    products, and maintained a dedicated Model Validation Subcommittee for that
8    purpose.   Five Officer Defendants—Mozilo, Sambol, Kurland, Sandefur, and
9    Sieracki—were members of the Asset/Liability Committee, and Sieracki became the
10   acting Chairman of the committee in February 2006.

11       298.   Through the use of these committees and others, as well as regular
12   communication with and among its subsidiaries and regular reporting regarding the
13   performance of divisions across the enterprise, Countrywide Financial maintained a
14   high level of day-to-day scrutiny and control over its subsidiaries.   Countrywide
15   Financial controlled the guidelines for loan origination, decided which assets to sell
16   and which to hold for its own investment portfolio by being advised of the quality of
17   the underwriting and the loans originated, set protocols for servicing the vast
18   portfolio of loans for which it had retained servicing rights, and approved the
19   manner in which it sold those loans it elected to securitize.

20       299.   Countrywide Financial also exercised actual day-to-day control over
21   the Depositors.   These Delaware corporations were structured as limited purpose
22   wholly-owned subsidiaries to acquire mortgage loan collateral from Countrywide
23   Home Loans and transfer the collateral to the issuing Trusts for sale to investors.
24   The Depositors were shell corporations that had no assets of their own.   They were
25   controlled by Countrywide Financial through its appointment of Countrywide
26   Financial executives (Sandefur, Sieracki, Kurland, Kripalani, and Sambol, among
27   others) as their directors and officers.   Revenues flowing from the issuance and sale
28   of the Certificates were passed through to Countrywide Financial.

300.   Countrywide Financial also had actual control over the Trusts.   Like the Depositors, the Trusts were shell entities that had no assets of their own or autonomy, but were mere subsidiaries of the Depositors created for the sole purposes of holding the pools of mortgage loans assembled by the Depositors, and issuing Certificates based on those mortgage pools to underwriters, including Countrywide Securities, for sale to the public.

301.   Countrywide Financial culpably participated in the violations discussed below.   It oversaw the actions of its subsidiaries and allowed them, including Defendants Countrywide Home Loans and Countrywide Securities, to engage in underwriting practices that were inconsistent with the descriptions presented in the Offering Documents; allowed its subsidiaries to misrepresent the Mortgage Loans' characteristics in the Offering Materials; and established special-purpose financial entities, such as CWABS, to serve as conduits for the Mortgage Loans.

302.   Countrywide Financial also participated in creating the Offering Materials and the Signatories, who were Countrywide Financial employees at the time, signed those Offering Materials.   Other Countrywide Financial employees, including Mozilo and Sambol, were also culpable participants in Countrywide's wrongdoing at the time they were employed by Countrywide Financial, as reflected by the SEC e-mails.   Countrywide Financial is also the parent company of Countrywide Home Loans, Countrywide Securities, and the Depositors.

303.   Unlike arms-length securitizations where the loan originator, depositor, underwriters, and issuers are unrelated third parties, here the transactions among the loan originator (Countrywide Home Loans), the Depositors (shell companies CWABS, CWHEQ, CWALT, and CWMBS), the Trusts (all Countrywide special-purpose shell entities), and the primary underwriter (Countrywide Securities) were not arms-length transactions at all.   Countrywide Financial controlled every aspect of the origination and securitization processes.

304.   All of the Mortgage Loans underlying the Certificates were originated by Countrywide Home Loans or were acquired by Countrywide Home Loans from other lenders.   Countrywide Financial formed the Depositors and the issuing Trusts as special purpose entities purely to complete the securitizations.   Once the loan certificates were acquired by the Trusts, they were purchased by the underwriters including Countrywide Securities, the primary underwriter.   Countrywide Securities and other underwriters then packaged and sold the Certificates to Allstate. Countrywide Financial also controlled the manner in which loans in the securitizations were serviced, both before and after the securitizations' Certificates were sold to the public, by using its own servicing division to service the loans.

305.   In sum, through its various committees and officers, Countrywide Financial maintained a high level of day-to-day scrutiny and control over its subsidiaries, and controlled the entire process leading to the sale of certificates to Allstate.   Countrywide Financial controlled the guidelines for loan origination, determined which traditional or non-traditional loan products to offer, set protocols for servicing the mortgage loans it originated or purchased from other lenders and for which it had servicing rights, approved the manner in which it sold the loans it elected to securitize, and controlled the disclosures made in connection with those securitizations.

306.   ***Control Person:   Countrywide Capital Markets.***   Countrywide Capital Markets exercised a high level of day-to-day control over its subsidiary, Countrywide Securities.   Mandates from Countrywide Financial passed through Kripalani and Countrywide Capital Markets to Countrywide Securities, and Kripalani, who was the President and CEO of both Countrywide subsidiaries, ensured that Countrywide Securities followed priorities and practices established by Countrywide Financial and Countrywide Capital Markets.

307.   As the division of the Countrywide enterprise charged with marketing the loans originated and acquired by Countrywide Home Loans, Countrywide

Capital Markets also exercised control over the Depositors and, through the Depositors, over the Trusts.   Along with Countrywide Financial, Countrywide Capital Markets determined and approved the manner in which Countrywide Securities and the Trusts selected and sold the securitized loans in the Certificate Offerings, and controlled the disclosures made in connection with each securitization.

308.   ***Control Person:   Mozilo.***   As set forth in paragraph 19, Mozilo had numerous positions and roles within Countrywide.

309.   Mozilo had the power to control and influence, and did in fact control and influence, all of the business operations of Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts).   Mozilo had the power to control and influence, and did control and influence, Countrywide Financial and Countrywide Home Loans.   Mozilo also had the power to control and influence, and did control and influence, primary violator Countrywide Securities, a wholly-owned Countrywide Financial subsidiary.

310.   Mozilo directly supervised Sambol, who was the direct supervisor of Kripalani during Kripalani's tenure as President, Chief Executive Officer, and Managing Director of Countrywide Securities.   Kripalani provided Sambol with regular business updates regarding Countrywide Securities, and Sambol shared and discussed this information with Mozilo.   As Sambol's supervisor, Mozilo had the power to control and did control Countrywide Securities.

311.   Mozilo also exercised his control and influence through senior management meetings.   For example, Countrywide Financial's management held monthly "Business Review" meetings attended by Mozilo and other senior executives.   During these meetings, the operations and performance of each Countrywide entity (including Countrywide Securities and the Trusts) were evaluated and discussed in great detail.   Mozilo and the rest of the senior

management team set the course for Countrywide Financial's various businesses including the business of Countrywide Securities.

312.   In making numerous statements to the public, Mozilo portrayed himself as the public face of Countrywide Financial and conveyed that he was speaking on behalf of Countrywide Financial and all of its subsidiaries (including Countrywide Securities and the Trusts).   Additionally, Mozilo exercised his control and influence over Countrywide Financial and other Countrywide entities by signing Countrywide Financial documents filed with the SEC.   These documents include Countrywide Financial's Form 10-Ks for the years 2003, 2004, 2005, and 2006.   Many of Mozilo's statements were false and misleading for the same reason the representations at issue in this action were false and misleading.

313.   Mozilo also controlled and influenced Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts) through his membership on several Countrywide Financial management and Board of Directors committees.   Mozilo was a member of at least the following Countrywide Financial committees: (1) Executive Strategy Committee; (2) Finance Committee; and (3) Credit Committee.   Through his committee and Board membership, Mozilo exercised his authority as a key member of Countrywide's decision-making team.

314.   Through his participation in the Countrywide Financial committees and its Board, Mozilo kept apprised of developments in the business practices of Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts) and exercised control and influence over Countrywide Financial's entire business, including the business of Countrywide Securities and the Trusts.

315.   Mozilo's ability to control and influence Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts) is further evidenced by his central role in bringing about the transformation of Countrywide Financial from a mortgage company with conservative underwriting policies into a loan-originating machine that ignored its own underwriting guidelines and took on

increasingly risky loans.   Mozilo directed Sambol to initiate the change in Countrywide's culture in 2003 and aggressively pushed Countrywide Financial into numerous new product offerings that changed the risk profile for the loans Countrywide issued.

316.   Mozilo's control and influence of Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts) was further evidenced by his close involvement in the daily management of all aspects of Countrywide Financial's core operations.   This included approving and overseeing Countrywide Financial's and Countrywide Home Loans' mortgage and loan product offerings – the very same mortgages and loans that were packaged together for the securitizations at issue in this case.

317.   Mozilo exercised his power to control and influence Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts) through his involvement in developing, modifying, and implementing Countrywide Financial's guidelines for making and underwriting new loans and mortgages. Mozilo acknowledged that "I participate every day in originations myself, and it keeps me apprised of what's happening."

318.   Mozilo also exercised his control and influence over Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts) through his participation in all areas of Countrywide's business, including the activities of Countrywide Securities.   For example, Mozilo exerted influence over various governance responsibilities relating to Countrywide Financial's "matching" strategy, including committee supervision and responsibility for: (1) guideline review and verification; (2) surveillance; (3) pricing and valuation; (4) monitoring and economic conditions; (5) servicing coordination; and (6) Countrywide Financial's subprime market position.

319.   Mozilo decided not to intervene with respect to the loans included in the securitizations at issue even after he became aware that Sambol was directing

1  Countrywide Securities to securitize pools of loans that featured extreme risk.
2  Mozilo knew the loans of deteriorating quality were being included and allowed the
3  inclusion of these loans to continue.

4      320.   It was well known within Countrywide Financial that Mozilo had such
5  extensive control and influence over the loan and origination practices that he was
6  personally responsible for instigating breaches in protocol on numerous occasions.
7  For example, Mozilo personally approved loans that did not meet the applicable
8  guidelines including (1) a loan internally flagged as "unsalable" because of a debt-
9  to-income ratio of 89%; (2) a loan for a high-profile borrower "on a reduced doc
10 basis as in the past"; and (3) a loan for that high-profile customer with 100% loan-
11 to-value financing in July 2004.

12     321.   Mozilo's control and influence resulted in company-wide weak
13 controls and procedures with respect to loan approval.   Countrywide Financial
14 employees acknowledged that Mozilo's practice of personally approving loans for
15 friends without the required paperwork that violated the stated requirements for
16 obtaining a loan and demonstrated that the requirements did not need to be followed.
17 Mozilo personally controlled the risky practices about which he and others at
18 Countrywide lied to the public.

19     322.   ***Control Person:   Sambol.***   As set forth in paragraphs 20-22 above,
20 Sambol had numerous positions and roles within Countrywide.

21     323.   By virtue of his senior management positions, Sambol had the power to
22 control and influence, and did control and influence, Countrywide Financial and
23 Countrywide Home Loans.   Sambol had the power to control and influence, and did
24 control and influence, primary violator Countrywide Securities, a wholly-owned
25 Countrywide Financial subsidiary.

26     324.   Sambol was the direct supervisor for Kripalani during Kripalani's
27 tenure as President, Chief Executive Officer, and Managing Director of
28 Countrywide Securities.   Kripalani provided Sambol with regular business updates

1 regarding Countrywide Securities, and Sambol provided direction to Kripalani

2 regarding Countrywide Securities' business.   Sambol had the power to control and

3 influence, and did control and influence, Countrywide Securities in his role as

4 Kripalani's supervisor.

5      325.   In making numerous statements to the public, Sambol portrayed

6 himself as a public face of Countrywide Financial and its subsidiaries and conveyed

7 that he was speaking on behalf of Countrywide Financial, Countrywide Home Loans

8 and Countrywide Financial's other subsidiaries (including Countrywide Securities).

9 Many of these representations were untrue for the same reasons the representations

10 at issue in this case were untrue.

11      326.   Sambol also exercised his authority to control and influence

12 Countrywide Financial and other Countrywide entities by signing numerous

13 materially false and misleading Countrywide Financial documents filed with the

14 SEC.   These documents include Countrywide Financial's:   (1) Form 10-Q filed on

15 November 7, 2006; (2) Form 10-Q filed on May 9, 2007; (3) Form 10-Q filed on

16 August 9, 2007; and (4) Form 10-Q filed on November 9, 2007.

17      327.   Sambol's ability to control and influence Countrywide Financial and its

18 subsidiaries (including Countrywide Securities and the Trusts) is further evidenced

19 by his central role in bringing about the change that transformed Countrywide

20 Financial from a mortgage company with conservative underwriting policies into a

21 loan-originating entity that ignored its own historical underwriting guidelines and

22 took on increasingly risky loans.   Sambol began to change Countrywide's culture in

23 2003 and aggressively pushed Countrywide Financial into numerous new product

24 offerings that changed the risk profile of the loans Countrywide issued.

25      328.   Sambol's ability to control and influence Countrywide Financial and its

26 subsidiaries (including Countrywide Securities and the Trusts) was further

27 evidenced by his close involvement in the daily management of Countrywide's

28 operations.   This included his creating, approving, and overseeing Countrywide

Financial's mortgage and loan product offerings through its subsidiary Countrywide Home Loans – including loans that were packaged together for the securitizations at issue in this case.

329.    Sambol had the power to control and influence, and did control and influence, Countrywide Financial, Countrywide Home Loans, and Countrywide Financial's other   subsidiaries (including Countrywide Securities and the Trusts) through his heavy involvement with developing, modifying, and implementing guidelines for making and underwriting new loans and mortgages.   Others within Countrywide routinely acknowledged that Sambol had the ultimate approval power for relaxing guideline requirements for issuing new loans and implementing any Countrywide programs relating to exceptions processes.   Sambol created the Exception Processing System, which was a computer system designed to approve exception loans routinely, even though they did not even satisfy the relaxed underwriting criteria.   Sambol also was responsible for changing FICO cut-offs under Countrywide's underwriting guidelines.

330.    Sambol had the power to control and influence, and did control and influence, Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts) through his membership on several Countrywide Financial management and Board of Directors committees.   Sambol was a member of at least the following Countrywide Financial committees: (1) Executive Strategy Committee; (2) Asset/Liability Committee; (3) Finance Committee; (4) Audit and Ethics Committee; and (5) Committee to Set Loan Loss Allowance.   Through his committee and Board membership, Sambol participated in Countrywide's decision-making team.

331.    Sambol's participation in the Countrywide Financial committees and the Board also kept him apprised of developments in the business practices of Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts) and afforded him further control and influence over Countrywide

Financial's entire business, including the business of Countrywide Securities and other Countrywide subsidiaries.

332.   Sambol exercised his control and influence on numerous occasions. For example, Sambol mandated a series of changes to the subprime mortgage business at Countrywide Financial and Countrywide Home Loans.   At Sambol's direction, Countrywide Financial and Countrywide Home Loans greatly expanded their roles in the subprime mortgage business despite warnings from employees that these loans were too risky.   The subprime mortgage market expansion is but one example of what everyone at Countrywide knew – if Sambol wanted a change to any Countrywide program (whether at Countrywide Financial, Countrywide Home Loans, Countrywide Securities, or any other Countrywide entity), then Sambol would be able to effect the change because of his control and influence.

333.   It was well known that Sambol was the highest-ranking person to involve when any issues arose in getting loans approved.   Account executives at Countrywide Home Loans told their subordinates to take an underwriter's decision not to approve the loan to Sambol to get the deal done.   Account executives and their subordinates recognized that Sambol had the power to approve any risky loan deal at Countrywide Financial or Countrywide Home Loans.

334.   Sambol threatened to fire subordinates unless they devised new ways for Countrywide Financial and Countrywide Home Loans to make money, including by pushing risky loan products.   Sambol pressured employees to price risky loans in a way that would not take into account the extent of the risk that the loans actually presented and would overstate the value of the loans.   Sambol also pressured employees to relax underwriting guidelines to enable increased production of risky loans.   Because of Sambol's ability to control and influence Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts), employees solicited, approved, and issued the risky loans that Sambol wanted.

335.   Through his ability to control and influence Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts), Sambol repeatedly crushed dissenting voices within Countrywide regarding the ever-increasing risk Countrywide was taking on in its mortgage programs.   For example, when employees raised concerns regarding increases in delinquencies, Sambol consistently pushed for risky loan products and downplayed or ignored the expressed concerns.   Sambol also used his control and influence to exclude individuals who managed and oversaw the credit risk positions from the decision-making process.   As a result of Sambol's actions, Countrywide Financial and Countrywide Home Loans continued their pursuit of risky loan products from 2003 through 2008.

336.   Sambol spearheaded the "lunge for growth" with respect to subprime mortgages that were inherently risky.   Sambol brushed aside warnings from risk-control managers that underwriting standards were too lax, stating that being too cautious would turn Countrywide Financial and its subsidiaries into a "nice, little boutique."   Sambol pushed a policy of offering nearly the entire range of excessively risky mortgage products available in the market, including 100% financing, 80/20 loans, and low-doc and no-doc loans for borrowers with weak credit, and through his control Sambol was able to implement this policy throughout Countrywide.

**B.   Bank of America's Liability as a Successor-in-Interest**

337.   The Bank of America Defendants are liable as successors-in-interest to Countrywide based on a series of transactions that were designed by Bank of America as part of a single integrated plan to defraud and disadvantage certain creditors by stripping Countrywide of its productive assets to the benefit of the Bank of America Defendants, while leaving behind shell entities with no income

1   producing assets to isolate Countrywide's bad assets and massive contingent

2   liabilities.

3      338.   Bank of America has attempted to divert attention from its larger

4   scheme to defraud and disadvantage certain Countrywide creditors by claiming that

5   the sole transaction at issue should be the forward-triangular merger by which Red

6   Oak Merger Corporation, a wholly owned Bank of America subsidiary, merged with

7   Countrywide Financial Corporation on July 1, 2008 (the "Red Oak Merger").

8   Though the Red Oak Merger may be the final step impacting the rights of

9   Countrywide's shareholders, who thereafter became Bank of America shareholders,

10   it was only the first step in a larger plan designed by Bank of America to

11   fraudulently disadvantage the rights of creditors with contingent claims, who

12   remained creditors of Countrywide.   It is this larger integrated, multi-step plan

13   intended by Bank of America to jeopardize certain Countrywide creditors' rights

14   (the "Consolidation Plan") that gives rise to Bank of America's successor liability

15   for Countrywide's conduct.

16      339.   Indeed, Bank of America's initial purchase price—***27% of

17   Countrywide's book value***—represents a recognition that the value of Countrywide

18   was depressed by Countrywide's contingent liabilities.   Yet following the Red Oak

19   Merger, the Bank attempted to gain the benefit of such a depressed purchase price

20   without simultaneously bearing the burden of the liabilities that led to the depressed

21   purchase price in the first place.   It did so by integrating the bargain-priced

22   productive assets into the Bank's own operating subsidiaries, while attempting to

23   isolate the liabilities by purportedly leaving them behind in the stripped-out, non-

24   operating Countrywide shell entities.

25      340.   Based upon the steps taken pursuant to the integrated Consolidation

26   Plan, the Bank of America Defendants became the successors-in-interest to

27   Countrywide because there was a consolidation or merger in fact, i.e. *de facto*

28   merger, of Countrywide and the Bank of America Defendants.   The Red Oak

Case No. Case No. 2:11-CV-05236 MRP (MANx)
                                    AMENDED COMPLAINT

Merger was just one step giving rise to a *de facto* merger.   There was a *de facto* merger because:   (a) the Consolidation Plan was an integrated, multi-step plan intended to defraud or disadvantage certain of Countrywide creditors; (b) the Bank of America Defendants did not pay fair consideration for Countrywide's assets and subsidiaries because the Consolidation Plan transactions were undertaken in bad faith and Bank of America did not pay fair value for Countrywide's assets and subsidiaries; (c) there was a continuity of ownership between Bank of America and Countrywide; (d) Countrywide ceased its ordinary business soon after the steps comprising the Consolidation Plan were consummated; (e) there was continuity of management, personnel, physical location, assets, and general business operations between Bank of America and Countrywide; and (f) Bank of America assumed the liabilities ordinarily necessary for the uninterrupted continuation of Countrywide's business.

341.   The Bank of America Defendants also became the successors-in-interest to Countrywide because the Consolidation Plan was undertaken with the intent to defraud creditors and escape Countrywide's contingent liabilities.   The Bank of America Defendants' fraudulent intent in undertaking the series of transactions comprising the Consolidation Plan is evidenced by the fact that they: (a) were not arm's length transactions; (b) were made without provisions for known potential lawsuits and investigations into Countrywide's mortgage origination, securitization, and servicing practices; (c) resulted in the transfer of substantially all of Countrywide's assets to the Bank of America Defendants; (d) were undertaken at the time when Countrywide was facing and/or threatened by significant legal liabilities; and (e) left Countrywide Financial materially worse off, amounting to a mere shell corporation with no viable business operations, only a small amount of low quality, illiquid assets, and no ability to satisfy massive contingent liabilities.

342.   The Bank of America Defendants did not pay fair consideration for Countrywide's assets and subsidiaries also because the Consolidation Plan

1  transactions were undertaken in bad faith and Bank of America did not pay fair

2  value.

3     343.   In addition, based upon express contracts or agreements, and based

4  upon representations and actions subsequent to July 1, 2008, the Bank of America

5  Defendants have expressly or impliedly assumed Countrywide's mortgage

6  repurchase and/or tort liabilities such that they are the successors-in-interest to

7  Countrywide.

8          **(1)     The Bank of America-Countrywide Consolidation Plan**

9     344.   The Red Oak Merger was just one formal step in a pre-planned, wider

10  Consolidation Plan designed to integrate Countrywide's operational assets while

11  isolating its contingent liabilities.

12     345.   On January 11, 2008, Bank of America announced that it would acquire

13  Countrywide Financial for approximately $4.1 billion in Bank of America shares.

14  The first formal step in the acquisition was carried out pursuant to an Agreement

15  and Plan of Merger (the "Red Oak Merger Agreement") under which Countrywide

16  Financial merged with and into Red Oak Merger Corporation, a wholly owned

17  subsidiary of Bank of America (the "Merger Sub"), with the Merger Sub continuing

18  as the surviving company.   The Red Oak Merger closed July 1, 2008 and the

19  Merger Sub was immediately renamed Countrywide Financial Corporation.   On

20  July 1, 2008, the acquisition was valued at $2.8 billion due to a decrease in Bank of

21  America's stock price since January 11, 2008.   At the conclusion of the Red Oak

22  Merger, Countrywide Financial was a wholly owned subsidiary of Bank of America.

23     346.   After the announcement of the intended acquisition, Bank of America

24  developed the Consolidation Plan—a carefully planned series of integrated

25  transactions developed between January and June 2008, and designed to transfer all

26  the ongoing business activities of Countrywide to Bank of America.   The goal of

27  the Consolidation Plan was to integrate Countrywide's mortgage, servicing,

28  insurance and banking businesses into the Bank of America Defendants through a

1   series of transactions by which Bank of America would acquire all of Countrywide's

2   productive assets, operations, and employees, integrate those assets, operations, and

3   employees into the Bank of America Defendants, and leave behind shell

4   Countrywide entities designed to segregate and ring fence Countrywide's bad assets

5   and contingent liabilities with the intent to defraud and disadvantage certain

6   creditors.

7        347.   The formal Red Oak Merger was just the first of a series of integrated

8   transactions by which the Consolidation Plan was effected.   The Consolidation Plan

9   was contemplated prior to the Red Oak Merger.   This conclusion is echoed by the

10  expert report of Robert Daines (who prepared a report on behalf of Bank of New

11  York Mellon, trustee for Countrywide-issued RMBS, in support of Bank of

12  America's proposed $8.5 billion settlement of certain investor claims), who stated

13  that the Bank of America Defendants and Countrywide "entered into several

14  transactions, which, I understand from discussions with BAC personnel, were

15  anticipated as of the merger date and which served to integrate Countrywide's

16  operations with those of [Bank of America]."   Robert Daines Expert Report in

17  BoNY Settlement at p. 7.

18       348.   The fact that the entire Consolidation Plan was contemplated prior to

19  the Red Oak Merger is also evidenced by Bank of America's public statements

20  between January and June 2008 regarding its intent to combine the mortgage and

21  servicing operations of Bank of America and Countrywide.   For example, in May

22  2008, Ken Lewis, Bank of America's then-CEO, announced that Barbara Desoer, a

23  Bank of America executive, would move to Countrywide's former offices in

24  Calabasas, California and lead the consumer real estate operations of Countrywide

25  Financial and Bank of America when they were combined.

26       349.   Bruce Hammonds, President of Consumer/Credit at Bank of America,

27  on April 22, 2008 testified before the Federal Reserve Bank of Chicago that:

28

Case No. Case No. 2:11-CV-05236 MRP (MANx)
AMENDED COMPLAINT

> Countrywide is the largest provider of mortgage products in the United States.   It is the nation's premier mortgage origination, fulfillment and servicing platform.   Combining these two companies will benefit customers of both organizations. . . . Our combined mortgage business will offer a range of products that continue to respond to market conditions and consumer demand with features that are fair to our consumers. . . . Upon completion of the merger we will continue our long established policy not to offer subprime mortgage loans . . . .

Bank of America Corporation and Countrywide Financial Corporation, Public Meeting Held February 22, 2008 at the Federal Reserve Bank, Chicago, Illinois, Tr. at 10:13-12:21.

350.   Liam McGee, President of Global Consumer and Small Business Banking for Bank of America, on April 28, 2008 testified before the Los Angeles Branch of the Federal Reserve Bank of San Francisco that "Bank of America's values and business practices will govern how we run the combined mortgage business.   So, we will operate under the Bank of America brand.   As with all acquisitions, the brand change will not happen overnight, but will be phased in as we integrate the company over time.   Now California, in particular, will benefit from this transaction.   I am pleased to announce today that Calabasas, California will be the national headquarters for the combined mortgage business."   Bank of America Corporation and Countrywide Financial Corporation, Public Meeting Held April 28, 2008 at the Federal Reserve Bank, Los Angeles, California, Tr. at 11:11-12:01 (emphasis added).   Mr. McGee went on to say that, "[w]ith approval of the merger, Bank of America's values and business practices will govern the *combined mortgage company*."   *Id.* at 39:07-15 (emphasis added).

351.   On June 5, 2008 the Federal Reserve Board issued an order noting that: "Bank of America has represented that it will operate the combined mortgage operations of BA Bank and Countrywide under BA Bank's policies, procedures, internal controls, and other risk management systems to ensure compliance with fair lending and other consumer protection laws and regulations."   Federal Reserve System, Order Approving the Acquisition of a Savings Association and Other

Case No. Case No. 2:11-CV-05236 MRP (MANx)
AMENDED COMPLAINT

Nonbanking Activities at p. 27 (June 5, 2008).   In addition, several other sections of the order discuss representations by Bank of America that the Bank of America and Countrywide organizations would be combined and that through the combined organization, Bank of America would provide various protections and benefits to Countrywide customers.

352.   Likewise, prior to the Red Oak Merger, Bank of America had already taken steps to execute the various asset transfers that were part of its integrated plan to merge Countrywide and Bank of America's businesses and strip Countrywide of its productive assets.   For example, on June 2, 2008 and June 19, 2008, Bank of America, N.A. ("BANA"), a subsidiary of NB Holdings Corp., filed applications with the Office of the Comptroller of the Currency ("OCC") for approval relating to the capital impact of its plan to transfer a pool of residential mortgage loans and 100 percent equity interest in Countrywide's servicing entities to BANA.   It was expected that these transactions would result in an "aggregate increase in BANA's tier 1 and total capital of approximately $31.271 billion" and a planned transfer of the bulk of this capital increase to NB Holdings Corp. in the amount of $26.9 billion.   OCC Conditional Approval Letter #865 from L. Beard to P. Wertz (June 30, 2008).

353.   The Red Oak Merger was closed on July 1, 2008.   Bank of America's Form 10-Q for the period ended September 30, 2009, reported that "[o]n July 1, 2008, the Corporation [i.e., Bank of America] acquired Countrywide through its merger with a subsidiary of the Corporation . . . . The acquisition of Countrywide significantly expanded the Corporation's mortgage originating and servicing capabilities, making it a leading mortgage originator and servicer."

354.   Under the terms of the Red Oak Merger Agreement, "shareholders of Countrywide [] receiv[d] .1822 of a share of Bank of America Corporation's stock in exchange for each share of Countrywide."   In other words, former Countrywide shareholders became Bank of America shareholders.   According to the 10-Q,

1   "Countrywide's results of operations were included in the Corporation's results

2   beginning July 1, 2008."   The Form 10-Q also acknowledged pending litigation

3   against Countrywide.

4          355.   Immediately upon completion of the Red Oak Merger, Countrywide

5   and the Bank of America Defendants commenced execution of the remaining steps

6   of the Consolidation Plan, which were carried out through a series of integrated

7   transactions that occurred mainly between July 1, 2008 and November 7, 2008,

8   between Countrywide Financial and its subsidiaries on the one hand, and Bank of

9   America and its subsidiaries on the other.   As explained by Bank of America's

10  counsel, Jonathan Rosenberg, at a hearing relating to successor liability claims

11  against Bank of America in another case:

12         The three main transactions that are at issue on the successor claims,
           your Honor, all happened in 2008.   First we are talking about the
13         forward triangular merger between Countrywide and [] Bank of
           America Corporation, Countrywide, and then Countrywide is merged
14         into a Bank of America subsidiary called Red Oak, and the end result is
           Bank of America Corporation being the parent of a wholly owned
15         subsidiary Countrywide Financial Corporation, and then Countrywide
           Financial Corporation has its various affiliates.   And then on July 2 of
16         2008, there is a transaction between Bank of America and Countrywide
           Financial Corporation and its subsidiaries in which assets go from
17         Countrywide to Bank of America Corporation, and in exchange about
           $30 billion dollars in consideration goes from Bank of America
18         Corporation or NB Holdings, which is a Bank of America affiliate, to
           Countrywide and its affiliates.   And then in November of 2008 there is
19         another transaction between the two in which substantially all the
           remaining assets at Countrywide Financial Corporation go up to Bank
20         of America Corporation in exchange for about $19 billion in
           consideration, $16.6 and the assumption of certain liabilities, and more
21         than two billion dollars in cash.   So those are the main transactions at
           issue on the successor liability side.
22
    *MBIA Insurance Corp. v. Countrywide Home Loans, et al.,* Index No. 602825-08,
23
    Hearing Tr. at 5-6 (N.Y. Sup. June 27, 2011).
24
           356.   While Bank of America determined that certain Countrywide
25
    operations could be integrated into Bank of America immediately after the Red Oak
26
    Merger, other transactions required third-party consent from regulators and
27
    contractual parties, and were completed on November 7, 2008.   This series of
28

transactions was carried out pursuant to a number of asset and share purchase agreements between Countrywide and the Bank of America Defendants that were separate from the Red Oak Merger Agreement.

357.   It was pursuant to these agreements that a *de facto* merger occurred between Countrywide and the Bank of America Defendants and that Bank of America intended to defraud creditors and escape Countrywide's contingent liabilities.   These agreements were intentionally designed to completely transfer and integrate Countrywide's ongoing operations into Bank of America, strip Countrywide Financial and its remaining subsidiaries, including Countrywide Home Loans and Countrywide Securities Corporation, of valuable assets, and leave Countrywide as a shell without the ability to produce ongoing revenues.

358.   These transactions were not negotiated at arm's length since as of July 1, 2008, Bank of America owned Countrywide Financial.

359.   ***The LD1 Transactions.***   Specifically, between July 1-3, 2008, Countrywide Financial, Countrywide Securities, and Countrywide Home Loans each sold a substantial amount of assets to the Bank of America Defendants and their direct subsidiaries (the "LD1 Transactions").   The OCC's approval of these transactions was conditioned upon Bank of America's and NB Holdings Corp.'s agreement to indemnify BANA for losses and expenditures that might be incurred in connection with the assets and any activity assumed with respect to any of the assets.

360.   On July 1, 2008, Countrywide Home Loans sold to NB Holdings Corp. a pool of residential mortgage loans, including first and second lien mortgages, home equity lines of credit, and construction loans, for approximately $6.9 billion, subject to certain adjustments.

361.   On July 1, 2008, Countrywide Home Loans novated a portfolio of derivative instruments to BANA, a wholly-owned subsidiary of Bank of America, in exchange for $1.8 billion.

Case No. Case No. 2:11-CV-05236 MRP (MANx)
AMENDED COMPLAINT

362.   On July 2, 2008, Countrywide Home Loans sold NB Holdings Corp. its membership interests in Countrywide GP, LLC and Countrywide LP, LLC, whose sole assets were a combined 100 percent equity interest in Countrywide Home Loans Servicing LP, in exchange for an approximately $19.7 billion promissory note, subject to certain adjustments.   Countrywide Home Loans Servicing, LP was the operating entity which serviced the vast majority of residential mortgage loans for Countrywide, owned servicing rights to residential mortgage loans, and was a substantial operating business.   Thus, as of July 2, 2008, Countrywide was no longer in the business of servicing mortgage loans, and Bank of America had taken that business over.

363.   On July 2, 2008, Countrywide Securities sold to Blue Ridge Investments, LLC, a wholly owned subsidiary of Bank of America, a pool of securities which included asset backed securities and mortgage backed securities, for approximately $147 million in cash.

364.   On July 3, 2008, Countrywide Home Loans sold to NB Holdings Corp a pool of residential mortgage loans, including first and second lien mortgages, home equity lines of credit, and construction loans, for approximately $2.5 billion, subject to certain adjustments.

365.   On July 3, 2008, Countrywide Commercial Real Estate Finance, a subsidiary of Countrywide Financial, sold to NB Holdings Corp. a pool of commercial mortgage loans for approximately $238 million, subject to certain adjustments.

366.   According to Countrywide's 10-Q Report for the period ended June 30, 2008:   "After being acquired, [Countrywide] sold certain assets to Bank of America for approximately $30.7 billion in demand notes and cash.   We used proceeds from the asset sales to repay our unsecured revolving lines of credit and bank loans for approximately $11.5 billion and to increase the capital of our Bank subsidiary by $5.5 billion."   In other words, following the LD1 Transactions, Bank of America

1  caused Countrywide to immediately apply the proceeds from the July 1-3, 2008

2  asset transfers to voluntarily pay off holders of much of Countrywide's debt, thus

3  preferring certain creditors over others, including those with contingent claims.   In

4  addition, Bank of America caused Countrywide to increase the capital of

5  Countrywide Bank, FSB by $5.5 billion, which resulted in a circular payment

6  because pursuant to the Consolidation Plan, on November 7, 2008 Bank of America

7  transferred Countrywide Bank, FSB to itself.

8       367.   Consequently, creditors with contingent claims cannot look to the

9  consideration paid to Countrywide in connection with the LD1 Transactions to

10  satisfy their claims because that consideration was paid to other creditors that Bank

11  of America decided to give preferential treatment to, or was returned to Bank of

12  America.

13       368.   ***The LD100 Transactions.***   Bank of America needed to seek consents

14  from regulatory agencies and counterparties in connection with the remaining asset

15  and share transfers contemplated as part of the Consolidation Plan.   On October 10,

16  2008, the Bank of America Defendants caused BANA to file applications with the

17  OCC relating to the capital impact of its plan to transfer substantially all the

18  remaining assets of Countrywide Home Loans to the Bank of America Defendants.

19  The OCC's approval of these transactions was conditioned upon Bank of America's

20  and NB Holdings Corp.'s agreement to indemnify BANA for losses and

21  expenditures that might be incurred in connection with the assets and any activity

22  assumed by BANA with respect to any of the assets.   OCC Conditional Approval

23  Letter #885 from L. Beard to P. Wertz (Nov. 6, 2008).

24       369.   On October 29, 2008, just before the November 7, 2008 transactions,

25  Bank of America caused Countrywide Securities, which acted as Countrywide's

26  broker-dealer and underwriter, to withdraw its registration as a broker dealer from

27  the Financial Industry Regulatory Authority (FINRA).   Without this registration,

28  Countrywide Securities was unable to continue its primary business—securities

dealing and underwriting—and so as of October 29, 2008, Countrywide Securities effectively ceased doing business.

370.   Subsequently, on November 7, 2008, after obtaining the necessary consents and approvals, Bank of America completed additional transactions in connection with the integration of Countrywide into Bank of America's other businesses and operations and as part of the Consolidation Plan (the "LD100 Transactions").

371.   Specifically, in exchange for approximately $1.76 billion, Countrywide Home Loans sold to Bank of America "substantially all" the remaining assets used in Countrywide's mortgage business, including, but not limited to:   (i) a pool of residential mortgages; (ii) remaining mortgage servicing rights; (iii) securities; (iv) real estate acquired through foreclosure on mortgage loans; (v) the technology platform used in the mortgage operations of Countrywide; (vi) furniture, fixtures, and equipment; (vii) third party contract rights, including real estate leases, vendor contracts, intellectual property licenses or other contracts necessary for the uninterrupted continuation of Countrywide's business; (viii) real property owned by Countrywide Home Loans; and (ix) mortgage servicing advance receivables, resulting in a total capital increase to Bank of America's wholly owned subsidiary, BANA, of approximately $5.157 billion.   *See* OCC Conditional Approval Letter #885 from L. Beard to P. Wertz (Nov. 6, 2008); Bank of America 8-K (November 7, 2008); Robert Daines Expert Report in BoNY Settlement (citing Asset Purchase Agreement, Schedule 2.2).

372.   Next, in exchange for promissory notes of approximately $3.6 billion, subject to certain adjustments, Bank of America transferred 100 percent of Countrywide Financial's equity interest in Countrywide Bank, FSB to Bank of America.   As part of the consideration for this transfer, Bank of America assumed certain debt securities and related guarantees of Countrywide in an aggregate amount of approximately $16.6 billion.   In doing so, Bank of America selectively

1  and intentionally disadvantaged and jeopardized the rights of creditors with

2  contingent claims, such as representation and warranty or fraud claims, in favor of

3  the rights of other creditors.

4      373.   At the time of the November 7, 2008 transactions, Countrywide Bank,

5  FSB was the largest Countrywide subsidiary.   Countrywide Bank was key to

6  Countrywide's ability to continue to fund mortgage loans, and therefore essential to

7  Countrywide's mortgage business.   Countrywide's 2007 10-K revealed that "as of

8  December 31, 2007, over 90% of [Countrywide's] monthly mortgage loan

9  production occurred in Countrywide Bank" and that as of January 1, 2008

10  Countrywide's "production channels ha[d] moved into the Bank, completing the

11  migration of substantially all of [Countrywide's] loan production activities from

12  [Countrywide Home Loans] to the Bank."

13      374.   By transferring to itself Countrywide Bank, FSB, along with

14  substantially all of the assets of Countrywide Financial and Countrywide Home

15  Loans, Bank of America left the remaining Countrywide entities with only illiquid

16  assets, no ongoing business, no ability to generate revenue, and insufficient assets to

17  satisfy massive contingent liabilities.

18      375.   Subsequently, in February 2009 Countrywide Bank, FSB filed an

19  application to become a National Association, and in April 2009, Countrywide

20  Bank, NA was *de jure* merged into BANA, a wholly owned subsidiary of Bank of

21  America.   As a result of this merger, the Bank of America Defendants assumed all

22  of the liabilities of Countrywide Bank, NA.

23      376.   Bank of America did not pay fair consideration for these assets because

24  the Consolidation Plan transactions were undertaken in bad faith with the intent to

25  defraud or disadvantage certain of Countrywide's creditors and because Bank of

26  America did not pay fair value for the assets.

27      377.   The assessment by the Delaware Chancery Court in *Arkansas Teacher*

28  *Retirement Sys., et al. v. Caiafa,* 996 A.2d 321 (Del. 2010), that the price paid to

Countrywide's shareholders in connection with the Red Oak Merger was "fair" does not negate the conclusion that the prices paid by Bank of America for the individual assets in connection with the LD1 and LD100 Transactions were not for fair value. The consideration later paid for individual assets can still be unfair to creditors even if shareholders first received a "fair" price for their equity.   In this case, Bank of America paid depressed prices relative to fair value for the individual assets and subsidiaries transferred in the LD1 and LD100 Transactions and, moreover, intentionally caused Countrywide's remaining liabilities to be understated.

378.   Bank of America has admitted that the purchase price in connection with the Red Oak Merger included a large discount for Countrywide's pending and potential contingent liabilities.   In an interview published on February 22, 2008 in the legal publication *Corporate Counsel*, a Bank of America spokesperson acknowledged Countrywide's liabilities:

> Handing all this litigation won't be cheap, even for Bank of America, the soon-to-be largest mortgage lender in the country.   Nevertheless, the banking giant says that Countrywide's legal expenses were not overlooked during negotiations.   'We bought the company and all of its assets and liabilities,' spokesman Scott Silvestri says.   '***We are aware of the claims and potential claims against the company*** and have factored those into the purchase.'

(Emphasis added.)

379.   The prices Bank of America later paid to Countrywide for individual assets and subsidiaries in connection with the LD1 and LD100 Transactions reflected the steep discounts taken by Bank of America in the price paid to Countrywide's shareholders in the Red Oak Merger to account for Bank of America's estimations of Countrywide's exposure to contingent liabilities, including potential lawsuits and representation and warranty claims.   In other words, the prices Bank of America paid would only be "fair value" if the Bank had assumed the corresponding contingent liabilities by which the assets were discounted.   But in spite of the discounts the Bank of America Defendants took advantage of in the Red Oak Merger based upon Countrywide's contingent liabilities, the Bank of America

1   Defendants simultaneously attempted, through the Consolidation Plan, to acquire

2   those assets free of Countrywide's contingent liabilities to the detriment of

3   Countrywide's contingent creditors.

4       380.   In addition, even if Bank of America had paid fair value for the various

5   assets and subsidiaries, which it did not, Countrywide's overall value and viability

6   was intentionally and materially reduced through the Consolidation Plan such that it

7   was left unable to satisfy liabilities to known and anticipated creditors.   Bank of

8   America intended, pursuant to the Consolidation Plan, to favor Countrywide's debt

9   holders by providing for such debt holders to be repaid in full, while fraudulently

10   disadvantaging and jeopardizing the claims of contingent creditors by leaving

11   Countrywide unable to satisfy such claims as a result of the LD1 and LD100

12   Transactions or thereafter.

13       381.   In addition, in seeking approval for the Consolidation Plan transactions,

14   Bank of America intentionally understated Countrywide's contingent liabilities

15   which, had they been accurately accounted for, would have reflected that such asset

16   transfers would render Countrywide insolvent and/or unable to satisfy claims by

17   contingent creditors.

18       382.   The net result of the Consolidation Plan was that through a series of

19   transactions, and in a matter of a few short months, Countrywide was reduced from

20   a company engaged in mortgage origination, securitization, servicing, insurance and

21   banking with a total of approximately $172 billion in assets, to a collection of

22   stripped, wind-down shell entities with massive understated contingent liabilities, no

23   viable business operations, and insufficient assets to satisfy claims from known and

24   anticipated contingent creditors.

25       383.   This conclusion is echoed by Bruce Bingham (who prepared a report on

26   behalf of Bank of New York Mellon, trustee for Countrywide-issued RMBS,

27   attempting to value Countrywide Financial in connection with a proposed $8.5

28   billion settlement of RMBS claims) who found that, as of March 31, 2011,

Countrywide Financial had "negative earnings," "minimal operating revenues," "does not originate, securitize, or service real estate loans," "has no operations that by themselves are economically viable on a go-forward basis," and "has no intangible assets (including contractual rights, trademarks and trade names, technical knowhow, technology, patents, copyrights, assembled workforce, or customer lists) with any value."   B. Bingham, Capstone Valuation Analysis prepared for Bank of New York Mellon, p. 7-8 (June 6, 2011) (hereinafter "Capstone Report").

384.   Bruce Bingham further stated that as of March 31, 2011, Countrywide Financial was reduced to total assets of $10.7 billion of which "BNYM, acting on behalf of the Trusts as Trustee, would recover no more than $4.8 billion" from. According to Bingham, it is likely that the value of Countrywide Financial's assets will continue to decline after March 2011.   Capstone Report at p. 12.   Robert Daines' report further revealed that while Countrywide employed over 44,000 people in 2008, it currently employs a mere 600 employees, primarily dedicated to resolving representation and warranty claims.   Robert Daines Expert Report in BoNY Settlement.

385.   Finally, on July 1, 2011, Bank of America Home Loans Servicing, L.P. (f/k/a Countrywide Home Loans Servicing, L.P.) was merged into BANA.   As a result of this merger, the Bank of America Defendants have assumed all the liabilities of Bank of America Home Loans Servicing, L.P. (f/k/a Countrywide Home Loans Servicing, L.P.).

386.   Further evidencing the very real prejudice to contingent creditors is the fact that, after leaving Countrywide Financial with "negative earnings," and "no operations" to generate any revenues, Bank of America has reportedly considered declaring Countrywide's bankruptcy, thus further jeopardizing the interest of Countrywide's remaining creditors.   For example, in September 2011, *Bloomberg*, based on the interview of four people with knowledge of Bank of America's

1   strategy, reported that Bank of America "would consider putting the unit into

2   bankruptcy if litigation losses threaten to cripple the parent."   Similarly, the *Los*

3   *Angeles Times* reported on September 12, 2011 that "BofA Chief Executive Brian

4   Moynihan didn't rule [bankruptcy] out Monday in addressing an analyst conference

5   in New York."

6        387.   The Consolidation Plan was intentionally structured so that

7   Countrywide's anticipated and massive contingent liabilities relating to its mortgage

8   origination, securitization, and servicing practices remained with Countrywide,

9   while all of its viable, revenue-generating assets and businesses were transferred to

10   the Bank of America Defendants, thus leaving Countrywide unable to satisfy these

11   liabilities.   Not only did Bank of America control the Countrywide entities at the

12   time these transactions were entered into, but Bank of America did not provide

13   adequate consideration for the assets it received from Countrywide because the

14   transactions were undertaken in bad faith and lacked fair value.   Bank of America

15   intentionally understated Countrywide's contingent liabilities, of which Bank of

16   America was fully aware, in connection with the Consolidation Plan transactions,

17   and these transactions, intended to strip Countrywide of its viable assets and

18   business operations, materially reduced Countrywide's overall value and viability,

19   such that Countrywide was left unable to satisfy liabilities to known and anticipated

20   creditors.   In other words, in self-dealing transactions, and in exchange for

21   inadequate consideration, Bank of America intentionally rendered Countrywide

22   insolvent and unable to satisfy creditors with contingent claims.

23        **(2)**    **The Integration of Countrywide's Operations into Bank of
America**

24

25        388.   There is no question that Bank of America in fact merged with

      Countrywide, thus ending Countrywide's ongoing business operations.   Bank of

26   America has described the series of transactions through which it acquired all the

27   productive assets of Countrywide Financial and its subsidiaries as a merger and

28

1  made clear that it planned and intended to integrate Countrywide Financial and its

2  subsidiaries into Bank of America fully by the end of 2009.

3      389.   For example, in a July 1, 2008 Bank of America press release, Barbara

4  Desoer, identified as the head of the "combined mortgage, home equity and

5  insurance businesses" of Bank of America and Countrywide Financial, said:   "Now

6  we begin to combine the two companies and prepare to introduce our new name and

7  way of operating."   The press release stated that, "[Bank of America] reiterated its

8  *combined* national consumer mortgage division will be based in Calabasas, Calif.

9  The *combined* company will begin originating mortgage and home equity products

10  under the Bank of America brand by mid-2009."   (Emphasis added.)   It further

11  explained that the bank "anticipates substantial cost savings from combining the two

12  companies.   Cost reductions will come from a range of sources, including the

13  elimination of positions announced last week, and the reduction of overlapping

14  technology, vendor and marketing expenses.   In addition, [Bank of America] is

15  expected to benefit by leveraging its broad product set to deepen relationships with

16  existing Countrywide customers."

17      390.   As another example, in its 2008 Annual Report, Bank of America

18  confirmed that "[o]n July 1, 2008, we acquired Countrywide," and stated that the

19  acquisition "significantly improved our mortgage originating and servicing

20  capabilities, making us a leading mortgage originator and servicer."   In the Q&A

21  section of the same report, the question was posed:   "How do the recent

22  acquisitions of Countrywide and Merrill Lynch fit into your strategy?"   Bank of

23  America responded that by acquiring Countrywide it became the "No. 1 provider of

24  both mortgage originations and servicing" and "as a combined company," it would

25  be recognized as a "responsible lender who is committed to helping our customers

26  be successful homeowners."   Similarly, in a July 1, 2008 Countrywide Financial

27  press release, Mozilo stated that "the combination of Countrywide and Bank of

28  America will create one of the most powerful mortgage franchises in the world."

391.   On April 27, 2009, Bank of America announced in a press release that "[t]he Countrywide brand has been retired."   Bank of America announced that it would operate its home loan and mortgage business through a new division named Bank of America Home Loans, which "represents the combined operations of Bank of America's mortgage and home equity business and Countrywide Home Loans."

392.   This press release made clear that Bank of America planned to complete its integration of Countrywide Financial into Bank of America "later this year."   Bank of America explained that it was in the process of rebranding former Countrywide "locations, account statements, marketing materials and advertising" as Bank of America Home Loans, and stated that "the full systems conversion" to Bank of America Home Loans would occur later in 2009.   Although the Bank of America Defendants have represented that Bank of America Home Loans is a "trade name" rather than a separate legal entity, it is a Bank of America trade name or brand and thus a part of Bank of America.   Many former Countrywide locations, employees, assets, and business operations now continue under the Bank of America Home Loans brand.   Bank of America Home Loans is thus a direct continuation of Countrywide's mortgage and servicing operations.

393.   Desoer was also interviewed for the May 2009 issue of *Housing Wire* magazine.   The article reported that:

> While the move to shutter the Countrywide name is essentially complete, the operational effort to integrate across two completely distinct lending and service systems is just getting under way.   One of the assets [Bank of America] acquired with Countrywide was a vast technology platform for originating and servicing loans, and Desoer says that the bank will be migrating some aspects of [Bank of America's] mortgage operations over to Countrywide's platforms.

394.   Desoer was also quoted as saying:   "We're done with defining the target, and we're in the middle of doing the development work to prepare us to be able to do the conversion of the part of the portfolio going to the legacy Countrywide platforms."   Desoer explained that the conversion would happen in

1   the "late fall" of 2009, and that the integration of the Countrywide Financial and

2   Bank of America platforms was a critical goal.

3        395.   After the integration had further progressed, Desoer stated in the

4   October 2009 issue of *Mortgage Banking* that "the first year is a good story in terms

5   of the two companies [coming] together and meeting all the major [goals and]

6   milestones that we had set for ourselves for how we would work to integrate the

7   companies."   For Desoer, it was "the highlight of the year . . . when we retired the

8   Countrywide brand and launched the new Bank of America Home Loans brand."

9   In the same issue, Mary Kanaga, a Countrywide transition executive who helped

10  oversee the integration, likened the process of integration to the completion of a

11  mosaic:   "Everything [*i.e.*, each business element] counts.   Everything has to get

12  there, whether it is the biggest project or the smallest project.   It's very much

13  putting a puzzle together.   If there is a missing piece, we have a broken chain and

14  we can't complete the mosaic."

15       396.   Countrywide Financial's former website now redirects to the Bank of

16  America website.   The Bank of America website announced that the companies

17  merged and the now-discontinued Countrywide website previously redirected

18  inquiries about the merger to the Bank of America webpage.   Bank of America

19  noted on its website that it was "combining the valuable resources and extensive

20  product lines of both companies."

21       397.   Under the "Our Heritage" tab on Bank of America's website, the web

22  page states that the purchase of Countrywide "resulted in the launch of Bank of

23  America Home Loans in 2009, making the bank the nation's leading mortgage

24  originator and servicer."   The Countrywide logo appears on the page.

25       398.    Mortgage contracts and legal documents state that Bank of America

26  Home Loans Servicing, LP is the entity "formerly known as" Countrywide Home

27  Loans Servicing, a former Countrywide subsidiary, which clearly shows that Bank

28

1  of America Home Loans Servicing, LP is the direct successor to Countrywide Home

2  Loans Servicing, since it is a mere continuation of Countrywide's business.

3      399.   As of September 21, 2009, former Countrywide bank deposit accounts

4  were reportedly converted to Bank of America accounts.   And on November 9,

5  2009, online account services for Countrywide mortgages were reportedly

6  transferred to Bank of America's Online Banking website.   According to press

7  reports, Bank of America Home Loans will operate out of Countrywide's offices in

8  Calabasas, California with substantially the same employees as the former

9  Countrywide entities.

10      400.   Prior to the Red Oak Merger, Countrywide employed approximately

11  44,000 people.   In the months that followed the Red Oak Merger, and as part of the

12  Consolidation Plan, approximately 20,000 of those employees became Bank of

13  America employees, and only a mere 600 employees, primarily dedicated to

14  resolving representation and warranty claims by creditors against Countrywide,

15  remain with Countrywide.   In addition, Bank of America retained many of

16  Countrywide's senior personnel, including key management personnel, to facilitate

17  the full transition of Countrywide's operations to Bank of America and to continue

18  running Countrywide's former business operations at Bank of America.

19      401.   In addition, through the Consolidation Plan, Bank of America explicitly

20  assumed Countrywide's third party contracts, including those ordinarily necessary

21  for the uninterrupted continuation of Countrywide's mortgage origination, servicing,

22  and banking business, such as real estate leases, vendor contracts, and intellectual

23  property licenses.

24      402.   As a result of executing the Consolidation Plan, Bank of America

25  began operating Countrywide's former mortgage origination and servicing

26  businesses, along with other former Countrywide business operations, out of

27  Countrywide's former offices, including its main office in Calabasas, California.   In

28  addition, Bank of America retained many of Countrywide's retail and other branch

1  locations and converted them to Bank of America retail and branch locations by,

2  among other things, changing the signage and appearance to reflect Bank of

3  America's trade names and logos and removing Countrywide's name from the

4  locations.

5       403.  Bank of America has generated substantial earnings from the

6  absorption of Countrywide's mortgage business.   For example, a Bank of America

7  press release regarding the company's 2009 first quarter earnings stated that "[n]et

8  revenue nearly quadrupled to $5.2 billion primarily due to the acquisition of

9  Countrywide and from higher mortgage banking income as lower interest rates

10  drove an increase in mortgage activity."   Lewis was quoted as saying, "We are

11  especially gratified that our new teammates at Countrywide and Merrill Lynch had

12  outstanding performance that contributed significantly to our success."

13       404.  A press release regarding Bank of America's 2009 second quarter

14  earnings similarly stated that "[n]et revenue rose mainly due to the acquisition of

15  Countrywide and higher mortgage banking income as lower interest rates spurred an

16  increase in refinance activity."   The press release explained that "higher mortgage

17  banking income, trading account profits and investment and brokerage services

18  income reflected the addition of Merrill Lynch and Countrywide."   Bank of

19  America reported that its average retail deposits in the quarter increased $136.3

20  billion, or 26 percent, from a year earlier, including $104.3 billion in balances from

21  Merrill Lynch and Countrywide.

22       405.  Bank of America's 2009 annual report stated that "[r]evenue, net of

23  interest expense on a fully taxable-equivalent (FTE) basis, rose to $120.9 billion,

24  representing a 63% increase from $74.0 billion in 2008, reflecting in part the

25  addition of Merrill Lynch and the full-year impact of Countrywide."   Bank of

26  America also reported that "[m]ortgage banking income increased $4.7 billion

27  driven by higher production and servicing income . . . primarily due to increased

28  volume as a result of the full-year impact of Countrywide . . . ."   Insurance income

1   also increased $927 million "due to the full-year impact of Countrywide's property

2   and casualty businesses."

3       406.   Thus, Countrywide Financial and its subsidiaries, which include each

4   of the Countrywide Defendants, have now been merged in fact into Bank of

5   America with the intent to defraud creditors and escape Countrywide's contingent

6   liabilities.   Bank of America is liable for the wrongdoing of the Countrywide

7   Defendants because it is the successor-in-interest to each of the Countrywide

8   Defendants.

9                   **(3)    Bank of America Assumed Countrywide's Liabilities**

10      407.   As discussed above, Bank of America's attempt through the

11  Consolidation Plan to isolate and leave behind the contingent liabilities fails because

12  the Bank is Countrywide's successor-in-interest due to the improper LD1 and

13  LD100 asset transfers.   However, even if that were not the case, the Bank is

14  additionally liable because it has since tried to back away from the Consolidation

15  Plan's intent to wrongfully isolate the liabilities, and in so doing has now expressly

16  and impliedly assumed the liabilities at issue here.   The Bank of America

17  Defendants have assumed Countrywide's contingent liabilities expressly in various

18  contracts, agreements, and settlements, and impliedly through conduct,

19  representations and payments of Countrywide's liabilities on behalf of Countrywide.

20      408.   In purchasing Countrywide Financial and its subsidiaries for merely

21  ***27% of its book value***, Bank of America was fully aware of the pending claims and

22  potential claims against Countrywide and priced those liabilities into the transaction.

23  On the Form 10-Q report of Countrywide Financial for the quarter ending on June

24  30, 2008, right before the July 1, 2008 merger, Countrywide Financial disclosed at

25  least thirty-nine legal proceedings that were pending against Countrywide at that

26  time.   In Bank of America's Form 10-K Report for 2009, Bank of America

27  acknowledged   that "[W]e face increased litigation risk and regulatory scrutiny as a

28  result of the Merrill Lynch and Countrywide acquisitions."

409.   Countrywide claims to have anticipated litigation with several counterparties, including investors and monoline insurers, prior to the Red Oak Merger.   Through the extensive due diligence conducted by Bank of America into Countrywide's assets, liabilities, and business, Bank of America was aware of pending and prospective litigation and therefore was knowledgeable regarding Countrywide's contingent liabilities prior to developing and carrying out the Consolidation Plan.

410.   For example, in an interview published on February 22, 2008 in the legal publication *Corporate Counsel*, a Bank of America spokesperson admitted that Bank of America had assumed Countrywide's liabilities:

> Handling all this litigation won't be cheap, even for Bank of America, the soon-to-be largest mortgage lender in the country. Nevertheless, the banking giant says that Countrywide's legal expenses were not overlooked during negotiations. '***We bought the company and all of its assets and liabilities***,' spokesman Scott Silvestri says. 'We are aware of the claims and potential claims against the company and have factored these into the purchase.'

411.   In addition, on October 6, 2008, during an earnings call, Joe Price, Bank of America's Chief Financial Officer, stated that "[a]s we transfer those operations [i.e., Countrywide Financial and its subsidiaries] our company intends to assume the outstanding Countrywide debt totaling approximately $21 billion." Asked about the "formal guaranteeing" of Countrywide's debt, Kenneth D. Lewis, Bank of America's former Chairman and Chief Executive Officer, responded: "The normal process we followed is what are the operational movements we'll make to *combine the operations*.   When we do that we've said the debt would fall in line and quite frankly that's kind of what we've said the whole time . . . .   [T]hat's been very consistent with deals we've done in the past from this standpoint."   (Emphasis added).

412.   Similarly, Lewis was quoted in a January 23, 2008 *New York Times* article reporting on the acquisition of Countrywide Financial and its subsidiaries, in which he acknowledged that Bank of America knew of the legal liabilities of

Countrywide Financial and its subsidiaries and impliedly accepted them as part of the cost of the acquisition:

> We did extensive due diligence.   We had 60 people inside the company for almost a month.   It was the most extensive due diligence we have ever done.   So we feel comfortable with the valuation.   We looked at every aspect of the deal, *from their assets to potential lawsuits* and we think we have a price that is a good price.

(Emphasis added).

413.   Bank of America has made additional statements showing that it has assumed the liabilities of Countrywide.   In a press release announcing the merger, Lewis stated that he was aware of the "issues within the housing and mortgage industries" and said that "the transaction [with Countrywide] reflects those challenges."   Despite these challenges, Lewis stated in October 2009 that "The Merrill Lynch and Countrywide integrations are on track and returning value already."

414.   Brian Moynihan, Bank of America's current CEO and President, testified before the Financial Crisis Inquiry Commission on January 13, 2010, that "our primary window into the mortgage crisis came through the acquisition of Countrywide . . . . The Countrywide acquisition has positioned the bank in the mortgage business on a scale it had not previously achieved.   There have been losses, and lawsuits, from the legacy of Countrywide operations, but we are looking forward."

415.   Addressing investor demands for refunds on faulty loans sold by Countrywide, Moynihan stated:   "There's a lot of people out there with a lot of thoughts about how we should solve this, but at the end of the day, we'll pay for the things that Countrywide did."   And, in a *New York Times* article published in December 2010, Moynihan, speaking about Countrywide, again confirmed:   "Our company bought it and we'll stand up; we'll clean it up."

416.   Similarly, Jerry Dubrowski, a spokesman for Bank of America, was quoted in an article published by *Bloomberg* in December 2010 that the bank will

1  "act responsibly" and repurchase loans in cases where there were valid defects with

2  the loans.   Through the third quarter of 2010, Bank of America faced $12.9 billion

3  in repurchase requests stemming largely from Countrywide originated loans.

4        417.   During an earnings call for the second quarter of 2010, Charles Noski,

5  Bank of America's Chief Financial Officer, stated that "we increased our reps and

6  warranties expense by $722 million to $1.2 billion as a result of our continued

7  evaluation of exposure to repurchases including our exposure to repurchase

8  demands from certain monoline insurers."   And during the earnings call for the

9  third quarter of 2010, Noski stated that "[t]hrough September, we've received $4.8

10  billion of reps and warranty claims related to the monoline-insured deals, of which

11  $4.2 billion remains outstanding, and approximately $550 million were

12  repurchased."

13        418.   The Bank of America Defendants continued to set aside reserves on

14  their own balance sheets for representations and warranty claims stemming from

15  Countrywide loans in subsequent quarters.   As of the fourth quarter of 2010, Bank

16  of America reserved $4.14 billion, and it had received $21.6 billion in representation

17  and warranty claims for loans originated between 2004 and 2008.   In 2010 alone

18  Bank of America had approved $7.0 billion in claims for repurchase.   In the first

19  quarter of 2011, Bank of America set aside an additional $1 billion, and then in the

20  second quarter of 2011 Bank of America announced it would set aside another $14

21  billion for such representation and warranty claims.   The dollar amount of the

22  reserves Bank of America set aside for representation and warranty claims exceeds

23  the total remaining assets of Countrywide Financial and its remaining subsidiaries

24  combined, and even the $7.0 billion in claims approved for repurchase in 2010 alone

25  far exceeds the $4.8 billion maximum recovery from Countrywide estimated by

26  expert Bruce Bingham, thus making clear that Bank of America has assumed

27  liability for representation and warranty claims on Countrywide originated loans.

28

419.   Bank of America has also assumed Countrywide's liabilities through its active negotiation and funding of litigation settlements on behalf of Countrywide. For example, since July 1, 2008, Bank of America executive Barbara Desoer was responsible for overseeing investigations by eleven state attorneys general into allegations that Countrywide had misled customers using predatory lending tactics. With Desoer leading negotiations, Bank of America reached various settlement agreements in which it has directly taken responsibility for Countrywide's liabilities. As part of settlement agreements with certain state attorneys general, valued at approximately $8.4 billion, Bank of America agreed to forgive up to 30 percent of the outstanding mortgage balances owed by former Countrywide customers.   The loans were made by Countrywide before Bank of America acquired Countrywide. In addition, in connection with the settlements with various state attorneys general, Bank of America executed written agreements by which it agreed to indemnify Countrywide Financial in the event Countrywide Financial breached or violated the settlement agreements with the state.

420.   Since July 1, 2008, Bank of America has paid to restructure certain of Countrywide Financial's home loans on its behalf, including up to 390,000 Countrywide loans Bank of America agreed to restructure in connection with the state attorneys general settlements.

421.   In October 2010, the *New York Times* reported that Bank of America is "on the hook" for $20 million of the disgorgement that Defendant Mozilo agreed to pay in his settlement agreement with the SEC.   The Red Oak Merger Agreement provided that all indemnification provisions "shall survive the merger and shall continue in full force and effect . . . for a period of six years."   According to the article, "Because Countrywide would have had to pay Mr. Mozilo's disgorgement, Bank of America took on the same obligation, even though it had nothing to do with the company's operations at the time."

422.   On January 3, 2011 Bank of America announced that it had agreed to pay $2.8 billion to settle claims to repurchase mortgage loans that Fannie Mae and Freddie Mac had purchased from Countrywide Financial or its subsidiaries.   In its press releases and presentation concerning the settlement, Bank of America admitted that it was paying to resolve claims concerning "alleged breaches of selling representations and warranties related to loans sold by legacy Countrywide." Moreover, Bruce Bingham's expert report indicates that in 2010 "BAC agreed to assume the full cost of certain representation and warranty liability associated with certain government sponsored entity portfolios originated by CFC."   Capstone Report at p. 10.

423.   On April 15, 2011, Assured Guaranty Ltd. ("Assured") reached a comprehensive $1.1 billion settlement with Bank of America regarding its liabilities with respect to 29 residential mortgage-backed securities transactions insured by Assured.   The settlement agreement covered both Bank of America and Countrywide-sponsored securitizations, as well as certain other securitizations containing concentrations of Countrywide-originated loans, that Assured had insured on a primary basis.

424.   On May 26, 2011, Bank of America agreed to pay more than $22 million to settle charges that it improperly foreclosed on the homes of active-duty members of the U.S. military between January 2006 and May 2009.   In a public statement concerning the settlement, Bank of America Executive President Terry Laughlin said:   "While most cases involve loans originated by Countrywide and the improper foreclosures were taken or started by Countrywide prior to our acquisition, it is our responsibility to make things right."

425.   On June 28, 2011, Bank of America announced a proposed $8.5 billion settlement with Bank of New York Mellon ("BoNY"), as Trustee for certain Countrywide RMBS trusts.   The settlement applies to claims that could be brought by BoNY in connection with 530 residential mortgage-backed securities

representing over $424 billion in mortgages that were underwritten by Countrywide and for which BoNY served as Trustee.

426.   In addition, in defending its proposed settlement agreement with BoNY, Bank of America explained why Bank of America, and not Countrywide, was responsible for indemnifying BoNY in connection with any claim or legal action arising from its role as a Trustee for Countrywide RMBS trusts:

> The indemnity in the PSAs is provided by the Master Servicer.   The Master Servicer was initially Countrywide Home Loans Servicing, LP, which resided within Countrywide.   But immediately after the July 1, 2008 acquisition by Bank of America Corporation of Countrywide Financial Corporation (the Countrywide parent company), the ownership interests in the Master Servicer were transferred from under Countrywide Financial Corporation to under Bank of America, N.A., and the Master Servicer was subsequently renamed BAC Home Loans Servicing, LP.11   The indemnity has thus long been on the Bank of America side of the line, not on the Countrywide side . . . .

*Walnut Place LLC, et al. v. Countrywide Home Loans, et al.*, No. 650497/2011 (N.Y. Sup. 2011), Dkt. No. 56, at p. 5-8.

427.   Bank of America's public statements accepting responsibility for Countrywide's contingent liabilities arising from Countrywide's mortgage origination, securitization and servicing practices, along with Bank of America's actual participation in and funding of the settlement of such liabilities, demonstrates that Bank of America intentionally structured the Consolidation Plan in such a way as to leave minimal and inadequate assets remaining in Countrywide to cover such liabilities, and that Bank of America has subsequently assumed such liabilities.

428.   For all the reasons set forth above, the Bank of America Defendants are, thus, successors in liability to Countrywide and are jointly and severally liable for the wrongful conduct alleged herein of the Countrywide Defendants.

### C.   The Bank of Amercia-Countrywide Asset and Share Transfers were Fraudulent Conveyances

429.   Bank of America's Consolidation Plan also resulted in fraudulent conveyances of Countrywide's assets and subsidiaries to the Bank of America

1  Defendants.   The assets and subsidiaries that were the subject of the LD1 and

2  LD100 Transactions were fraudulently conveyed to the Bank of America

3  Defendants because, as explained above, these transactions were made without fair

4  consideration and with the actual intent to defraud certain of Countrywide's

5  creditors, and resulted in Countrywide becoming insolvent and/or unable to pay

6  creditors with contingent claims.

7        430.   Additionally, the LD1 and LD100 Transactions, which were carefully

8  planned by Bank of America as part of one integrated plan, should be treated as a

9  single transaction for purposes of analysis under fraudulent conveyance law because

10  the Bank of America Defendants carefully planned, and thus had actual knowledge,

11  of, the entire scheme that rendered their exchanges with Countrywide fraudulent.

12  As detailed above, multiple representatives of the Bank of America Defendants

13  made repeated representations that indicated that the LD1 and LD100 Transactions

14  were contemplated prior to the Red Oak Merger and as part of an integrated scheme

15  to segregate Countrywide's assets from its contingent liabilities and combine the

16  business operations of Countrywide into Bank of America.   In addition, the Bank of

17  America Defendants took overt actions prior to the Red Oak Merger to begin the

18  LD1 and LD100 Transactions, including seeking regulatory approval for those

19  transactions prior to the Red Oak Merger.

20             **(1)    Bank of America's Fraudulent Intent**

21        431.   The Bank of America Defendants' fraudulent intent in connection with

22  the LD1 and LD100 transactions is evidenced by the fact that the conveyances:   (a)

23  were not arm's length transactions; (b) were made without provisions for known

24  potential lawsuits and investigations into Countrywide's mortgage origination,

25  securitization, and servicing practices; (c) resulted in the transfer of substantially all

26  of Countrywide's assets to the Bank of America Defendants; (d) were undertaken at

27  the time when Countrywide was facing and/or threatened by significant legal

28  liabilities; (e) were made without adequate or fair consideration in that they were

undertaken in bad faith and/or were not for fair value; (f) rendered Countrywide insolvent; and (g) left Countrywide Financial materially worse off, amounting to a mere shell corporation with no viable business operations, only a small amount of low quality, illiquid assets, and no ability to satisfy massive contingent liabilities.

### (2)   Bank of America Did Not Pay Fair Consideration

432.   Further, as explained above, the LD1 and LD100 Transactions were not for fair consideration because the transactions were undertaken in bad faith and Bank of America did not pay reasonable or fair value for Countrywide's assets and subsidiaries.

433.   As noted above, the prices Bank of America paid for Countrywide's assets and subsidiaries reflected steep discounts to account for Countrywide's exposure to contingent liabilities, including potential lawsuits and representation and warranty claims—the Bank paid just 27% of Countrywide's book value in the initial Red Oak Merger.

434.   Yet through the LD1 and LD100 Transactions, the Bank of America Defendants attempted to isolate Countrywide's valuable assets and subsidiaries from its contingent liabilities for purposes of defrauding creditors by setting up transactions by which the Bank of America Defendants would acquire the assets and subsidiaries at discounted prices without assuming the corresponding contingent liabilities by which the prices were discounted.   In seeking approval for these transactions, the Bank of America Defendants intentionally understated Countrywide's contingent liabilities to conceal the fact that the proposed asset and subsidiary transfers would render Countrywide insolvent and/or unable to satisfy claims by contingent creditors.

### (3)   Countrywide Rendered Insolvent or Unable to Pay Contingent Creditors

435.   As a consequence of the LD1 and LD100 Transactions, Countrywide Financial and its remaining subsidiaries were rendered insolvent by the conveyance

because at the time of the conveyance, the value of Countrywide's remaining assets was insufficient to pay known and anticipated claims by contingent creditors.

436.   In addition, Countrywide Financial intended or believed at the time of the LD1 and LD100 Transactions that it would incur debts to contingent creditors beyond its ability to pay them as they matured, and the Bank of America Defendants were aware of these contingent liabilities.   Thus, Countrywide's overall value and viability was materially reduced through the Consolidation Plan such that it was left unable to satisfy liabilities to known and anticipated creditors.

437.   Therefore, Allstate is entitled to relief under the laws prohibiting fraudulent conveyances.

### D.   Allstate's 1933 Act Claims Have Been Tolled By Previously-Filed Class Action Complaints

438.   On November 14, 2007, a class action was filed against various Countrywide entities, former officers, and underwriters on behalf of all investors who purchased or otherwise acquired certain mortgage-backed securities that were issued, underwritten or sold by Countrywide.   *See Luther v. Countrywide Home Loans Servicing LP*, BC380698 (Cal. Super. Ct. 2007).   The *Luther* complaint alleges claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.

439.   Among the Offerings that Allstate invested in, the following were included in the November 2007 *Luther* class action:   CWALT 2005-25T1, CWALT 2006-30T1, CWALT 2006-45T1, CWALT 2006-9T1, and CWALT 2006-J1. Allstate was expressly stated to be part of the defined class in *Luther*, as of November 14, 2007, with respect to these Offerings.

440.   On June 12, 2008, a different securities class action was filed against Countrywide in California state court, *Washington State Plumbing & Pipefitting Pension Trust v. Countrywide Financial Corp*., BC392571 (Cal. Super. Ct. 2008). Like *Luther*, this action also alleged Section 11, 12(a)(2), and 15 claims against

1   Countrywide, its former officers, and underwriters, although *Washington State*
2   *Plumbing* based its claims on different securitizations than those in *Luther*.

3       441.   Among the Offerings that Allstate invested in, the following were
4   included in the June 12, 2008 *Washington State Plumbing* class action:   CWALT
5   2007-18CB, CWALT 2007-20, CWHL 2005-HYB7, CWHL 2006-9, CWL 2005-
6   11, CWL 2005-13, CWL 2005-16, CWL 2005-17, CWL 2006-1, CWL 2006-9,
7   CWL 2006-S1, CWL 2006-S2, CWL 2006-S5, CWL 2007-4, CWL 2007-S1, and
8   CWL 2007-S2.   As in *Luther*, Allstate was expressly stated to be part of the defined
9   class in *Washington State Plumbing*, as of June 12, 2008, with respect to these
10  Offerings.

11      442.   On September 9, 2008, the *Luther* complaint was amended to add the
12  securitizations from *Washington State Plumbing* to the *Luther* class.   The
13  *Washington State Plumbing* action was consolidated with the original *Luther* action,
14  and a consolidated and amended complaint was filed on October 16, 2008.   Allstate
15  was included in the defined class in the *Luther/Washington State Plumbing*
16  consolidated complaint with respect to investments in the following Offerings:
17  CWALT 2005-25T1, CWALT 2006-30T1, CWALT 2006-45T1, CWALT 2006-
18  9T1, CWALT 2006-J1, CWALT 2007-18CB, CWALT 2007-20, CWHL 2005-
19  HYB7, CWHL 2006-9, CWL 2005-11, CWL 2005-13, CWL 2005-16, CWL 2005-
20  17, CWL 2006-1, CWL 2006-9, CWL 2006-S1, CWL 2006-S2, CWL 2006-S5,
21  CWL 2006-S8, CWL 2007-4, CWL 2007-S1, and CWL 2007-S2.

22      443.   The consolidated *Luther* action was subsequently dismissed on
23  jurisdictional grounds in January 2010 and refiled that month as *Maine State*
24  *Retirement System v. Countrywide Financial Corp.,* No. 10 Civ. 0302 (C.D. Cal.
25  2010).   Allstate was included in the defined class in the *Maine State* complaint with
26  respect to investments in the following Offerings, the same Offerings in the
27  *Luther/Washington State Plumbing* consolidated complaint:   CWALT 2005-25T1,
28  CWALT 2006-30T1, CWALT 2006-45T1, CWALT 2006-9T1, CWALT 2006-J1,

Case No. Case No. 2:11-CV-05236 MRP (MANx)
AMENDED COMPLAINT

1  CWALT 2007-18CB, CWALT 2007-20, CWHL 2005-HYB7, CWHL 2006-9,

2  CWL 2005-11, CWL 2005-13, CWL 2005-16, CWL 2005-17, CWL 2006-1, CWL

3  2006-9, CWL 2006-S1, CWL 2006-S2, CWL 2006-S5, CWL 2006-S8, CWL 2007-

4  4, CWL 2007-S1, and CWL 2007-S2.

5      444.   In a November 4, 2010 decision, the *Maine State* court held that the

6  named plaintiffs in the class action had standing to sue Countrywide only with

7  respect to 81 of the offerings in which the named plaintiffs themselves invested.

8  *Maine State Retirement System v. Countrywide Financial Corp.,* No. 10 Civ. 0302

9  (C.D. Cal. Nov. 4, 2010) (opinion), at 7.   The court rejected the notion that the

10  plaintiffs could represent class members who bought in other Countrywide

11  offerings, even if the offerings emanated from a common registration statement.

12  The net effect of the court's ruling is to narrow the *Maine State* class and to exclude

13  class members whose investments in Countrywide mortgage-backed securities do

14  not overlap with those of the named plaintiffs.   *Id.* at 5-8.

15      445.   Some of Allstate's investments were made in the same Offerings as the

16  named plaintiffs in the *Luther, Washington State Plumbing, and Maine State*.

17  These Offerings include CWABS 2005-11, CWABS 2006-9, and CWHEQ 2006-S2.

18      446.   However, certain other of Allstate's Countrywide investments appear

19  not to overlap with the investments of the named plaintiffs (though Allstate cannot

20  be certain of this because the *Luther* complaint does not list the individual purchases

21  of plaintiff David Luther).   Nonetheless, it appears that the Court's standing ruling

22  may have the effect of involuntarily excluding Allstate from the Countrywide

23  mortgage-backed-securities class action, at least with respect to certain of its

24  investments.

25      447.   Because of the uncertainty arising from this ruling, Allstate has chosen

26  to file this separate action and to assert its 1933 Act claims and other claims, which

27  have been tolled by the pendency of the various Countrywide RMBS class actions.

28  Allstate has been part of the putative class in all of the Countrywide class actions,

from *Luther* to *Washington State Plumbing* to *Maine State*.   Allstate reasonably and justifiably relied on the named plaintiffs in these class actions to protect its rights and it reasonably and justifiably relied on the class action tolling doctrines of *American Pipe* and *WorldCom* to toll the statute of limitations on its 1933 Act claims.

448.   Under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), all putative class members are treated as if they filed their own individual actions until they either opt out or until a certification decision excludes them.   *Id.* at 255.   As the Second Circuit stated in *In re WorldCom Securities Litigation*, 496 F.3d 245, 255 (2d Cir. 2007):   "[B]ecause Appellants were members of a class asserted in a class action complaint, their limitations period was tolled under the doctrine of *American Pipe* until such time as they ceased to be members of the asserted class, notwithstanding that they also filed individual actions prior to the class certification decision."   *WorldCom*, 496 F.3d at 256.

449.   Allstate was a member of the putative class "asserted" in *Luther* and subsequent class actions and its 1933 Act claims are therefore timely pursuant to *American Pipe and In re WorldCom.*

450.   Except for the Bank of America Defendants, Mozilo, and Countrywide Capital Markets, each Defendant in this Complaint was also a defendant in the *Luther* or *Washington State Plumbing* class actions, for the same causes of action asserted herein.

### **THIRD CAUSE OF ACTION**

#### **(Common-law Fraud)**

451.   Allstate realleges each allegation above as if fully set forth herein.

452.   This claim is brought against Countrywide Financial, Countrywide Home Loans, Countrywide Securities, the Depositors (the "Common-Law Fraud Defendants"), and the Bank of America Defendants as Countrywide's successor.

453.   The material representations set forth above were fraudulent, and the Common-Law Fraud Defendants' representations fraudulently omitted material statements of fact.   The representations at issue are identified above and in the Exhibits, and are summarized in Section III above.

454.   Each of the Common-Law Fraud Defendants knew their representations and omissions were false and/or misleading at the time they were made.   Each of the Common-Law Fraud Defendants made the misleading statements with an intent to defraud Allstate.

455.   Allstate justifiably relied on the Common-Law Fraud Defendants' false representations and misleading omissions.

456.   Had Allstate known the true facts regarding the Common-Law Fraud Defendants' underwriting practices and quality of the loans making up the securitizations, it would not have purchased the Certificates.

457.   As a result of the Common-Law Fraud Defendants' false and misleading statements and omissions, as alleged herein, Allstate has suffered damages according to proof.   The Countrywide Defendants are liable to Allstate for common-law fraud, and the Bank of America Defendants are liable as their successors.

## NINTH CAUSE OF ACTION

### (Successor and Vicarious Liability)

458.   Allstate realleges each allegation above as if fully set forth herein.

459.   The Bank of America Defendants are liable as successors in interest for Countrywide's wrongdoing, in its entirety, under common law, because:   (a) there was a consolidation or merger in fact, i.e. *de facto* merger, of Countrywide and the Bank of America Defendants; (b) because the Consolidation Plan was undertaken with the intent to defraud creditors and escape Countrywide's contingent liabilities; and/or (c) the Bank of America Defendants' have expressly or impliedly assumed Countrywide's tort liabilities.

460.   By virtue of the conduct alleged herein, the Bank of America Defendants are successors in liability to Countrywide and are jointly and severally liable for the wrongful conduct alleged herein of the Countrywide Defendants.

## TENTH CAUSE OF ACTION

### (Intentional Fraudulent Conveyance)

461.   Allstate realleges each allegation above as if fully set forth herein.

462.   The Bank of America Defendants fraudulently conveyed the assets that were the subject of the LD1 and LD100 Transaction because these transactions were made without fair consideration and with the intent to defraud certain of Countrywide's creditors.

463.   The Bank of America Defendants' intent can be inferred from the following indicia of fraud:   (a) the transactions were not arm's length transactions; (b) the transactions were made without provisions for known potential lawsuits and investigations into Countrywide's mortgage origination, securitization, and servicing practices; (c) the transactions resulted in the transfer of substantially all of Countrywide's assets to the Bank of America Defendants; (d) the transactions were undertaken at the time when Countrywide was facing and/or threatened by significant legal liabilities; (e) the transactions were made without adequate or fair consideration in that they were undertaken in bad faith and/or were not for fair value; (f) the transactions rendered Countrywide insolvent; and (g) the transactions left Countrywide Financial materially worse off, amounting to a mere shell corporation with no viable business operations, only a small amount of low quality, illiquid assets, and no ability to satisfy massive contingent liabilities.

464.   The LD1 and LD100 Transactions were not for fair consideration because the transactions were undertaken in bad faith and Bank of America did not pay reasonable or fair value for Countrywide's assets and subsidiaries.

465.   As a consequence of the LD1 and LD100 Transactions, Countrywide Financial and its remaining subsidiaries were rendered insolvent by the conveyance

1  because at the time of the conveyance, the value of Countrywide's remaining assets

2  was insufficient to pay known and anticipated claims by contingent creditors.

3      466.  In addition, Countrywide Financial intended or believed at the time of

4  the LD1 and LD100 Transactions that it would incur debts to contingent creditors

5  beyond its ability to pay them as they matured.

6      467.  The fraudulent conveyances injured Allstate because Countrywide

7  became unable to satisfy contingent creditor claims because it was rendered

8  insolvent by the fraudulent conveyances and/or the remaining value of

9  Countrywide's assets was so diminished that Countrywide no longer held sufficient

10  assets to satisfy contingent creditor claims.

11     468.  Accordingly, by virtue of the conduct alleged herein, Allstate is entitled

12  to relief under the law of fraudulent conveyance because the assets and shares

13  transferred in the LD1 and LD100 Transactions were fraudulently conveyed by the

14  Bank of America Defendants.

## **ELEVENTH CAUSE OF ACTION**

### **(Constructive Fraudulent Conveyance)**

17     469.  Allstate realleges each allegation above as if fully set forth herein.

18     470.  The LD1 and LD100 Transactions also give rise to a claim for

19  constructive fraudulent conveyance because these transactions were made without

20  fair consideration and rendered Countrywide insolvent and/or unable to pay

21  creditors with contingent claims.

22     471.  The LD1 and LD100 Transactions were not for fair consideration

23  because the transactions were undertaken in bad faith and Bank of America did not

24  pay reasonable or fair value for Countrywide's assets and subsidiaries.

25     472.  As a consequence of the LD1 and LD100 Transactions, Countrywide

26  Financial and its remaining subsidiaries were rendered insolvent by the conveyance

27  because at the time of the conveyance, the value of Countrywide's remaining assets

28  was insufficient to pay known and anticipated claims by contingent creditors.

473.   In addition, Countrywide Financial intended or believed at the time of the LD1 and LD100 Transactions that it would incur debts to contingent creditors beyond its ability to pay them as they matured.

474.   The fraudulent conveyances injured Allstate because Countrywide became unable to satisfy contingent creditor claims because it was rendered insolvent by the fraudulent conveyances and/or the remaining value of Countrywide's assets was so diminished that Countrywide no longer held sufficient assets to satisfy contingent creditor claims.

475.   Accordingly, by virtue of the conduct alleged herein, Allstate is entitled to relief under the law of fraudulent conveyance because the assets and shares transferred in the LD1 and LD100 Transactions were fraudulently conveyed by the Bank of America Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE Allstate prays for relief as follows:

An award of damages against Defendants in favor of Allstate against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including at a minimum:

a.   Rescission and recovery of the consideration paid for the Certificates, with interest thereon, pursuant to Allstate's Section 12(a)(2) claim;

b.   Allstate's monetary losses, including loss of market value and loss of principal and interest payments, on all other claims besides Allstate's Section 12(a)(2) claim;

c.   Attorneys' fees and costs;

d.   Prejudgment interest at the maximum legal rate; and

e.   Such other and further relief as the Court may deem just and proper.

1    In the alternative, Allstate demands rescission and recovery of the consideration
2    paid for the Certificates, with interest thereon.   Allstate is prepared to tender the
3    Certificates in the event the Court grants such relief.

### JURY TRIAL DEMANDED

4
5            Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a
6    trial by jury on all issues triable by jury.
7

8    DATED:  Los Angeles, California            QUINN EMANUEL URQUHART &
9               November 10, 2010                      SULLIVAN, LLP

10

11                                                   By:  /s/ Jeremy D. Andersen
                                                          Daniel L. Brockett
12                                                        Marc L. Greenwald
                                                          David D. Burnett (*pro hac vice*)
13                                                        51 Madison Avenue, 22nd Floor
                                                          New York, New York   10010-1601
14                                                        Telephone:   (212) 849-7000
                                                          Fax:   (212) 849-7100
15                                                        danbrockett@quinnemanuel.com
                                                          marcgreenwald@quinnemanuel.com
16                                                        daveburnett@quinnemanuel.com

17                                                        Jeremy D. Andersen
                                                          865 South Figueroa Street, 10th Floor
18                                                        Los Angeles, California  90017-2543
                                                          Telephone:   (213) 443-3000
19                                                        Facsimile:   (213) 443-3100
                                                          jeremyandersen@quinnemanuel.com
20
                                                         *Attorneys for Plaintiffs Allstate*
21                                                       *Insurance Company, Allstate Life*
                                                         *Insurance Company, Allstate Life*
22                                                       *Insurance Company of New York,*
                                                         *and American Heritage Life*
23                                                       *Insurance Company*

24
25
26
27
28