LINK: 217

1

2

3

4

5

6

7

8  **UNITED STATES DISTRICT COURT**

9  **CENTRAL DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  ALLSTATE INSURANCE COMPANY, et al., | Case No. 2:11-CV-05236-MRP (MANx) |
| 13              Plaintiffs, | **ORDER RE BANK OF AMERICA DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** |
| 13        v. | |
| 14  COUNTRYWIDE FINANCIAL CORPORATION, et al., | |
| 16              Defendants. | |

17

18

19

20

21

22

23

24

25

26

27

28

# I.   INTRODUCTION & BACKGROUND

This securities action concerns residential mortgage-backed securities ("RMBS") purchased by Allstate Insurance Company, Allstate Life Insurance Company, Allstate Life Insurance Company of New York, and American Heritage Life Insurance Company (collectively "Allstate" or "Plaintiffs") in multiple offerings structured and sold by several of the defendants.  Generally, Allstate alleges that Countrywide Financial Corporation ("CFC" or "Countrywide"), three of its subsidiaries, four Countrywide-sponsored Special Purpose Vehicles, and a number of those entities' former officers and directors are liable to Allstate for misrepresentations regarding the quality of Countrywide-issued residential mortgage backed securities ("RMBS") that Allstate purchased between 2005 and 2007.  This motion concerns the sole issue of whether three of the defendants, Bank of America Corporation, NB Holdings Corporation, and BAC Home Loans Servicing, LP (collectively the "Bank of America Defendants"), should remain in the case.[1]

The Court assumes familiarity with Countrywide's business, the particular Countrywide-issued RMBS at issue in this case, the representations contained in the offering documents for those RMBS, Allstate's purchases of those RMBS, and the procedural history of this case.  A full background is available in the Court's prior ruling in this case, in which the Court granted in part and denied in part Defendants' motions to dismiss the Complaint.  *Allstate Ins. Co. v. Countrywide Fin. Corp.*, No. 2:11-CV-05236-MRP (MANx), 2011 WL 5067128 (C.D. Cal. Oct. 21, 2011) ("*Allstate I*").

---

[1] NB Holdings is a wholly owned subsidiary of Bank of America Corporation.  AC ¶ 31.  BAC Home Loans Servicing, LP is a limited partnership subsidiary of Bank of America Corporation.  AC ¶ 30.  The Court refers to Bank of America Corp. as Bank of America.

1         The present motion does not address primary liability, but rather whether

2    Bank of America, which acquired CFC in July 2008 through a reverse triangular

3    merger, can be held liable to Allstate.  The Court dismissed Bank of America Corp.

4    and NB Holdings Corp. in *Allstate I*, but granted leave to amend.  Plaintiffs filed

5    an Amended Complaint (the "AC"), which added BAC Home Loans Servicing, LP

6    as a defendant, added a theory of relief, and added several pages of factual and

7    narrative specificity.  The Bank of America Defendants moved to dismiss Counts

8    Nine, Ten, and Eleven of the AC as insufficient.  The Court agrees.  For the

9    reasons discussed herein, the Court **DISMISSES** Cause of Action Nine (Successor

10   and Vicarious Liability), Cause of Action Ten (Intentional Fraudulent

11   Conveyance), and Cause of Action Eleven (Constructive Fraudulent Conveyance).

12   Dismissal is **WITH PREJUDICE**.

13       **II.    HISTORY OF THE TRANSACTIONS**

14        On January 11, 2008, Bank of America announced that it would acquire

15   CFC in a stock-for-stock transaction valued at approximately $4.1 billion.  AC ¶

16   345.  The merger closed on July 1, 2008.  *Id.*  To effectuate the merger, Bank of

17   America formed a subsidiary called Red Oak Merger Corp.  *Id.*  CFC merged into

18   Red Oak Merger Corp., which immediately renamed itself Countrywide Financial

19   Corporation.  *Id.*  The end result of the merger was that, after July 1, 2008, CFC

20   was a wholly-owned subsidiary of Bank of America.  *Id.*  This process is known as

21   a reverse triangular merger.

22        The same week as the Red Oak Merger, Countrywide and various Bank of

23   America entities engaged in the first of two sets of asset sales.  This set of

24   transactions, referred to as the "LD1[2] Transactions" included:

25

26

27   _____

    [2] The "LD" prefix denotes the term Legal Day, and refers to the number of days

28   after the Red Oak Merger a transaction occurred.  Allstate refers to the first set of
     asset sales as the LD1 transactions and the Court adopts that nomenclature for

- Countrywide Home Loans sold a pool of residential mortgage loans to NB Holdings Corp. for $6.9 billion on July 1, 2008.  AC ¶ 360.
- Countrywide Home Loans novated a portfolio of derivative instruments to BANA, a Bank of America Corp. subsidiary, for $1.8 billion on July 1, 2008.  AC ¶ 361.
- Countrywide Home Loans sold its interests in Countrywide GP, LLC and Countrywide LP, LLC, which collectively owned a 100 percent equity interest in Countrywide Home Loans Servicing LP, in exchange for a $19.7 billion promissory note on July 2, 2008.  AC ¶ 362.
- Countrywide Securities sold a pool of asset-backed securities and mortgage-backed securities to Blue Ridge Investments, LLC, a subsidiary of Bank of America Corp. for $147 million on July 2, 2008.  AC ¶ 363.
- Countrywide Home Loans sold a pool of residential mortgage loans to NB Holdings Corp. for $2.5 billion on July 3, 2008.  AC ¶ 364.
- Countrywide Commercial Real Estate Finance, a subsidiary of CFC, sold a pool of commercial mortgage loans to NB Holdings Corp. for $238 million on July 2, 2008.  AC ¶ 365.

The LD1 transactions resulted in Countrywide receiving slightly more than $30 billion in cash and promissory notes.  AC ¶¶ 360–365.

In October 2008, Countrywide sought permission from the Office of the Comptroller of the Currency ("OCC") to sell the remainder of Countrywide Home Loans' assets to various Bank of America entities.  AC ¶ 368.  The OCC approved the sale on November 6, 2008, *id.*, and Countrywide engaged in a second set of

---

purposes of this Opinion.  The transactions actually occurred on Legal Days one through three, and are sometimes referred to by different names in other sources.

asset sales known as the LD100 transactions on November 7, 2008.  AC ¶ 370.
Those transactions included:

- Countrywide Home Loans sold "substantially all" the remaining
  assets used in Countrywide's mortgage business to Bank of America
  for a $1.76 billion promissory note.  AC ¶ 371.
- CFC sold its equity interest in Countrywide Bank, FSB to Bank of
  America for a $3.6 billion promissory note and the assumption of
  $16.6 billion in public debt.  AC ¶ 372.

Allstate alleges that the three transactions described above (the Red Oak
Merger, LD1, and LD100) make the Bank of America Defendants liable under
successor and vicarious liability theories.  AC ¶ 459.  Allstate further alleges that
the LD1 and LD100 transactions were either actual or constructive fraudulent
conveyances.  AC ¶¶ 461–475.

## III.   CHOICE OF LAW

Before embarking on a substantive analysis, the Court must determine which
law to apply to each of Allstate's claims.  The Court has already held that
Delaware law applies to Allstate's successor liability claims.  *Allstate I*, 2011 WL
5067128, at *4–6.  The Court now holds that Illinois law applies to Allstate's
fraudulent conveyance claims.

The case was transferred from the Southern District of New York pursuant
to 28 U.S.C. § 1404(a).  ECF No. 116.  The Court therefore applies the substantive
law, including choice-of-law rules, of New York to Allstate's state law claims.
*Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964) ("A change of venue under §
1404(a) generally should be, with respect to state law, but a change of
courtrooms."); *Newton*, 22 F.3d at 1459 (9th Cir. 1994) ("Because the case was
transferred under 28 U.S.C. § 1404(a) . . . we apply the choice-of-law rules of [the
transferor forum]").

1    New York choice of law requires the Court to first analyze whether a true

2    conflict exists.  *Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d 452, 492

3    (S.D.N.Y. 2001).  Illinois follows the Uniform Fraudulent Transfer Act ("UFTA"),

4    while New York follows the Uniform Fraudulent Conveyance Act ("UFCA").

5    N.Y. Debt. & Cred. Law Ch. 12, Art. 10; 740 Ill. Comp. Stat. § 160.  The UFCA

6    and UFTA are substantially similar, but they differ in a few respects.  The UFTA

7    specifically enumerates badges of fraud, whereas New York looks to the common

8    law.  740 Ill. Comp. Stat. § 160/5(b); *MFS/Sun Life Trust-High Yield Series v. Van*

9    *Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995).  The UFTA

10   requires a lack of "reasonably equivalent value" as an element of constructive

11   fraudulent transfer.  740 Ill. Comp. Stat. § 160/5(a)(2).  By contrast the UFCA

12   requires an absence of "fair consideration."  N.Y. Debt. & Cred. Law § 272(a).

13   "Fair consideration" is defined as requiring both "fair equivalent" value and "good

14   faith."  *Id.*  A true conflict therefore exists between Illinois and New York law.

15   *See also Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 426–27 (S.D.N.Y. 2006)

16   (conflict exists between the UFCA and UFTA).

17   When a true conflict does exist, New York employs an "interest analysis" to

18   apply the law of the jurisdiction "having the greatest interest in the litigation."

19   *Cromer Finance*, 137 F. Supp. 2d at 492 (citing *Curley v. AMR Corp.*, 153 F.3d 5,

20   12 (2d Cir. 1998)).  "[F]or claims based on fraud, a court's 'paramount' concern is

21   the locus of the fraud, that is, the place where the injury was inflicted, as opposed

22   to the place where the fraudulent act originated.  The place in which the injury is

23   deemed to have occurred is usually where the plaintiff is located."  *Id.* (citations

24   omitted).  *See also*, *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993) ("If

25   conflicting conduct-regulating laws are at issue, the law of the jurisdiction where

26   the tort occurred will generally apply because that jurisdiction has the greatest

27   interest in regulating behavior within its borders.").  Two out of the four plaintiffs

28   are incorporated in Illinois, and those two plaintiffs hold the vast majority of the

RMBS at issue in this case.  The Court therefore applies Illinois law to Allstate's fraudulent transfer claims.

## IV.    MOTION TO DISMISS STANDARD

A Rule 12(b)(6) motion to dismiss should be granted when, assuming the truth of the plaintiff's allegations, the complaint fails to state a claim for which relief can be granted.  *See Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).  In deciding whether the plaintiff has stated a claim, the Court must assume the plaintiff's allegations are true and draw all reasonable inferences in the plaintiff's favor.  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the Court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  A court reads the complaint as a whole, together with matters appropriate for judicial notice, rather than isolating allegations and taking them out of context.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).

## V.    DISCUSSION

Allstate alleges constructive fraudulent transfer, actual fraudulent transfer, assumption of liabilities, fraud, and de facto merger.  The elements of these causes of action are often related (or in the case of assumption of liabilities, inversely related).  The Court begins with fraudulent transfer.  Allstate's failure to plead the elements of fraudulent transfer, namely lack of reasonably equivalent consideration and fraudulent intent, is fatal to its fraud and de facto merger claims as well.  In the end, Allstate fails to plead any basis for successor liability.

### A.    ALLSTATE HAS NOT ADEQUATELY ALLEGED ANY FRAUDULENT TRANSFER

Illinois law provides two theories of fraudulent transfer–actual and constructive.  Actual fraudulent transfer occurs when the transferor acts with the "actual intent to hinder, delay or defraud any creditor."  740 Ill. Comp. Stat. §

7

160/5(a)(1).  Constructive fraudulent transfer occurs when (i) the transferor does not receive "reasonably equivalent value" in exchange for the transaction and (ii) the transferor is insolvent at the time of the transaction or knows that it will shortly become insolvent.  740 Ill. Comp. Stat. § 160/5(a)(2).  A transfer made with actual intent to hinder, delay, or defraud may be fraudulent even if the transferor received reasonably equivalent value.  *In re Spatz*, 222 B.R. 157, 167 (N.D. Ill. 1998) (fair consideration not a defense to actual fraudulent transfer claim).  When, as here, a plaintiff attempts to plead intent through circumstantial evidence or so-called badges of fraud, courts weigh the both the transferor's solvency and the adequacy of consideration in determining intent.  740 Ill. Comp. Stat. § 160/5(b)(8)–(9).  Though solvency and adequacy of consideration are only two of the eleven statutorily enumerated badges of fraud, they are among the most compelling; a transfer made by a solvent entity and for reasonably equivalent value would not normally be expected to disadvantage creditors.  The Court therefore begins its inquiry with constructive fraudulent transfer before moving on to the question of Countrywide's intent.

1.    *Constructive Fraudulent Transfer*

Constructive fraudulent transfer has two elements:  reasonably equivalent value and insolvency.  Because Allstate has failed to plead the first element, the Court does not reach the question of whether Countrywide was insolvent at the time of the transactions.

While Illinois courts have not conclusively defined "reasonably equivalent value," there are several factors that they frequently look to.  *In re Jumer's Castle Lodge, Inc.*, 329 B.R. 837, 843 (C.D. Ill. 2005).  These include (i) whether the value of what was transferred is equal to the value of what was received; (ii) the market value of what was transferred and received; (iii) whether the transaction took place at an arm's length; and (iv) the good faith of the transferee.  *Id.* (quoting *In re Roti*, 271 B.R. 281, 303 (Bankr. N.D. Ill. 2002)).  The Court may look to non-

monetary value such goodwill, increased ability to borrow capital, and the ability to pay present debts or to otherwise remain in business.  *In re Image Worldwide Ltd.*, 139 F.3d 574, 578–82 (7th Cir. 1998) (considering indirect benefits provided by intercorporate guarantees even though the transferor received no direct compensation).  "There is no fixed formula for determining reasonable equivalence, but will depend on all the facts of each case, an important element being fair market value."  *In re Roti*, 271 B.R. at 295.  The factors are somewhat interrelated in this case; Allstate's principle arguments for bad faith are that the transactions were not at arms' length and that the transactions were for inadequate consideration.  Opp. at 7–10, 15.

"Whether 'reasonably equivalent value' has been given is typically a question of fact."  *Wachovia Secs., LLC v. Neuhauser*, 528 F. Supp. 2d. 834, 859 (N.D. Ill. 2007).  However, a complaint must still "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  *Iqbal* and *Twombly* provide two working principles which guide courts in determining whether a claim is "plausible."  The first is that the Court should disregard legal conclusions and recitations of the legal elements of a claim.  *Iqbal*, 129 S. Ct. at 1949.  The second is that a complaint must plead something more than facts which are "consistent with" liability but also with non-culpable action.  *Twombly*, 550 U.S. at 556.  A claim is plausible when the plaintiff pleads facts which permit a "reasonable inference" of liability.  *Iqbal*, 129 S. Ct. at 1949.

Applying the first principle, the Court ignores sections of the AC that merely recite a legal conclusion and instead looks for facts that would support such a conclusion.  The following excerpts of the AC are legal conclusions and therefore irrelevant:

- "The Bank of America Defendants did not pay fair consideration . . . because the Consolidation Plan transactions were undertaken in bad faith and Bank of America did not pay fair consideration."  AC ¶ 342.

- "Bank of America did not pay fair consideration for these assets because the Consolidation Plan transactions were undertaken in bad faith with the intent to defraud or disadvantage certain of Countrywide's creditors and because Bank of America did not pay fair value for the assets."  AC ¶ 376.

- "[T]he prices paid by Bank of America for the individual assets in connection with the LD1 and LD100 Transactions were not for fair value. . . . In this case, Bank of America paid depressed prices relative to fair value for the individual assets and subsidiaries transferred in the LD1 and LD100 Transactions."  AC ¶ 377.

- "The prices Bank of America later paid to Countrywide for individual assets and subsidiaries in connection with the LD1 and LD100 Transactions reflected the steep discounts taken by Bank of America in the price paid to Countrywide's shareholders in the Red Oak Merger to account for Bank of America's estimations of Countrywide's exposure to contingent liabilities . . . [but] the Bank of America simultaneously attempted, through the Consolidation Plan, to acquire Countrywide's assets free of Countrywide's contingent liabilities."  AC ¶ 379.

- "Bank of America did not provide adequate consideration for the assets it received from Countrywide because the transactions were undertaken in bad faith and lacked fair value."  AC ¶ 387.

- "[I]n exchange for inadequate consideration, Bank of America intentionally rendered Countrywide insolvent and unable to satisfy creditors with contingent claims."  AC ¶ 387.

- "Bank of America's Consolidation plan also resulted in fraudulent conveyances of Countrywide's assets and subsidiaries to the Bank of America Defendants."  AC ¶ 429.
- "The assets and subsidiaries that were the subject of the LD1 and LD100 Transactions were fraudulently conveyed to the Bank of America Defendants because, as explained above, these transactions were made without fair consideration . . . and resulted in Countrywide becoming insolvent and/or unable to pay creditors with contingent claims."  AC ¶ 429.
- "[T]he LD1 and LD100 Transactions were not for fair consideration because the transactions were undertaken in bad faith and Bank of America did not pay reasonable or fair value for Countrywide's assets and subsidiaries."  AC ¶ 432.
- "[T]he prices Bank of America paid for Countrywide's assets and subsidiaries reflected steep discounts to account for Countrywide's exposure to contingent liabilities, including potential lawsuits and representation and warranty claims–the Bank paid just 27% of Countrywide's book value in the initial Red Oak Merger."  AC ¶ 433.
- "[T]he Bank of America Defendants [acquired] the assets and subsidiaries at discounted prices."

Each of the above allegations is a legal conclusion regarding the adequacy of consideration.  Some simply state the ultimate purported grounds for liability.  *E.g.* AC ¶ 429 ([T]he sales "resulted in fraudulent conveyances.").  Others attempt to prove the legal grounds for liability by stating an element in a conclusory fashion. *E.g.* AC ¶ 377 ("[T]he prices . . . were not for fair value.").  Yet others attempt to prove an element by reciting the legal factors that go into proving that element. *E.g.* AC ¶ 342 ("Defendants did not pay fair consideration . . . because the Consolidation Plan transactions were undertaken in bad faith and Bank of America

1  did not pay fair consideration.").  Most are maddeningly circular.  *Id.* ("Defendants

2  did not pay fair consideration . . . because . . . Bank of America did not pay fair

3  consideration.").

4       Recitation of the legal elements is permissible in a complaint; in fact it

5  frequently provides the parties and the Court with a helpful framework to

6  determine what facts the plaintiff must plead and what issues will be in dispute.

7  However, legal conclusions may not substitute for well-pleaded facts allowing the

8  Court to reasonably infer that those conclusions are true.  Such facts are noticeably

9  absent in the AC.  Once the legal conclusions are stripped away, the Court is left

10  with the rather bare description of the LD1 and LD100 transactions contained in

11  paragraphs 359–72.  Those paragraphs describe the assets that Countrywide sold

12  and their prices.  They do not contain any indication that any other market for these

13  assets existed, or what the assets' "true" market value was, or what the accounting

14  value of the assets was, or why the Court should disregard the very concrete

15  intangible benefit that proceeds from the asset sales were used to pay off debt,

16  increase working capital, and otherwise allow Countrywide to remain in business.

17       The only facts that Allstate is left with are (i) that Countrywide had $172

18  billion in assets before the asset sales (AC ¶ 382), (ii) that Countrywide had $10.7

19  billion in assets as of March 31, 2011 (AC ¶ 384), and (iii) that Countrywide sold

20  most of those assets in exchange for some $53 billion in consideration (AC ¶¶

21  359–72).[3]  Allstate makes much of the sizeable difference between $172 billion

22  and $10.7 billion, and remarks upon the fact that Countrywide's remaining assets

23  do not generate revenue.

24       Taking these facts as true and making all reasonable inferences in favor of

25  Allstate, these facts are consistent with liability.  However, they are equally

26

27  [3] When pressed at oral argument, Allstate's counsel reiterated the same three facts

28  while emphasizing that Countrywide had lost all of its revenue-generating assets.
Tr. at 32.

12

1    consistent with non-culpable behavior.  It is a core principle of corporate finance

2    that a revenue-producing asset may be reduced to its net present value and sold for

3    cash.  The fact of the sale and the fact that the transferor no longer has access to a

4    revenue stream say nothing about whether the consideration was adequate:

5    Countrywide would still be a "shell" devoid of operating entities and revenue

6    generation even if Bank of America had overpaid in the LD1 and LD100

7    transactions.

8           The other fact, a comparison of CFC's gross assets in 2008 and 2011, is

9    even less relevant.  First, the gross assets figure that Allstate cites refers to the total

10   assets of the entity, not the value of the specific assets that Countrywide sold in the

11   LD1 and LD100 transactions.[4]  Second and more importantly, assets make up only

12   half of a balance sheet; without reference to liabilities the Court has no way of

13   knowing whether creditors are worse off with Countrywide's present assets of

14   $10.7 billion than they would have been with gross assets of $172 billion set off

15   against Countrywide's 2008 liabilities.  Bank of America has introduced mountains

16   of accounting evidence purporting to show the former (i.e. that the gap between

17   $172 billion and $10.7 billion is explained by offsetting liabilities that Bank of

18   America assumed in the LD1 and LD100 transactions).  The accuracy of this

19   accounting data is subject to reasonable dispute, and so the Court declines to take

20   judicial notice of it for that purpose.  *United States v. Corinthian College*, 655 F.3d

21   984, 999 (9th Cir. 2011).   But Bank of America need not win for Allstate to lose.

22   The question on a motion to dismiss is whether Allstate has alleged any facts to

23   create a plausible inference of liability.  Allstate has alleged no fact from which the

24

25   [4] Allstate makes a plausible argument that, because the LD1 and LD100

26   transactions involved nearly all of Countrywide's assets, Allstate can show lack of
      reasonably equivalent value in the component transactions by showing the

27   dimunition in assets of the entity.  Because Allstate has failed to plausibly plead a
      dimunition in value of the entity, the Court declines to address whether this *res*

28   *ipsa locutor*-style pleading is appropriate.

1    Court could reasonably infer that Bank of America paid less than reasonably

2    equivalent consideration.  The supporting facts alleged by Allstate could have been

3    true either way—exactly the sort of consistent-with-liability-but-not-probative-

4    thereof facts that *Twombly* held may not support a claim.  *Twombly*, 550 U.S. at

5    556.  Allstate's claim for constructive fraudulent conveyance must be dismissed.

6    *2.     Actual Fraudulent Transfer*

7            Actual fraudulent transfer is a misnomer; the statute prioritizes intent of the

8    transferor rather than the actual effects of the transfer.  740 Ill. Comp. Stat. §

9    160/5(a)(1) provides that a transfer is fraudulent if made "with actual intent to

10   hinder, delay, or defraud any creditor of the debtor."  This standard applies

11   irrespective of whether the transferor received adequate consideration or was

12   insolvent at the time of the transfer.  *In re Spatz*, 222 B.R. 157, 167–170 (N.D. Ill.

13   1998) (fair consideration not a defense to actual fraudulent transfer claim).  Nor

14   does it matter that a claim is contingent and has not yet been reduced to judgment.

15   740 Ill. Comp. Stat. § 160/2(c).  Because actual intent is difficult to prove, courts

16   frequently look to "badges" of fraud.  *In re Edgewater Med. Ctr.*, 373 B.R. 845,

17   855 (Bkrtcy. N.D. Ill. 2007).  Illinois has codified these badges in its fraudulent

18   transfer statute.  They include whether:

19           (1) the transfer or obligation was to an insider;

20           (2) the debtor retained possession or control of the property transferred after

21   the transfer;

22           (3) the transfer or obligation was disclosed or concealed;

23           (4) before the transfer was made or obligation was incurred, the debtor had

24   been sued or threatened with suit;

25           (5) the transfer was of substantially all the debtor's assets;

26           (6) the debtor absconded;

27           (7) the debtor removed or concealed assets;

28

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

740 Ill. Comp. Stat. § 160/5(b).

There is no serious argument that badges two, three, six, seven, or eleven are present in this case.  The Court held above that Allstate has not alleged any fact that would permit an inference that Countrywide received less-than-adequate consideration.  Badge eight is therefore absent as well.

Badges four, nine, and ten are interrelated.  Allstate argues that each is present because of Countrywide's allegedly massive contingent litigation liabilities.  Opp. at 17.  Bank of America counters that those contingencies are overstated, and that they were in any event not apparent at the time of the LD1 and LD100 transactions.  While RMBS cases had been filed against Countrywide as early as November 2007,[5] the majority of RMBS cases, including this action, were not filed until 2010.  As before, the Court strips out speculation, legal conclusions, and recitations of the elements.  *Iqbal*, 129 S. Ct. at 1949.

Few facts support the presence of badges four, nine, or ten once the Court strips out conclusions like "Countrywide . . . [had] massive understated contingent liabilities," AC ¶ 382, "Counrrywide was left unable to satisfy liabilities to known and anticipated creditors," AC ¶ 387, "Countrywide was facing and/or threatened

---

[5] *Luther v. Countrywide Home Loans Servicing LP*, No. BC 380698 (Cal. Super. Ct. Nov. 14, 2007.

1    by significant legal liabilities," AC ¶ 431, "Countrywide Financial and its

2    remaining subsidiaries were rendered insolvent by the conveyance," AC ¶ 435,

3    "the value of Countrywide's remaining assets was insufficient to pay known and

4    anticipated claims by contingent creditors," *id.*, and "Countrywide Financial

5    intended or believed at the time of the LD1 and LD100 Transactions that it would

6    incur debts to contingent creditors beyond its ability to pay them as they matured."

7    AC ¶ 436.

8         Allstate argues that massive contingent litigation liability rendered

9    Countrywide insolvent at the time LD1 and LD100 transactions.  To evaluate that

10   claim, the Court needs facts that would allow it to assess the scope of

11   Countrywide's RMBS exposure and plaintiffs' likelihood of success in those suits.

12   Allstate provides none.[6]  As stated above, most RMBS suits were not filed until

13   2010 or 2011.  Allstate pleads no facts that should have alerted Bank of America

14   that a wave of such suits was on the horizon, much less that those suits would have

15   been successful.[7]  The one piece of evidence that Allstate could point to is the

16

17   _____

18   [6] The statements that Allstate identifies in ¶¶ 378 and 410–15 do not aid its cause.

19   Those statements are all variations on Bank of America's public statement that it
     "[is] aware of the claims and potential claims against [Countrywide]."  AC ¶ 378.

20   These statements do not identify those claims with any specificity.  There is

21   therefore no indication either that Bank of America was referring to RMBS claims
     or that Bank of America thought that those claims were on a scale sufficient to

22   bankrupt Countrywide.

23   [7] The Court does not mean to imply, of course, that Allstate must prove

24   Countrywide's liability in all RMBS cases globally in order to show its insolvency
     and therefore recover from Bank of America in this particular case.  But, Allstate

25   must go further than describing Countrywide's contingent liabilities as "massive,"
     it must provide some facts that justify such a descriptor.  The Court recognizes that

26   this is a difficult burden at the pleading stage, but that difficulty is a necessary

27   byproduct of the fact that Allstate asks the Court to imagine more than $10.7

28   billion worth of liabilities that appear on no balance sheet and have not come to
     pass in the years since the LD1 and LD100 transactions.  The difficulty is

*Luther* complaint.  That complaint was filed in 2007, and it is incorporated by reference into the AC in reference to Allstate's tolling argument.  AC ¶¶ 438–450. Standing alone, the 2007 version of the Luther complaint is insufficient to create any inference that Countrywide was insolvent at the time of the LD1 and LD100 transactions.  The Luther plaintiffs did not have standing to pursue many of the claims that they asserted, and plaintiffs have provided no facts from which the Court could adequately assess the Luther plaintiffs' likelihood of success.

On the contrary, Allstate's insolvency argument is refuted by two facts that Allstate explicitly pleads in the AC.  First, Allstate alleges that Bank of America paid 27% of Countrywide's book value in the initial Red Oak Merger.  AC ¶ 433. This discount was purportedly to "account for Countrywide's exposure to contingent liabilities, including potential lawsuits."  The AC does not specify whether this 27% of book value represents the $4.1 billion that Bank of America initially agreed to or the merger's $2.8 billion value at closing on July 1, 2008, but it is irrelevant.  By this statement Allstate admits that Countrywide had a positive book value (assets less liabilities) at the time of the Red Oak Merger and that, even accounting for contingent liabilities, Bank of America believed that Countrywide had more assets than liabilities.  Second, Allstate admits that Countrywide still exists as a company and retains assets of $10.7 billion.  AC ¶ 384.  The legal system is certainly slow, and scores of cases remain pending.  Nevertheless, Countrywide still exists four years later with arguably greater *net* assets than it had in 2008.  This provides an ex-post indication, however weak, that Countrywide was not insolvent at the time of the LD1 and LD100 transactions.  The Court therefore finds that badges nine and ten are absent in this case.  Badge four is arguably present because of *Luther*, but the Court assigns it minimal weight.

_____

compounded by the technical complexity of RMBS suits and the fact that many claims are now time-barred.  *E.g. Allstate I.*

1    The AC adequately pleads that the transfers were to insiders and that the

2    transactions comprised substantially all of Countrywide's assets.  Badges two and

3    five are therefore present.  The question is whether these two badges of fraud,

4    standing with the *de minimis* presence of badge four, support a claim under Illinois

5    law.

6    Illinois courts take a flexible approach to interpreting the badges of fraud.

7    The badges are not additive, but rather must be viewed holistically.  *Brandon v.*

8    *Anasthesia & Pain Mgmt. Assoc., Ltd.*, 419 F.3d 594, 600 (7th Cir. 2005).  Even

9    one badge might suffice if it were sufficiently probative of intent to disadvantage

10   creditors.  *Id.* (the fact that a debtor absconded, or that a debtor transferred assets to

11   a lienor who then transferred them to an insider, might be sufficient by themselves

12   to allege actual fraudulent transfer).[8]  In the same way, "proof of some, or even

13   all," of the badges may not show intent.  *Lindholm v. Holtz*, 221 Ill. App. 3d 330,

14   334 (2d Dist. 1991).  *See also In re Zeigler*, 320 B.R. 362, 378 (Bankr. N.D. Ill.

15   2005) (six factors insufficient to give rise to inference of actual intent when none

16   of the six factors contradict an alternative innocent explanation for the transfers).

17   It all depends on the circumstances.

18   *In re Zeigler*, mentioned above, is particularly applicable to this case.  There,

19   the court held that six badges of fraud were present.  *In re Zeigler*, 320 B.R. at 378.

20   These included the two badges present in this case, a transfer to an insider and a

---

22   [8] Other courts have stated, typically in dicta, that one or two badges are not,

23   standing alone, enough to state a case for actual fraudulent transfer.  *E.g. Grede v.*

24   *Bank of N.Y. Mellon*, 441 B.R. 864, 881 (N.D. Ill. 2010) ("Although a single badge of fraud is, in and of itself, insufficient to establish the requisite intent, the presence

25   of several badges of fraud 'may create a presumption of fraudulent intent[.]'")

26   (citing *Leibowitz v. Imsorn*, No. 02 cv 4465, 2003 WL 21785620, at *2 (N.D.Ill. Aug. 1, 2003)).  The statute defines the badges as items that a court may consider.

27   740 Ill. Comp. Stat. § 160/5(b).  The Court agrees with the *Brandon* and *Lindholm*

28   courts that the number of badges matters much less than the strength of the inference that those indicia permit.

1    transfer of substantially all the debtor's assets.  *Id.*  Nevertheless, the *Zeigler* court
2    made a directed finding of no actual fraudulent transfer.  The defendant had
3    provided a plausible explanation of its motives for the transfer that explained the
4    presence of the six badges of fraud.  The court found that the six badges were
5    consistent both with a plausible innocent explanation of the transfer and with
6    actual intent to defraud.  *Id.*  In this scenario, even six badges of fraud raise no
7    inference of liability.  The badges were explained by an alternate justification, and
8    so the *Zeigler* court found no basis to impose liability.

9          The Court performs the same analysis and reaches the same result in this
10   case.  It is a matter of public record that the Red Oak Merger triggered the
11   acceleration of many of CFC's debts.  *E.g.* CFC, Current Report (Form 8-K) (Aug.
12   16, 2007), Ex. 99.1, §§ 6.03, Art. 7(d) (Ex. 9 at 310–313).  Bank of America has
13   argued that the LD1 and LD100 transactions were designed to keep the
14   Countrywide businesses within the Bank of America family while providing CFC
15   with the liquidity necessary to pay those debts when they came due.  Mot. at 7;
16   Reply at 12.  This is a reasonable justification that would explain why the sales
17   were to insiders and of substantially all of Countrywide's assets.  Returning to
18   *Iqbal* and *Twombly*, the two badges of fraud that Allstate pleads are consistent both
19   with liability and with an innocent explanation.  Allstate has not pleaded any facts
20   that tip its allegations from "consistent with liability" to plausible, and therefore
21   the actual fraudulent transfer claims must be dismissed.  The Court therefore
22   **GRANTS** the motion to dismiss Allstate's fraudulent transfer claims.  Dismissal is
23   **WITH PREJUDICE**.

24   **B.    ALLSTATE HAS NOT ADEQUATELY ALLEGED ASSUMPTION OF LIABILITIES**

25         An exception to the well-settled rule against successor liability is triggered
26   when the "purchaser expressly or implicitly agrees to assume liability."  *Raytech*
27   *Corp. v. White*, 54 F.3d 187, 192 n.6 (3d Cir. 1995).  Nothing in the AC indicates
28   that Bank of America has expressly or implicitly agreed to assume Countrywide's

RMBS liability.  Allstate proffers ¶¶ 413–26 as evidence of assumption.  Opp. at 25.  The Court is baffled at this claim.  Paragraphs 413–14, read charitably to Allstate, reflect Bank of America acknowledging that Countrywide, *its subsidiary*, faces losses and liabilities.  Paragraphs 415–16 are statements to the effect that Bank of America will "pay for the things that Countrywide did" and will "act responsibly."  Those statements could be read to mean that Bank of America will cause Countrywide, its corporate subsidiary, to pay its debts and act responsibly.  They could also be read to mean that Bank of America will pay some of Countrywide's debts but not others.  Even read in the manner most favorable to Allstate, the statements reflect a present intent by Bank of America to voluntarily pay Countrywide's liabilities.  Bank of America cites no precedent for conflating a present intent to voluntarily pay the debts of another with a legal assumption of those debts.

Paragraphs 417–18 indicate that Bank of America has increased its reserves to cover representation and warranty claims.  It is not clear from the AC that these increases have anything to do with Countrywide as opposed to Bank of America's other businesses.  As noted later in the AC, Bank of America may now be liable for certain representation and warranty claims by virtue of the fact that its subsidiary BAC Home Loans Servicing is now the Master Servicer to many RMBS.  AC ¶ 426.  In any event, it is paradoxical and unwarranted to use the fact that a company has taken a litigation reserve expense as proof of the company's liability.  Paragraphs 419–25 relate to the fact that Bank of America has voluntarily paid to settle several cases against Countrywide and its former officers and directors.  The fact that Bank of America has voluntarily paid certain debts of Countrywide does not mean that it was legally obligated to pay them, nor that it is legally obligated to pay others.  *Allstate I*, 2011 WL 5067128, at *23–24.  Paragraph 426 directly contradicts Allstate's argument, as it explains why Bank of

1   America is *directly* liable to Bank of New York Mellon for certain indemnification

2   claims.

3       Allstate has not adequately alleged assumption of liabilities, express or

4   implied.  The Court therefore **GRANTS** the motion to dismiss that portion of the

5   AC.  Dismissal is **WITH PREJUDICE**.

6   **C.   THE BANK OF AMERICA DEFENDANTS ARE NOT LIABLE AS**

7       **COUNTRYWIDE'S SUCCESSOR**

8       Allstate alleges that Bank of America is liable by virtue of a *de facto* merger

9   between Bank of America and Countrywide.[9]  Delaware uses the doctrine of *de*

10  *facto* merger sparingly, "only in very limited contexts."  *Binder v. Bristol-Myers*

11  *Squibb, Co.*, 184 F. Supp. 2d 762, 769 (N.D. Ill. 2001).  The Court has previously

12  analyzed Delaware law and determined that the following four factors govern

13  whether a plaintiff has adequately alleged *de facto* merger under Delaware law:  (i)

14  was adequate consideration received and held by the transferor corporation in

15  exchange for the assets that were transferred; (ii) did the asset transfer comply with

16  the statute governing such an asset sale; (iii) were creditors or stockholders injured

17  by a failure to comply with the statute governing an asset sale; and (iv) was the

18  sale designed to disadvantage shareholders or creditors?  *Maine State Ret. Sys. v.*

19  *Countrywide Fin. Corp.*, No. 2:10-CV-0302 MRP (MANx), 2011 WL 1765509, at

20  *7 (C.D. Cal. Apr. 20, 2011).

21      Allstate has been somewhat reluctant to specify which transaction, in

22  particular, constitutes a *de facto* merger.  The Court considers four possibilities: (i)

23  the Red Oak Merger standing alone, (ii) the LD1 transaction standing alone, (iii)

24

25

26  _____

27  [9] Allstate also alleges that Countrywide is liable by virtue of the fraud exception.
    Opp. at 19.  Allstate relies entirely on the already-dismissed fraudulent transfer
    claims to support its fraud allegation.  *Id.*  The Court therefore dismisses the fraud

28  allegations for the same reasons set out in Section V.A.2 above.

the LD100 transaction standing alone, and (iv) the three transactions together. For none of the permutations has Allstate pleaded a *de facto* merger.

When the Red Oak merger was first announced, several shareholders filed suit to block the merger. The Delaware Chancery Court, after months of discovery and prodigious briefing, issued an order finding no evidence that the price was unfair. *In re Countrywide Corp. S'Holders Litig.*, C.A. No. 2464-VCN, 2009 WL 2595739, *3 (Del. Ch. Aug. 24, 2009). Allstate has never contended that the Red Oak Merger failed to comply with applicable Delaware statutes, and no court has ever so-found. Finally, Countrywide retained all of its assets in the Red Oak Merger. It is therefore difficult to see how creditors could have been harmed by the Red Oak Merger standing alone.

The Court discusses the LD1 and LD100 transactions in greater detail above. To summarize, Allstate has pleaded no facts from which the Court could infer that the compensation in the LD1 and LD100 transactions was not reasonably equivalent.[10] Neither has Allstate pleaded any facts from which the Court could infer that the transactions were designed to disadvantage creditors. Allstate claims that the asset sales violated both Delaware's version of the UFTA and Section 271 of the Delaware General Corporation Law. Opp. at 23. Allstate has failed to allege any violation of the Delaware UFTA for the same reasons that it failed to allege any violation of the Illinois UFTA. *See* Section V.A, *supra*. Allstate's argument regarding Section 271 must similarly be dismissed. Section 271 explicitly permits an asset sale by written consent. Del. Gen. Corp. L. § 271. To prove that the directors violated their fiduciary duty, Allstate would need to show

---

[10] The legal standard is even more stringent for purposes of Delaware *de facto* merger law. The failure to plead lack of reasonable equivalence necessarily includes the failure to plead lack of "adequate" consideration.

that the consideration was unfair.[11]  *Abelow v. Symonds*, 184 A.2d 173, 176 (Del. Ch. 1962) (Transaction permitted under Section 271 must be approved unless it is "legally unfair.").  Though the terminology is somewhat different ("legally unfair" as opposed to lack of "reasonably equivalent value"), this claim fails for the same reason that the Court dismissed Allstate's constructive fraudulent transfer claim. There are simply no facts from which the Court could draw an inference that the consideration was unfair.

Finally, Allstate alleges that the three transactions should be collapsed into one because they were "part of a single integrated plan to defraud."  ¶ 337.  In general, Delaware follows the doctrine of independent legal significance.  *Hariton v. Arco Electronics, Inc.*, 188 A.2d 123, 125 (Del. 1963) (Asset sale followed by dissolution not a *de facto* merger, even though it had the same effect as a merger, because the two steps are legally independent.).  Allstate argues that *In re Hechinger Inv. Co. of Delaware* stands for the proposition that the Court should collapse the transactions based on the "knowledge and intent of the parties involved in the transactions."  274 B.R. 71, 91 (D. Del. 2002) (citing *Wieboldt Stores v. Schottenstein*, 94 B.R. 488, 502 (N.D. Ill. 1988).  A related line of cases supports collapsing multi-step leveraged buyout ("LBO") transactions when they are part of "one integrated transaction."  *In re Tribune Co.*, No. 08-13141 (KJC), 2011 WL 5142420, *24 (Bankr. D. Del. Oct. 31, 2011).[12]

---

[11] The parties vigorously dispute whether CFC's directors owed any fiduciary duty to a creditor such as Allstate at all.  Delaware law is clear that directors owe a fiduciary duty only to the corporation and its shareholders.  *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007).  Nevertheless, when a corporation is in the zone of insolvency, a creditor may protect its interests by bringing a derivative action.  *Id.*  The Court need not address this issue.  *De facto* merger law questions whether a law was violated, not whether a particular plaintiff would have had standing to bring suit.
[12] None of Allstate's cases arise in the *de facto* merger context.  *In re Hechinger* and *In re Tribune* both involve the question of whether the later stages of an LBO

1    Allstate alleged neither that the three transactions were undertaken with

2    fraudulent intent nor that they are actually part of one integrated transaction.  First,

3    the Red Oak Merger left the assets of Countrywide untouched—the asset sales are

4    the transactions that arguably "stripped" Countrywide and left the creditors without

5    recourse.  Allstate argues that Bank of America acquired control in the Red Oak

6    Merger in order to later strip out the assets in the LD1 and LD100 transactions.[13]

7    If Allstate had any evidence of such fraudulent intent, it would have easily met its

8    burden to plead an actual fraudulent transfer with respect to the asset sales.

9    Allstate failed to plead facts from which the Court could infer an intent to

10   disadvantage or defraud creditors with respect to the asset sales.  S*upra* section

11   V.A.2.  Since the asset sales are the only transactions that could have

12   disadvantaged creditors, Allstate has similarly failed to plead an integrated plan to

13   disadvantage creditors.

14

15   rendered the debtor insolvent at the time of the first step.  *In re Hechinger*, 274

16   B.R. at 91; *In re Tribune*, 2011 WL 5142420, at *24.  It is not clear that the LBO

17   cases provide a ready analogy to a reverse triangular merger followed by asset sale.
     The initial stage of an LBO is financed, albeit indirectly, by the debt that the target

18   takes on in the later stages of the LBO.  The steps of the transaction are therefore

19   more closely related than in the present transaction.  Because the steps of an LBO
     are so closely related, a court could reasonably find that, when step one leads

20   inexorably to step two (which renders the target insolvent), the target is actually

21   insolvent as of step one.  Much of this analysis is peculiar to the question of
     insolvency in the LBO context.  It is worth noting, for example, that *In re Tribune*

22   did not even consider collapsing the transactions for purposes of determining

23   whether reasonably equivalent value had been paid.  *In re Tribune*, 2011 WL
     5142420, at *22.  The Court will assume, *arguendo*, that the tests laid out in *In re*

24   *Hechinger* and *In re Tribune* could apply in this case.

25   [13] Allstate acknowledged as much at oral argument:
     The Court:  So you're not looking at the Red Oak transaction?

26   Mr. Greenwald:  It's not relevant. And whether the Red Oak transaction, in and of

27   itself, was for the creditors has no relevance here. The Red Oak transaction is only
     relevant because it gave them control of the board of the Countrywide entity that

28   then approved these transactions which were in bad faith.  Tr. at 35.

Second, assuming that *In re Tribune* applies, Delaware would use a three-factor test to determine whether a multi-step process is actually "one integrated transaction." *In re Tribune*, 2011 WL 5142420, at *24.  Those factors are: (i) whether all of the parties involved had knowledge of the multiple transactions, (ii) whether each transaction would have occurred on its own, and (iii) whether each transaction was dependent or conditioned on other transactions.  *Id.*  Allstate has alleged the first factor by virtue of its allegations that Bank of America was planning the asset sales at the time of the Red Oak Merger.  AC ¶¶ 337, 340, 344, 346–56.  Factor two is arguably present.  Bank of America knew that the Red Oak Merger would trigger numerous debt covenants.  It is therefore unlikely that Bank of America would have purchased Countrywide without a plan for Countrywide to free up the billions of dollars necessary to meet its newly accelerated debt obligations.  Just as in the *Tribune* case, however, factor three is not present.  The merger was not contingent on the asset sales, nor vice versa.  Just as in *Tribune*, several of the asset sales required third-party approval.  "Because there was uncertainty created by the conditions precedent to Step Two [here the LD100 transactions], the parties ensured that the Step One [here the Red Oak Merger] transaction could stand on its own." *In re Tribune Co.*, 2011 WL 5142420.  For that reason, it is inappropriate to collapse the three transactions.

Finally, the Court notes that, even if the Court were to collapse the transactions, Allstate still would not have pleaded any of the factors in the Court's *de facto* merger analysis.  The asset sales are the only portions of the combined transaction that could have injured Allstate directly.  Allstate's failure to plead either the lack of reasonably equivalent value or fraudulent intent with respect to the asset sales therefore forecloses factors one and four.  Factors two and three are foreclosed because Allstate still would not have alleged that the transactions violated any law.  The Court therefore **GRANTS** the motion to dismiss Allstate's successor liability claims.  Dismissal is **WITH PREJUDICE**.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VI.    CONCLUSION

For the reasons discussed above, Counts nine, ten, and eleven are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

DATED:  February 02, 2012

Hon. Mariana R. Pfaelzer

United States District Judge